# ATTACHMENT 1

# CHEESWRIGHTS

### SCRIVENER NOTARIES | LLP

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **ANDREW JONATHAN CLAUDET** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY the genuineness of the signature of **DANIELLA ISABEL HORTON** subscribed to the certificate hereunto annexed marked "A", such signature being in the own, true and proper handwriting of the said Daniella Isabel Horton, honorary secretary of **THE LONDON MARITIME ARBITRATORS ASSOCIATION** of London, England;

AND I DO FURTHER CERTIFY the genuineness of the impression of the seal of **THE LONDON MARITIME ARBITRATORS ASSOCIATION** aforesaid, affixed to the said certificate.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this tenth day of July in the year two thousand and nineteen.



Regulated by the Faculty Office of the Archbishop of Canterbury

Bankside House, 107 Leadenhall Street, London, EC3A 4AF
tel 020 7623 9477   email notary@cheeswrights.co.uk
www.cheeswrights.co.uk

Canary Wharf office tel 020 7712 1565

Cheeswrights LLP is a limited liability partnership incorporated in
England and Wales with registered number OC426084



International
Union
of Notaries



SCRIVENER
NOTARIES

| | |
|---|---|
| **APOSTILLE**<br>(Convention de La Haye du 5 octobre 1961) | |

| 1. | **Country:**<br>Pays / Pais: | United Kingdom of Great Britain and Northern Ireland |
|---|---|---|

| **This public document**<br>Le présent acte public / El presente documento público | |
|---|---|

| 2. | **Has been signed by**<br>a été signé par<br>ha sido firmado por | Andrew Jonathan Claudet |
|---|---|---|
| 3. | **Acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public |
| 4. | **Bears the seal / stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | The Said Notary Public |

| **Certified**<br>Attesté / Certificado | |
|---|---|

| 5. | **at**<br>á / en | London | 6. | **the**<br>le / el día | 10 July 2019 |
|---|---|---|---|---|---|
| 7. | **by**<br>par / por | Her Majesty's Principal Secretary of State<br>for Foreign and Commonwealth Affairs | | | |
| 8. | **Number**<br>sous no / bajo el numero | APO-1546496 | | | |

| 9. | **Seal / stamp**<br>Sceau / timbre<br>Sello / timbre | 10. | **Signature**<br>Signature<br>Firma | A. Khan |
|---|---|---|---|---|

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country

**To verify this apostille go to www.verifyapostille.service.gov.uk**



# LMAA

**THE LONDON MARITIME ARBITRATORS ASSOCIATION**

The Baltic Exchange  |  38 St. Mary Axe  |  LONDON EC3A 8BH

"A"

## <u>CERTIFICATE</u>

8 July 2019

*TO WHOM IT MAY CONCERN*

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>
<u>AND</u>
<u>IN THE MATTER OF AN ARBITRATION</u>

BETWEEN

### CORPORATIVO GRUPO R S.A. DE C.V.

**Claimant (Buyer)**

and

### SHANARA MARITIME INTERNATIONAL S.A.

**Respondent (Seller)**

### "CABALLO MARANGO"

### MEMORANDUM OF AGREEMENT 21 MARCH 2014

## <u>FINAL ARBITRATION AWARD</u>

*I, Daniella Horton, being the Honorary Secretary of the London Maritime Arbitrators Association, hereby certify that the Award dated 30 May 2019 and Reasons for and forming part of the Final Arbitration Award annexed hereto are the original Award and the original Reasons made in this reference and issued by Ms Sarra Kay and Mr Simon Gault, both being Full Members of the LMAA, and Mr David Lucas, being a Supporting Member of the LMAA. I further certify that the signatures to the original Award and original Reasons are the authentic signatures of Ms Kay, Mr Gault, and Mr Lucas.*

Yours sincerely,

**Daniella Horton**
Honorary Secretary

Telephone: +44 (0)20 7283 7701  |  Facsimile: +44 (0)20 7283 7702  |  E-mail: info@lmaa.london
Website: www.lmaa.london





<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>

<u>**AND**</u>

<u>**IN THE MATTER OF AN ARBITRATION**</u>

**B E T W E E N:**

**CORPORATIVO GRUPO R S.A. DE C.V.**

Claimant (Buyer)

**- and –**

**SHANARA MARITIME INTERNATIONAL S.A.**

Respondent (Seller)

**"CABALLO MARANGO"**

**MEMORANDUM OF AGREEMENT 21 MARCH 2014**

---

**FINAL ARBITRATION AWARD**

---

1.    The Claimant ("**Grupo R**") is a company incorporated in Mexico.

2.    The Respondent ("**Shanara**") is a company incorporated in Panama.  It was at all relevant times the owner of the offshore support vessel "CABALLO MARANGO" (the "**Vessel**").

3.    By a Memorandum of Agreement (the "**MOA**") dated 21 March 2014, Shanara agreed to sell and Grupo R agreed to buy the Vessel.  Grupo R paid to Shanara a deposit of US$5,000,000 (the "**Deposit**").  The Vessel was never delivered and Grupo R claimed back the Deposit.  Shanara did not return the Deposit and disputes have arisen under the MOA.

4.    The MOA contains an arbitration agreement, cl.16, which reads as follows:

1

*Law and Arbitration*

*This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.*

*The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration Proceedings are commenced.*

*The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such an appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both Parties as if the sole arbitrator had been appointed by agreement.*

*…*

5.    On 9 July 2015 Grupo R appointed Ms Sarra Kay as their arbitrator. On 24 July 2015, Shanara appointed Mr Simon Gault as their arbitrator. On 1 March 2019, Ms Kay and Mr Gault appointed Mr David Lucas as third arbitrator and chairman of the Tribunal.

6.    The seat of this arbitration is London.

7.    A hearing took place in London on 7-9 May 2019, at which both parties were represented by counsel and solicitors.

8.    The tribunal having carefully considered all the parties' submissions, both written and oral, and all the documentary evidence and other materials submitted to them, and having conferred and found themselves to be in agreement with one another, for the reasons set out in the accompanying Reasons which are to be read with and form part of this award, **DO MAKE, ISSUE AND PUBLISH THIS OUR UNANIMOUS AWARD**, as follows.

9.    **WE AWARD AND DECLARE AS FOLLOWS:**

(A)    That Shanara shall forthwith pay to Grupo R the amount of US$5,000,000 (five million United States Dollars), being the amount of the Deposit.

(B)   That interest shall be payable forthwith on the said amount of US$5,000,000 at the rate of 4.5% p.a., such interest to be compounded with quarterly rests, from 30 January 2015 until the date of payment.

(C)   That Shanara's Counterclaim for a declaration that it is entitled to retain the Deposit fails.

(D)   That cl. 13 of the MOA would preclude any entitlement of Shanara to damages.

(E)   That Shanara shall bear its own legal costs and shall pay Grupo R's legal costs in the reference on the basis for which section 63(5) of the Arbitration Act 1996 provides, such costs to be assessed by us if not agreed, and we expressly reserve our jurisdiction for that purpose.  Interest shall be payable thereon at the rate of 4.5% per annum with quarterly rests from the date of the date of the Award until payment.

(F)   That Shanara shall bear the fees of the Tribunal, which we quantify in the sum of £43,297.50, and if they have first been paid by Grupo R, such sum shall be refunded immediately and in full by Shanara together with interest thereon at the rate of 4.5% per annum with quarterly rests from the date of payment until the date of reimbursement.

(G)   That this our Final Award is final as to all matters determined herein but **WE HEREBY RESERVE** to ourselves jurisdiction to determine by further award or awards:

(i)      An assessment as to costs; and

(ii)     Quantification of Shanara's claim for damages in the event of our Award being successfully challenged.

**DATED and made in London** *30 / May /* **2019**

........................
**SARRA KAY**

........................
**SIMON GAULT**

........................
**DAVID LUCAS**

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**B E T W E E N:**

### CORPORATIVO GRUPO R S.A. DE C.V.

Claimant (Buyer)

**- and –**

### SHANARA MARITIME INTERNATIONAL S.A.

Respondent (Seller)

### "CABALLO MARANGO"

### MEMORANDUM OF AGREEMENT 21 MARCH 2014

---

### REASONS FOR AND FORMING PART
### OF THE FINAL ARBITRATION AWARD

---

**INTRODUCTION**

1.   The Claimant Corporativo Grupo R S.A. de C.V. ("**Grupo R**") in the arbitration to which these Reasons relate seeks repayment from the Respondent Shanara Maritime International S.A. ("**Shanara**") of a deposit of US$5 million plus interest paid under a Memorandum of Agreement (the "**MOA**") for the sale and purchase of the offshore support vessel "CABALLO MARANGO" ("**MARANGO**"), which was never delivered.  Shanara counterclaims for damages for repudiation and/or renunciation of the MOA and a declaration that it is entitled to retain the deposit. The arbitration has been run in parallel with an arbitration concerning another offshore support vessel, "CABALLO MAYA" ("**MAYA**") wherein the Claimant is also Grupo R and the Respondent is Marfield Limited Incorporated ("**Marfield**").

1

Unless the context indicates otherwise, we shall refer below to Shanara and Marfield together as the "**Sellers**".

2. The two arbitrations relating to MARANGO and MAYA (together, the "**Vessels**") are very closely related, with identical arguments being raised in each.  However, although the arbitrations have by agreement been held concurrently, they have not been consolidated and two separate Final Awards are being published.  Likewise, a separate set of Reasons has been prepared for each Award.  However, both sets of Reasons are substantially identical.

3. Grupo R originally also had a claim for compensation for loss and expense, but this has not been pursued.

4. At a certain stage, the Sellers indicated an intention to amend their counterclaims to include not only the claims for damages and declarations that they were entitled to retain the deposits on the Vessels (the "**Deposits**") but also claims arising out of alleged breaches by Grupo R of the arbitration agreements, but this also has not been pursued.

5. The arbitrators in the two arbitration proceedings are the same: Ms Sarra Kay (appointed by Grupo R on 9 July 2015), Mr Simon Gault (appointed by the Sellers on 24 July 2015) and Mr David Lucas (appointed as third arbitrator and chairman by Ms Kay and Mr Gault on 1 March 2019).

6. Upon his appointment, Mr Lucas provided the parties with a disclosure statement to the effect, *inter alia*, that until 31 December 2017 he had been a partner of Hill Dickinson LLP, the solicitors who took over the conduct of the arbitration on behalf of Grupo R from Campbell Johnston Clark on 19 October 2018.   No objection was taken by the parties.

7. The MOAs contain agreements providing for arbitration in London in accordance with the Arbitration Act 1996 and the LMAA Terms current at the time when the arbitration proceedings are commenced.  The arbitrations were commenced on 10 July 2015 and therefore the LMAA Terms 2012 are applicable thereto.

8.  The parties completed exchange of written Submissions by 27 November 2015 and exchanged Questionnaires in accordance with the LMAA Terms in January 2016.

9.  On 1 February 2016, the Tribunal (as then constituted) directed *inter alia* that quantification of the counterclaim be deferred and that the two arbitrations be heard concurrently.

10. Witness statements were prepared and signed in late 2016.  After that, the arbitrations advanced very slowly until the hearing, which took place during three days from 7 to 9 May 2019.  Grupo R were represented by Michael Coburn QC and the Sellers by Nigel Eaton QC.  Witness evidence was heard as described below.

## DRAMATIS PERSONAE

11. We list in this table the entities and individuals primarily featuring in the arbitration, together with their abbreviated names used below:

| Abbreviated name | Full name | Description |
|---|---|---|
| Coastline | Coastline Maritime Pte Ltd | A management company in Singapore, owned by Coastline Group Inc of Panama; entities within the group own Marfield and Shanara |
| Grupo R | Corporativo Grupo R S.A. de C.V. | The Claimants in both arbitrations. They operate a fleet of vessels involved in the offshore industry in the Gulf of Mexico |
| Marfield | Marfield Limited Incorporated | The Owners of MAYA[1] |
| Mr Garza | Mr José Ramiro Garza Vargas | Chief Executive of Grupo R based in Mexico City and a witness at the hearing |
| Mr Garza Senior | Mr José Ramiro Garza Cantu | President of Grupo R and father of Mr Garza |
| Mr Highlands | Mr David T Highlands | Operations Director of Coastline based in Singapore and a witness at the hearing |

---

[1] One feature of this case to which some time was devoted at the hearing was the allegedly somewhat obscure and convoluted legal position with regard to MAYA.  We do not propose to discuss it but would simply note that some references appeared in the documents before us to an MOA concluded on 18 March 2011 between Marfield and a company called GGM Shipping S.A. de C.V. ("**GGM**") for the sale of MAYA.  A deposit of $41M was apparently paid, but not the rest of the price of $130M and the MOA was terminated by Marfield on 18 November 2013.  It appears that there was, at the very least, some form of collaboration between GGM and OSA.  We also gathered that there was an arbitration between GGM and Marfield.  The circumstances surrounding the involvement of GGM were said to be somewhat murky but we regarded them as ultimately irrelevant to the issues before us.

3

| Mr Highlands Senior | Mr Terry Highlands | The General Manager of Coastline and father of Mr Highlands |
|---|---|---|
| Mr Maringer | Mr Steve Maringer | A broker at Clarksons Offshore New York who introduced the Sellers/Coastline to Grupo R |
| Mr Mohamed | Mr Raschid Mohamed Sánchez | Business Development Director of Grupo R based in Mexico City and a witness at the hearing |
| Mr Schulz | Mr Julian Schulz | A Project Manager at Coastline based at the relevant time in Mexico; he provided a signed witness statement but did not give evidence at the hearing: when cross-examined, Mr Highlands informed us that Mr Schulz was no longer an employee |
| OSA | Oceanografía S.A. de C.V. | A Mexican operator of offshore vessels owned by a Mr Amado Yanez and used by Pemex and bareboat charterers of the Vessels prior to the start of negotiations between the parties to these arbitrations |
| Pemex | Petróleos Mexicanos | The Mexican state-owned petroleum company which had contracted with OSA for the employment of the Vessels and to whom Grupo R intended to charter the Vessels |
| PGR | Procuraduría General de la República | The Mexican Attorney General's office and the authority responsible for investigating financial crimes |
| SAE | Servicio de Administración y Enajenación de Bienes | The Mexican authority responsible for the administration and control of assets in the possession of the state |
| Shanara | Shanara Maritime International S.A. | The Owners of MARANGO |

## DOCUMENTS

12.  The documentation placed before the Tribunal for the hearing was fairly extensive, running to more than 2,000 pages (admittedly, with an element of duplication), with the *inter-partes* correspondence alone running to almost 800 pages. The Tribunal did not attempt to review the entirety of the documentation, but did consider all documents referred to by the parties in their Submissions and Skeleton Arguments and during the course of the hearing.

## THE MOAs

13.  The MOAs for both Vessels were on the Norwegian Saleform 2012. They went through three iterations in circumstances which we describe in the chronology

4

below.  All three iterations bore the date 21 March 2014, even though only the first (the "**First Set**") came into existence and was signed and exchanged on that date[2]; the second (the "**Second Set**") came into existence and was signed and exchanged on or about 16 June 2014; and the third (the "**Third Set**") came into existence and was signed and exchanged on or about 16 July 2014.  The MOAs in the Third Set are the final and definitive contracts out of which our jurisdiction derives and on which the parties have based their submissions.  The terms of each of the MOAs in the Third Set are substantially the same as each other, save for the identity of each of the Sellers, the consideration (US$178M in the case of MARANGO and US$150M in the case of MAYA) and the Cancelling Date (5 October in the case of MARANGO and 10 October in the case of MAYA).

14.   The relevant terms of each MOA are as follows:

> *2. Deposit*
> *As security for the correct fulfilment of this Agreement the Buyers shall make an advance payment to the Sellers of US$5,000,000 … ('the Deposit") within six (6) Banking Days after the date that:*
>
> *(i)  This Agreement has been signed by the Parties and exchanged in original or by e-mail or telefax.*
>
> *3.  Payment*
> *On … delivery of the Vessel, but not later than three (3) Banking Days after the date that Notice of Readiness has been given in accordance with Clause 5 … the balance of the Purchase Price and all other sums payable on delivery by the Buyers to the Sellers under this Agreement shall be paid in full free of bank charges to the Sellers' Account.*
>
> *5.  Time and place of delivery and notices*
> *(a)      …*
> *Cancelling Date (see Clause 14): [5][10][3] October 2014 …*
>
> *(b)      …*
> *When the Vessel is at the place of delivery and both physically and documentarily ready for delivery in accordance with this Agreement, the Sellers shall give the Buyers a written Notice of Readiness for delivery.*
>
> *13. Buyers' default*
> *Notwithstanding anything herein to the contrary, should Buyers fail to [sic] any of its obligations under this Agreement, Sellers shall have the right to cancel this Agreement and to retain the Deposit … , which shall be Sellers sole and exclusive remedy.*
>
> *14. Sellers' default*
> *Should the Sellers fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date the Buyers shall have the option of cancelling this Agreement …*

---

[2] As will be explained below, the Buyers under the MOAs in the First Set were not Grupo R but rather Portuguese nominee companies of Grupo R.

[3] As mentioned above, in the case of MARANGO, the Cancelling Date was 5 October; in the case of MAYA, the Cancelling Date was 10 October.

*In the event that the Buyers elect to cancel this Agreement, the Deposit together with interest earned, if any, shall be released to them immediately.*

*Should the Sellers fail to give Notice of Readiness by the Cancelling Date or fail to be ready to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for their documented loss and for all expenses together with interest …*

*18. Entire Agreement*
*The written terms of this Agreement comprise the entire agreement between the Buyers and the Sellers in relation to the sale and purchase of the Vessel and supersede all previous agreements whether oral or written between the Parties in relation thereto.*

*Each of the Parties acknowledges that in entering into this Agreement it has not relied on and shall have no right or remedy in respect of any statement, representation, assurance or warranty (whether or not made negligently) other than as is expressly set out in this Agreement.*

## BAREBOAT CHARTERS

15. The disputes under consideration arise exclusively under the MOAs and our jurisdiction is based solely of the arbitration agreements in the MOAs.  However, it is relevant to note that the MOAs were part of an overall transaction between the parties which included bareboat charters (the "**Charters**") of the Vessels for a period of six months plus a further period of six months at charterers' option.

16. The overall transaction was originally concluded on the date indicated above, namely 21 March.  The time for delivery into the Charters was stated to be not before 1 April, so that it was originally envisaged that the initial six months' term would expire on or shortly after 1 October.  Upon the expiry of the Charters, the Vessels would be delivered under the MOAs.  It is against this timetable, as envisaged on 21 March, that the parties agreed the cancelling dates in the MOAs of 5 and 10 October.

## EVENTS

17. The nature of Grupo R's case in each arbitration is simple: Notices of Readiness for MARANGO and MAYA were not tendered by each Cancelling Date as specified in cl. 5(a) of each MOA, namely 5 and 10 October respectively, so Grupo R were entitled to cancel, as they did on 28 January 2015, and recover the Deposits.  Were the arbitrations only concerned with Grupo R's claims, the recital of relevant facts would be brief indeed.   On the other hand, the nature of the Sellers' case is more complex and by its nature requires a consideration of

6

the relevant communications and events over a protracted period, not least because optimism and pessimism as to a successful completion of the MOAs succeeded each other frequently and in roller-coaster fashion. We accordingly now set out the events leading to the arbitrations in some detail. Since the Sellers' case requires judgments as to the parties' respective perceptions, the "feel" of their communications may on occasion be relevant and we have therefore quoted extensively from them *verbatim*. Unless otherwise stated, all dates are in 2014[4]. We omit reference to the fairly lengthy and detailed exchanges relating to the technical inspections of the Vessels.

18. **September/October 2013**: OSA, the bareboat charterers of the Vessels under charters concluded in 2008 and 2011, cease paying hire thereunder.

19. **24 January**: Tradewinds report a probe by Mexican officials into OSA's dealings with Pemex.

20. **Early February**: OSA are alleged to have defrauded Citibank of about US$400-560M.

21. **27 February**: on or about this date, Coastline terminate the OSA charters of the Vessels by notice.

22. **28 February**: the PGR issue an "*Aseguramiento*" whereby they take control of OSA's assets. Mr Highlands Senior calls Mr Amado Yanez and tells him of Coastline's decision to terminate the charters of the Vessels, to which Mr Yanez agrees.

23. **2 March**: the PGR transfer control of OSA to SAE.

24. **2 March**: representatives of Shanara take repossession of MARANGO.

25. **3 March**: Mr Highlands reports to Mr Maringer that Coastline have terminated the charters of the Vessels with OSA, repossessed the Vessels and put them up for sale.

---

[4] Given that the protagonists were based in Mexico, Singapore and New York and were on occasion in other locations (including London) and that time zones of transmission or receipt of emails are usually not apparent, it is possible that on some occasions the dates indicated below for email communications may be out of kilter by a day either way.

7

26.  **6 March**: representatives of Marfield take repossession of MAYA.

27.  **7 March**: Mr Highlands, Mr Highlands Senior, Mr Garza, Mr Mohamed, Mr Maringer and Grupo R's in-house counsel meet in Grupo R's office in Mexico City to discuss the possible sale and purchase of the Vessels.  Mr Highlands explains the background to the termination of the charters with OSA and the Vessels' unavailability in the light of the PGR "*Aseguramiento*".  Mr Garza seeks reassurance of the steps being taken by Coastline to secure the release of the Vessels in the near future so that Grupo R can employ them with Pemex.  Mr Garza gave evidence at the hearing that when negotiating terms with Coastline from this point until such terms were agreed on 21 March, he knew that Coastline were also speaking at the same time to other potential buyers of the Vessels.

28.  **12 March**: following the meeting and an initial offer letter for MARANGO alone, submitted on 10 March, Grupo R submit to Coastline an updated offer for both MARANGO and MAYA.  The main features of the offer are:

- Bareboat charters for six months, with charterers' option to extend for another six months;

- Advance payments on delivery of $3.1M for MARANGO and $2M for MAYA, to be treated as on account of the base purchase prices;

- Base purchase prices of $172M and $153M respectively;

- Hire of $62,500/day and $52,500/day respectively, also to be treated as on account of the base purchase prices.

29.  **14 March**: following further negotiations, Grupo R and Coastline sign a letter recording Grupo R's intention to proceed in accordance with the above offer, save that the advance payments be prior to delivery and in the amounts of $5M for each Vessel, the base purchase prices be $178M and $150M respectively and the hire be $65,000/day for each Vessel.  Mr Garza told us in evidence that he was prepared to pay the higher prices and daily charter rate because Grupo R were keen to buy the Vessels.

30. **21 March**: following further exchanges, at a meeting in Mexico City MOAs and Charters for the Vessels are signed between the Sellers on the one hand and Portuguese nominee companies of Grupo R (and not Grupo R themselves) on the other. This is the First Set, as referred to above. Mr Garza gave evidence that at this time he was aware of the "*Aseguramiento*" but thought that it and the legal problems with the Vessels would be on a short-term basis: he did not have any idea that it might take "*as long as it was*" to sort out.

31. **27 March**: the PGR arrest the Vessels.

32. **28 March**: Mr Mohamed and his colleague Luis Figueroa[5] meet Mr Highlands, Mr Highlands Senior and Mr Maringer in Mexico City. Mr Highlands and Mr Highlands Senior report on the arrests. Mr Mohamed realises that this will affect the deliveries under the Charters.

33. **31 March**: Mr Highlands Senior writes to Grupo R saying:

> *… how upset and sorry we are with the problems encountered by us on the Charter and Sale of our Vessels with the ongoing work for Pemex.*
>
> *Last Wednesday, 26th March 2014 we had discussion with Mr Emilio Lozoya and Mr Carlos Roa[6] on the problems with the failure of OSA and the collapse of the company leaving all the workers without employment.*
>
> *We did not discuss our agreements with your company and have not indicated any contract to Mr Lozoya and Mr Roa but now we are of the view that we should have a discussion on a direct basis with Mr Lozoya and ask him if he could arrange for the Minister of Justice also to attend so we can achieve the situation of your company Grupo R putting the ships back to work and giving the people in Carmen jobs and hope for the future.*
>
> *I will be in Mexico City next week with my son David and we are available to discuss all to meet at your convenience.*
>
> *I thank you for your patience and understanding in this very confusing situations.*

34. **1 April**: Mr Garza replies:

> *We understand the situation, we confirm our interest in continue the agreement as soon as all the legal matters are resolved, please keep us inform how the things are developing.*

Mr Garza told us at the hearing that he thought that at this time he knew that the PGR had arrested the Vessels on 27 March but that, this notwithstanding, he was still interested in proceeding with the purchase of the Vessels.

---

[5] Head of Legal at Grupo R.

[6] Mr Lozoya was the CEO of Pemex at the time; when examined at the hearing, Mr Garza said that Mr Roa was "*the main advisor*", presumably of Mr Lozoya.

35.  **4 April**: at a meeting at Grupo R's office, Mr Highlands informs Mr Mohamed that the Vessels remain under arrest.

36.  **9 April**: on or about this date, the PGR apply for a "*Concurso*".  Mr Garza gave evidence that he understood this to be a procedure whereby the assets of OSA would be seized and sold if necessary to repay its debts, and that part of the process would involve trying to restructure OSA to keep it as a going concern. We were given to understand that the process was under the supervision of a judge in Mexico City.  When Mr Highlands gave evidence, he told us that the PGR –

> *… had basically no rules to which they could be held accountable to on a day-to-day basis, whereas a concurso was administered by a court-appointed judge, we felt we could appeal to him, which was more optimistic than dealing with the PGR as was.*

37.  **11 April**: Mr Mohamed sends a message to Mr Highlands and Mr Highlands Senior asking for an update as to the release of the Vessels.

38.  **15 April**: Mr Highlands Senior reports to Mr Mohamed that he has had a meeting with the PGR to arrange the finalisation of the release of both Vessels, from which Mr Mohamed understands that the PGR will release the Vessels shortly.

39.  **21 April**: at a Pemex conference, Mr Mohamed and Mr Garza meet a number of Pemex executives who mention that they need the Vessels for their operations, but that the detention must be resolved by Coastline with the proper authorities as Pemex could not get involved.

40.  **24 April**: Mr Highlands Senior reports to Mr Mohamed that Coastline  have been busy making representations to the PGR both informally and through the "*legal route*".  He asks whether Grupo R has had any success with Pemex in being able to put the Vessels back to work for Pemex.  Mr Mohamed replies that Pemex have mentioned in meetings with Mr Garza that they do require the Vessels for their operations but that the legal status over the Vessels is out of their hands and that needs to be solved with the proper authorities.  He asks for an update in that regard, to which there is no response.

41. **2 May**: Mr Maringer informs Mr Highlands Senior that Mr Garza has suggested a meeting with Coastline on 13 May in Mexico City.  Furthermore, he reports that Mr Mohamed has reiterated on the phone that Grupo R -

> … is ready to act on both vessels and that they will perform even if no Pemex contract is in hand.

42. **5 May**: Coastline propose cancellation of the MOAs and Charters in the following terms:

> As you are aware that we have experienced delays in the completion of the Charters and MOA/Purchase of our vessels due to the problems in Mexico with the Oceanografia/SAE/ PGR situation.
>
> We have taken actions through the Courts in Campeche and have been granted a suspension on the PGR which will finalise in June.
>
> As you are aware you have not been able to go forward due to these circumstances. It is better that we the Owners cancel the Charter Partys for the Caballo Maya and the Caballo Marango as we have gone past due cancelling date on all four items.
>
> We remain in the future open to any proposals that you wish to make regarding the purchase of the vessels as we are no longer interested in chartering the vessels only in selling the vessels.

Mr Garza told us that this message was the first time he learnt of the Campeche court proceedings.  He also agreed that this email made Grupo R aware that the Vessels would not be released until June; further, that at this time it was apparent that by then there was insufficient time left to complete the six-month charterparties before the MOA cancelling dates.

43. **16 May**: following a telephone conversation the previous night, Mr Highlands Senior reports to Messrs Garza and Mohamed as follows:

> The PGR and SAE through their legal team have been presented with original documentation both in the Courts of Campeche and in their office in Mexico City showing the following:
>
> [The letter then sets out the ownership structure for each of the Vessels.]
>
> After these presentations the SAE and the PGR have to report to their Attorney General Office.  Meanwhile we are progressing through the Courts in Campeche to have a hearing on the Marfield Case (Caballo Maya) on 2nd June 2014 and Shanara Case (Caballo Marango) on 9th June 2014.
>
> Once we have judgement in our favour we then have to apply to the judge in Mexico City who is in charge of the Concurso Mercantil (Corporate Re-organisation) to have his permission to release the vessels.
>
> As you can see for us to honour the Charters and the MOAs for the two vessels is it not possible also Grupo R under the circumstances cannot lodge the deposit all take on the Charters of the vessels as they cannot be delivered free and clear of liens.
>
> Therefore in accordance with the following:

11

> [The letter then lists both MOAs and Charters, each of which is "*cancelled by mutual agreement*". The letter concludes:]
>
> *We very much regret this unfortunate situation concerning the wrongful detention and seizure of our vessels by the PGR/SAE but we can only take actions as we have described.*

When giving evidence, Mr Garza confirmed that despite Coastline's proposal that the contracts be cancelled by mutual agreement, he still wanted to buy the Vessels.

In his witness statement, Mr Garza said that accordingly a conference call was then arranged between Mr Highlands, Mr Highlands Senior, Mr Maringer, Mr Mohamed and Mr Garza; during the call it was agreed that the Charters and MOAs would in fact continue (in evidence, Mr Garza agreed that this was at Grupo R's suggestion) and that Grupo R would organise a meeting with the PGR at the request of Coastline. Mr Garza amplified on this evidence at the hearing, explaining that he made it clear that Grupo R did not want to cancel the Charters and the MOAs; further, it was agreed that they would continue in force. Mr Garza stated in evidence that he explained at the meeting that Grupo R still wanted to buy the Vessels notwithstanding the court case and the legal issues.

Mr Maringer follows up on this conference call confirming that all parties have agreed that the contracts will remain in effect, that Grupo R will work to arrange a meeting with the PGR (something which they agreed during the conference call to try to organise) and that the parties will regroup next week.

44. **19 May**: Mr Highlands Senior writes to Mr Maringer:

> *Very much appreciate the efforts that everyone is making and the interest that Grupo R have in the vessels also their intentions to contact the PGR at Attorney General level to find out what they can.*
>
> *On our side we keep supplying information to the PGR/SAE as required. We are also pursuing matters through the Courts in Campeche but all very slow.*
>
> *As we stated on the phone the PGR/SAE are asking if they could make an arrangement on the two vessels well we could put the vessels back to work for Pemex via the Oceanagrafia set up with the SAE, Mr Maza.*
>
> *This is an option for us and our Lenders are supportive of this scheme.*
>
> *We do not share their view. Our Best Position is if Mr Garza sees the PGR and finds out their situation where this will give Grupo R confidence to proceed.*
>
> *On our side to enable us to proceed we have offered to change the MOA's to where we have a 10% deposit held in Escrow once this is done we can block the advances been made to us by the SAE/PGR and say to talk to Grupo R they hold the ships.*

> *Otherwise if we cannot do this then we should in good sense end the MOA's and Barecon Charter Party by mutual consent.*
>
> *My regret are that this situation has taken place but our two ships are (2) two in (72) seventy two ships and detained by the PGR/SAE.*
>
> *I trust our comments meet with your opinion.*

45. **End May/beginning June**: following arrangements made by Mr Garza Senior (who knows the Attorney General), Coastline and Grupo R meet the PGR.  Mr Highlands said in his witness statement that the PGR representative expressed himself content that the Vessels belong to the Sellers, that the matter would be reviewed with the Attorney General and the Vessels would be released four days later.

46. **3 June**: Mr Highlands Senior writes to Grupo R to thank them for assisting with the PGR and continues:

> *We subsequently have had two further meetings with Oceanografia Legal Team and Mr Hugo Ruis Raynard of the PGR.*
>
> *There is a deal been offered to us for the two ships on a charter basis with a new revitalised Oceanografia when the company will be taken over by other investors.  There is pressure for us to go ahead with this so the ships can go back to work for Pemex.  The PGR could immediately release the ship if we agree to the Oceanografia proposal.*
>
> *Our position is this, the ownership of the ships is not in dispute now.  The so called Sale Agreement with Oceanografia produced by their Lawyers is not even signed and they have the wrong company the MOA and the Deposit payments was GGM Shipping S.A. de C.V. owned by Martin Diaz Alvares and his cousins Mr Javier Rodrigues Borgio.  The MOA was cancelled as they could not finance the contract.  GGM Shipping S.A. de C.V. is not Oceanografia S.A. de C.V. as claimed.*
>
> *We are of the opinion that the best way to move forward and prevent the new company is for us to proceed immediately on the MOA signed in March.*
>
> *The best plan is for Mr Garza Senior to talk with his people in the PGR/ Ministry as before then move forward to prevent this new revitalised Oceanografia using the ships.*
>
> *Trust you can resolve problems.*

47. **6 June**: Mr Maringer writes to Mr Garza and Mr Mohamed saying that he has attempted to contact Mr Mohamed all week with no success.  He reports that:

> *Mr Highlands is asking for feedback/update from Grupo R based on the recent meetings with the PGR.  Plus, he is again getting pressure from the SAE to work for them directly. Please can someone contact me with update?*

Later that day, Mr Highlands Senior writes to Mr Mohamed as follows:

> *I have been informed of the latest news in Mexico reference my ships, the PGR and the latest Sale of Oceanografia to Mr Aleman et* [sic]

13

> *As we have not had any resolution on our contracts for my vessels, can we not arrange to cancel the contract as we have now waited almost eleven weeks and we are under severe political pressure to allow the vessels back to work with SAE/PGR charterers.*
> *I have tried to contact you but understand you are away on businesses.*
> *Very difficult situation.*

When giving his evidence, Mr Garza told us that Mr Mohamed showed him this message and that, despite its content, he was willing to proceed and pay the $5M Deposits.

48. **14 June**: this message notwithstanding, the parties continue to talk and on 14 June Mr Maringer reports to Mr Highlands and to Mr Highlands Senior that Mr Garza has asked if they would send a letter on Coastline letterhead to Grupo R which he had drafted as it would help with the Attorney General and meetings with the SAE.  The text of the letter (which Mr Highlands Senior duly provided two days later) reads as follows:

> *Reference is made to the contracts we have to charter and purchase our vessels Caballo Maya and Caballo Marango (the Vessels).*
>
> *I want to inform you that the Mexican Government through the Procuraduría General de la República (PGR) and the Servicio de Administración y Enajenación de Bienes (SAE), have been insisting us to charter the Vessels to Oceanografia.*
>
> *We would like to confirm that our position is to honour the contracts we have signed with Corporativo Grupo R S.A. de C.V. and we are doing everything in our hands to make the Vessels free and clear in order to proceed with our agreements.*
>
> *Any additional assistance you can provide in order to resolve the situation as soon as possible is highly appreciated.*

49. **16 June**: Mr Schulz reports to his colleagues on his discussion with Mr Mohamed as follows:

> *Make them offer – I raised that we didn't believe that the contract was valid without payment he said they had a different opinion that he had discussed this with Mr Toban and Mr Garza and suggested we make an offer.  I said what about just looking at Marango.  He said we should send them something even a simple email that says what we propose.*
>
> *We talked again about the intent to do short term charter of the Marango to create some income and to keep the support of Pemex he asked if it was with Grupo R I told him that would be the ideal situation.  That we would have to see how to make that work.  They intended to take the vessels to their in Tampico and rename them as part of Grupo R fleet.  I suggested that we get working 1st and once all is resolved then they look at the Grupo R branding later I told him we will get all the OSA stuff off asap.  Also we could do a lot of this if not all with the vessels working and everyone getting paid.*
>
> *On the contract with Grupo R I told him how it wasn't valid without payment he said that they have a different opinion.  I believe they have discussed this with Steve from Clarkson's.  I explained how various other companies are offering to make payment to get the vessels and that the financial pressure was significant for us.  Also explained that if we*

14

*looked at sorting the Marango first and get her working we could focus on the fight to resolve the Maya.  Told him the feedback from Fortress[7] is they will pay and wait.*

*I informed him that most parties now agree that is if there is a dispute on the Maya it must be arbitrated in London not in Mexico.  And we agreed that she could work while this is being done however the most pressure here is created by the vessels being off hire.  He also raised that he didn't think they would go near the arbitration because we would be able to claim damages and that it was clear they have not complied with the MOA.*

*Talked about working to get the Marango sorted 1st and then having to fight on the Maya preferably while she working is creating income. I told him I had discussed this with the SAE lawyer and we hope to be pushing this way next week.*

*Explained the MOA was with GGM – went through the relevant information and he agreed that if the requirements of the MOA had not been meet that there is no equity I explained we have the information that explains where the money was used and this has been provided to relevant parties but the main issues is that the agreements where with GGM and not OSA and that SAE have said they are separate companies also that it was always explained that way to us. Hugo they survey work together however it was we he was trying to force the deal with OSA.  He agreed that it seems clear to him.*

*Bare cons with OSA – I confirmed that the contracts for the vessels well with Oceanografia not GGM.*

*My general feeling is that they want to sort this out but are being very cautious.  When talking about making an offer he seemed genuine.*

As mentioned above, also on 16 June Mr Highlands Senior provides the signed letter to Grupo R which Mr Garza requested two days earlier. At the same time, he provides copies, signed by him of new versions of the MOAs and the Charters, this time with the buyers and charterers named as Grupo R.  This is the Second Set referred to above.  The purpose of novating the contracts from the unknown Portuguese nominees to the well-known Mexican company Grupo R is to assist in persuading the Mexican authorities and Pemex to release the Vessels.

The final development on 16 June is that Mr Highlands Senior sends an email to Grupo R as follows:

*I understand from our recent discussions and actions that there are a number of people in the PGR and SAE who consider that Coastline Group Incorporated, Marfield Ltd Incorporated and Shanara Maritime International SA the regarded Owners of vessels Caballo Maya and Caballo Marango are the property and ownership of Mr Terence Highlands.  As you are aware we wish to proceed with our MOAs and Charter Agreements on the two vessels.*
*To commit and move matters forward, would it be a more simple solution if we moved immediately to complete the purchase on the Caballo Marango and put it to work with Pemex as discussed.*
*We will demonstrate opposition of ownership etc on Caballo Maya and push for the vessels Caballo Maya's release by the PGR and SAE.*
*Your comments appreciated.*

---

[7] We were told by Mr Highlands that Fortress is a US investment fund which at the time had indicated that it had raised $3 billion on the stock market to invest in offshore oil and gas shipping and it had expressed an interest in buying the Vessels.

50.   **17 June**: Mr Garza requests a revised version of the letter on Coastline letterhead to Grupo R.

51.   **18 June**: Mr Mohamed sends to Mr Maringer and Mr Highlands the MOAs and Charters (the Second Set) for MARANGO and MAYA duly signed on behalf of Grupo R.

On the same day, Mr Highlands sends emails to Mr Mohamed formally addressed to the Portuguese nominees of Grupo R which had been the buyers under the original MOAs concluded on 21 March.   The emails cancel those MOAs "*due to non payment of the deposit*".

52.   **19 June**: Mr Mohamed sends an email to Coastline stating that Grupo R are willing to proceed with the cash deposits of $5M per Vessel –

> *even though the vessels are not free and clear, nor in good physical and legal conditions. Please find attached the amendment No. 1 to the Barecons and the MOAs for both vessels duly signed from our side.   Please send us a signed copy of the documents and the information of the guarantee in order to proceed with the transfers.*

For present purposes, we do not need to consider the suggested changes to the Charters.  In brief, the more significant of the proposed amendments to the MOAs were as follows:

a)   The Deposit was to be paid within 6 banking days of the amendment, rather than 6 banking days after the MOA had been signed;

b)   A counter-guarantee for the Deposit was to be given;

c)   Some remedial works were to be carried out;

d)   Notice of readiness was not to be tendered before 5 days after the bareboat charter period had ended; and

e)    The cancelling date was to be extended from to 7 days after the expiry of the charter, subject to the right to accelerate closing.

53.   **20 June**: Mr Highlands Senior responds on behalf of the Sellers as follows:

> *The owners note your request for an addendum to the MOAs.*

*The owners note your reference to a "request" for payment of the deposits. It is the owners position that the payment of the deposit is a legal requirement on the buyers.*

*As you state you will not proceed without a contract amendment all guarantee and you have such a low opinion on the vessels condition and legal status, please find attached the notice of cancellation on the MOAs for buyers default.*

*Under a separate cover we will copy you on our notices to Pemex withdrawing the vessels.*

The attached notices of cancellation for each of the Vessels recite the stipulation in each MOA that the Deposit has to be paid within six banking days after the date on which the agreement has been signed, namely 21 March 2014.   As neither Deposit has been received, each notice states:

*The Sellers hereby cancel the sales contract due to non-payment of the deposit.*

This prompts Mr Mohamed to email Mr Highlands Senior proposing a conference call.   In the event, the participants to the call are only Mr Mohamed and Mr Maringer.   Mr Mohamed states that Grupo R still want to buy the Vessels and requests that Coastline withdraw the cancellation notices.   As we have said, Mr Maringer did not give evidence, but in his witness statement Mr Highlands says that he was given an account of the conversation by Mr Maringer: Mr Mohamed had said:

*…Pemex had asked Grupo R to participate in a process which might, if the Grupo R owned or had the right to use the Vessels, lead to the Vessels being utilised by Pemex again.   Mr Mohamed further reiterated that Grupo R wished to hire and purchase the Vessels in accordance with the agreements, notwithstanding the arrests.   Mr Maringer was further told that if Pemex wished to utilise the Vessels then Grupo R would need to continue to assist in having the Vessels released from the arrests.   Mr Mohamed also asked Mr Maringer to persuade the Sellers to permit the Agreements to be reinstated, reflecting our mutual understanding that they had been cancelled.*

54.   **23 June**: following that call, the Sellers send letters to Grupo R reading as follows:

*If the deposit of US$5000000 as per clause 2 is remitted on 23rd June 2014 and received by Wednesday 25th June 2014, the Sellers will consider both contracts to be valid and in force as per the MOA and Barecon terms and conditions.*

At the same time, Mr Highlands sends Grupo R a copy of Shanara's letter addressed to Pemex and bearing the date 18 June reading as follows:

*By this letter we confirm that Shanara Maritime International, SA and Corporativo Grupo R, S.A. de C.V. or nominee, has firm and valid contracts with us to charter and purchase the vessel Caballo Marango …*

*This is subject to Grupo R, S.A. de C.V. meeting their contractual requirements and commitments to Shanara Maritime International SA.*

*Corporativo Grupo R, S.A. de C.V. or nominee has the exclusive right to present a commercial offer to PEMEX Exploracion y Produccion for the above-mentioned vessel.*

17

*This letter is valid until 1/7/2014.*

A similar letter is sent for MAYA.

Thereupon, Mr Garza authorises the payments of the Deposits and the remittances are effected.

55. **25 June**: the two Deposits are received.  The Sellers confirm that the MOAs are "*firm and active*".  When cross-examined at the hearing, Mr Highlands informed us that the funds went into "*the general Shanara Coastline account*".

56. **30 June**: Mr Maringer sends a report to Mr Highlands and Mr Highlands Senior as follows:

> *An update from Grupo R:*
>
> A) *Two other companies have offered the "MAYA" and "MARANGO" to Pemex: ProPetro (Protexa/Fortress) and Sapura.  Each company has given documents to Pemex claiming access to the vessels but we all know that there must be a subject in that document for Owners' approval.  Grupo R will let this play out over the next week but please note that Terry and/or David may receive a few more calls from other market participants.  Please name Grupo R as your partner and you are welcome to say that firm contracts are in place between Coastline and Grupo R.*
>
> B) *The meeting hosted by Mr Lozoya with the PGR and SAE was postponed.  Grupo R while waiting for the new date.*
>
> C) *As a result of B), Mr Garza arranged and met with the Federal Minister of Finance last week (he reports to the President of Mexico.).  The SAE is part of the this ministry and thus the Minister is the senior boss of the entire division.  According to Grupo R, the meeting was positive and we should get more details this week.*
>
> D) *Grupo R are prepared to perform additional inspections on the "MAYA" or the "MARANGO" to move the process forward to commence the bareboat.  Please advise if you wish them to inspect.*

57. **2 July**: Mr Highlands Senior writes to Mr Robert Gibbons of Fortress:

> *Thanks for your mail reference MOAs for our vessels Caballo Maya and the Caballo Marango.*
>
> *We are not in a position to go ahead with signature etc with this as we have other commitments.*
>
> *Mr Raschid Mohamed at Grupo R is now responsible for the vessels.  You can contact him direct as I understand you have been in contact with Grupo R.*

58. **3 July**: Mr Mohamed writes to Mr Highlands:

> *Pemex is requesting us to deliver originals of the letters that you issue for us to present in the commercial process Pemex is running.*
>
> *They want the letters notarised and apostilled.*

*Could you please help us to get those documents?  We need to present them as soon as they can be available.*

59.   **4 July**: Mr Highlands immediately obliges and sends the letters, duly notarised and apostilled, to Mr Mohamed.

60.   **7 July**:  Mr Highlands writes to Mr Mohamed:

*For your guidance Fortress/Protexa have admitted that they cannot proceed.*

*Sapura still pushing us but the letter should end that.*

*Do you have an indication of when Pemex will award the contract?*

*I am aware of an in field date of November.*

61.   **8 July**: OSA is placed in administration and a second arrest or injunction is placed on assets owned by it or in its possession, including the Vessels.

62.   **14 July**: while in Singapore on other business, Mr Mohamed suggests a meeting with Mr Highlands.  During the meeting, Mr Highlands says there is no news with regard to the release of the Vessels.

63.   **16 July**: Coastline send to Mr Mohamed the original copies of the MOAs and Charters for both Vessels, duly signed.  This is the Third Set, referred to above. It was common ground at the hearing that the MOAs in this Third Set are the contracts under which the references herein arise.  Mr Mohamed explained in his witness statement that a mistake in the Second Set was corrected in the Third Set to reflect the fact that MARANGO was not inspected and accepted, but had defects which needed correcting before she would be in a deliverable condition.

64.   **24 July**: Mr Highlands writes to Mr Mohamed:

*The latest update on the PGR.*

*We were informed late on the 23rd that we had proven our ownership of the vessels, Caballo Maya and Caballo Marango.*

*They will be released from the PGR sometime next week.*

*Contrary to very specific commitments despite clear statements on ownership, they will only return the vessels to OSA (in administration by SAE).  They cite that as they took possession from OSA, they must reverse the process.*

*Any issues whether contractual or other, between the owners (former) charterers are then commercial and civil, not subject to the PGR criminal procedure.*

*Naturally a direct return of the vessels to us as Owners is preferred.*

19

*Should the vessels go to OSA, we intend to exercise our cancellation and repossession rights.*

*Notices were issued in February and our repossession agents have been on the vessels since March.*

*It should be noted that we have flag state return to port notices and the class suspensions on both vessels to prevent them being sent to work.*

*We would ask your assistance with the following:*

*Could you use your influence to try and have the vessels delivered to us as owners directly. We will prevail in the latter scenarios but as ever, this will take more time.*

*It may also be the case that rogue elements of the former OSA management loyal to the former shareholder may push an agenda to attempt to solicit work from Pemex.*

*Could you inform Pemex that the vessel will only be available through your goodselves.*

*As ever, thank you for any kind assistance in advance.*

65. **29 July**: Mr Highlands writes to Mr Mohamed:

*I wanted to keep you up to date.*

*We have come under a lot of pressure to do a deal with the Aleman group.*

*We have been told by their legal counsel that unless we sell to them, the PGR will not lift the arrest.*

*Naturally we believe this is a bluff.*

*Any advice or guidance you could give?*

*Please advise.*

66. **13 August**: Mr Mohamed writes to Mr Schulz:

*As commented by phone, please find attached the information we need for meeting. It would be ideal to have support documentation for every step.*

*This is a unique opportunity to explain the situation.*

The attached documents are draft summaries of the relevant history with regard to each of the Vessels, with blanks left by Mr Mohamed for completion with the relevant details. On the same day Mr Schulz passes this email and the attachments to Mr Highlands Senior, explaining:

*Please see attached document from Raschid. Mr Garza has been requested to meet someone very senior within the government to discuss why the vessels should be released to us.*

*All the parts in yellow are my comments some of the questions I have answered. If it is easier you can write on it a copy and send it back I will complete and send it back to him they need it for 1st thing tomorrow Mexico.*

*Raschid is happy to have any other details we think relevant included but wants to keep it fairly simple.*

> *They don't want to change the format because they will have to convert back to Spanish later.*

On the same day, Mr Schulz emails drafts of the completed documents back to Mr Mohamed, followed up by a further message with extra information provided by Mr Highlands Senior.

67. **16 August**: Mr Maringer writes to Mr Highlands and Mr Highlands Senior:

> *I received a call this afternoon from Raschid.  As you both know, Mr Garza Sr. Has been summoned to a high-level government meeting next week to discuss the situation on the two vessels.*

> *As a result, Garza Sr. has asked Clarksons to obtain from Coastline copies of your bareboat/ purchase option contracts with Oceanografía for both the Marango and the Maya.*

> *Garza Sr. wants to have the contractual and legal confidence of his position when he faces in the "senior government official" next week.*

> *Please advise if you can send a scanned copy to me or to Raschid directly for their confidential review.*

68. **18 August**: Mr Schulz sends to Grupo R over 80 pages of documentation, consisting of the completed summaries which Mr Mohamed requested on 13 August together with supporting documents.

69. **10/11 September**: by chance, Mr Garza and Mr Mohamed meet Mr Highlands at a conference in Oslo.  Mr Highlands provides an update regarding the status of the Vessels and whether they will be released; he adds that he will be meeting OSA to see if a deal can be done to get the Vessels released.   In his witness statement, Mr Mohamed recalled Mr Highlands saying that the situation with the PGR was "*still a mess*".  When examined at the hearing, Mr Garza agreed that Mr Highlands was not able to give any indication as to when the Vessels were going to be released.

70. **5 and 10 October**: after 11 September, there is then a long hiatus and the cancelling dates under both MOAs pass without further communications between the parties.  However, on 10 October Mr Maringer passes to Mr Garza and Mr Mohamed a report from Reuters to the effect that Grupo Aleman has agreed to buy OSA.  He asks what effect, if any, this news has on "*our project*".

71. **18 October**: Mr Schulz writes to Mr Mohamed:

21

> *I am currently in London meeting with Terry.  We had some feedback late in the week that maybe things might start to change with the Alemans officially pulling out of the save OSA plan.*
>
> *We had some positive things said but nothing to get excited about yet.*
>
> *Our feel is that things maybe starting to swing but now would be a really good time for any pressure that can be put on from your end.*
>
> *I am due back in Mexico City on Tuesday.  If you are back in maybe we can get together and I can give a full update.*

72. **20/21 October**: Mr Mohamed replies that he is in London too and suggests a meeting the next day.  A brief meeting duly takes place, attended by Mr Mohamed, Mr Highlands and Mr Schulz.  Mr Mohamed stated in his witness statement that Mr Highlands and Mr Schulz said that the Vessels were still detained by the PGR "*but according to them they were on the verge of being released*" and Mr Mohamed reported on this to Mr Garza afterwards.  In his statement, Mr Garza noted that "*Coastline had made similar promises previously*" and when examined at the hearing he agreed that he was not very confident that the Vessels were about to be released: indeed, he was becoming pessimistic.  On the other hand, when he gave his evidence to us, Mr Highlands said that the email of 18 October described above reflected Coastline's collective feeling of "*cautious optimism*".  He pointed in particular to the reference in Mr Schulz's email to "*the Alemans officially pulling out of the save OSA plan*" as "*a piece of political obstruction placed in our way*", the removal of which was "*to our benefit*".

73. **12 December**: in his witness statement, Mr Garza noted that as the weeks went by, he felt that Grupo R had little choice but to think about cancelling: they could not wait indefinitely.  He added that he had internal discussions during November and the decision was made, as a first step, to make clear to Coastline that Grupo R was reserving its rights in respect of cancelling.

Accordingly, on 12 December (when, Mr Garza acknowledged at the hearing, nothing had changed since the October meeting), Grupo R send  to Coastline and Mr Maringer an "*official communication*" relating to each of the Vessels addressed to each of the Sellers.  The substance of each letter is the same and the letter to Shanara relating to MARANGO reads as follows:

> *We refer to the MOA and the Bareboat Charterparty.*

22

*Pursuant to Clause 5 of the MOA, the Seller is obliged to tender Notice of Readiness for delivery not before 1 October 2014.  The Cancelling Date under the MOA is 5 October 2014[8].*

*Should the Seller fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date, the Buyer shall have the option (but not the obligation) of cancelling the MOA.  On cancellation of the MOA, the Buyer shall be entitled to an immediate refund of the Deposit, together with interest.*

*The Seller has failed to give Notice of Readiness and/or complete a legal transfer of the Vessel by the Cancelling Date i.e. 5 October 2014.  Accordingly, the Buyer is now entitled to cancel the MOA and seek an immediate refund the Deposit, plus interest earned thereon.*

*We, the Buyer, hereby expressly reserves the right to cancel the MOA.  Any delay in exercising his right (or any other right and/or remedy under the MOA and/or Bareboat Charterparty and/or at law) shall not be construed as constituting a waiver of that right and/or any other right or remedy under the MOA and/or Bareboat Charterparty and/or at law, nor preclude or restrict any further exercise of the right to cancel the MOA and/or any other right or remedy.*

*All the Buyer's Rights under the MOA and/or the Bareboat Charterparty and/or at law are expressly reserved.*

74. **14 December**: Mr Highlands Senior replies:

    *Thank you for your mail or Friday 12th December 2014 and the enclosures.*

    *Thanks for all your help and attention.*

In his witness statement, Mr Highlands said that in the light of Grupo R's conduct up to that time and their representations that they wished to go ahead with the agreements, he thought nothing of Grupo R's reservation of rights:

> *I just thought that these were sent as part of an internal compliance procedure which Grupo R had to follow and did not expect that Grupo R would then purport to cancel the Agreements.*

At the hearing, Mr Highlands was challenged about this statement by Mr Coburn, who put it that it was " *a bit thin*": he invited Mr Highlands to accept that the letters of 12 December were sent to make it explicit that the right to cancel had arisen and that Grupo R was entitled to cancel and to get the Deposit back.   Mr Highlands responded:

> *rightly or wrongly, our belief at the time was that time had passed and we didn't put any credence to this.*

He did not agree that it was "*perfectly obvious*" that Grupo R had started to think about cancellation.  He responded:

> *Maybe it's black and white, but our thoughts were if they wished to cancel they would have done so, and this wasn't a cancellation.  That was how we viewed it.*

---

[8] In the letter to Marfield relating to MAYA, in both places where it is mentioned this date reads 10 October 2014.

23

In summary, he thought it was okay just to ignore the message.

75. **28 January 2015**: there being no further news in the meantime, Grupo R send to Coastline and Mr Maringer a further "*official communication*" relating to each of the Vessels addressed to each of the Sellers.  The substance of each letter is again the same and that to Shanara relating to MARANGO reads as follows:

> *We refer to our letter of December 12th, 2014.*
>
> *Pursuant to Clause 5 of the MOA, the Seller is obliged to tender Notice of Readiness for the delivery not before 1 October 2014. The Cancelling Date under the MOA is 5 October 2014[9]. A deposit in the sum of US$5,000,000.00 was paid by the Buyer to the Seller on or around 25 June 2014.*
>
> *The Seller has failed to give Notice of Readiness in accordance with Clause 5 or failed to be ready to validly complete a legal transfer by the Cancelling Date.  Accordingly, we, the Buyer, hereby cancel the MOA with immediate effect.*
>
> *The Buyer now calls on you, the Seller, to make an immediate refund of the Deposit in the sum of US$5,000,000.00 together with any and all interest earned on the Deposit.  The Deposit should be paid into the following account:*
>
> [Details set out]
>
> *In addition, the Owners agreed that the Vessel would be delivered into the Bareboat Charterparty on or around 1 April 2014 and/or within a reasonable time thereafter. Wrongfully and in repudiatory breach of the Bareboat Charterparty, Owners failed to deliver the Vessel on 1 April 2014 or at all.  Accordingly, Charterers hereby accept Owners' repudiatory breach of the Bareboat Charterparty and terminate the Bareboat Charterparty with immediate effect.*
>
> *We look forward to receiving your confirmation, by return, that the Deposit has now been refunded.*
>
> *In the meantime, all the Buyer's rights and/or remedies under the MOA and/or the Bareboat Charterparty and/or at law remain expressly reserved.*

No reply is received to either letter.  At the hearing, Mr Highlands said that it was a surprise when Coastline received the letter, but agreed with Mr Coburn that neither he nor his father nor others at Coastline expressed surprise or indignation; further, he accepted that there was no accusation that Grupo R had gone back on any understanding, but admitted that perhaps they should have done.

76. **18 March 2015**: solicitors for Grupo R, Campbell Johnston Clark, come on the scene for the first time and send  to Coastline a letter relating to each of the

---

[9] In the letter to Marfield relating to MAYA, this date reads 10 October 2014.

Vessels addressed to each of the Sellers.  The substance of each letter is again the same and that to Shanara relating to MARANGO reads as follows:

> *We are London solicitors instructed for and on behalf of the Buyer in relation to a claim arising under the MOA entered into between the Seller and the Buyer for the sale and purchase of Vessel.  Please direct all future correspondence concerning this matter to our London office.*

> *Pursuant to Clause 5 of the MOA, the seller was obliged to tender Notice of Readiness for delivery not before 1 October 2014.  If the seller failed to give notice of readiness by 5 October 2014[10] (the "Cancelling Date") and/or was not ready to complete a legal transfer by the Cancelling Date, then pursuant to Clause 14, the Buyer became entitled to cancel the MOA.*

> *An advance payment in the sum of US$5,000,000.00 (USD five million) (the "Deposit") was paid by the Buyer to the Seller on or around 23 June 2014.*

> *The Seller failed to give a Notice of Readiness in accordance with Clause 5 and failed to be ready to validly complete a legal transfer of title by the Cancelling Date.  Accordingly, on 28 January 2015, pursuant to Clause 14 of the MOA, the Buyer exercised its right to cancel the MOA and called upon the Seller to return the Deposit immediately together with any interest accrued thereon.  This was communicated clearly to the Seller by letter dated 28 January 2015 which was sent by email, fax and courier and the copy of which is enclosed.*

> *As a result of the Seller's failure to give a Notice of Readiness for delivery and/or to be reviewed to validly complete a legal transfer of title by the Cancelling Date, the Buyer has suffered losses and/or expenses, which is the Seller is obliged to compensate the Buyer pursuant to Clause 14.  The Buyer will confirm shortly what its losses and expenses are in this respect.*

> *To date, despite the Buyer's letter of 28 January 2015, the Deposit with any accrued interest thereon has not been returned to the Buyer and remains outstanding.  This sum is indisputably due to the Buyer and is well overdue.  There is no defence of justification whatsoever for the Seller's delay in effecting immediate remittance of the deposit with accrued interest.*

> *Accordingly, take note that should you, the Seller, fail to provide confirmation within 7 days from the date of this letter that the sum of US$5,000,000.00 will be remitted to Buyer's bank account detailed in the enclosed letter by **16:00 (GMT) on Wednesday 1 April 2015**, we are instructed to commence arbitration proceedings without further notice to you.  Such proceedings will include a claim for recovery of interest and costs in addition to the Deposit Plus accrued interest and losses and/or expenses.*

> *If arbitration proceedings prove necessary, we are instructed to secure the Buyer's claims against the Seller's assets in any appropriate jurisdiction(s).*

> *Please acknowledge receipt of this letter and really look forward to receiving confirmation that US$5,000,000.00 together with any interest will be remitted to the Buyer's bank account before 16:00 (GMT) on 1 April 2015.*

> *The Buyer reserves its rights, relatives or defences whether arising under the MOA, at the law, or otherwise.*

77. **25 March 2015**: at 17:49 Campbell Johnston Clark send to Coastline an email relating to each of the Vessels.  The substance of each email is again the same and that relating to MARANGO reads as follows:

---

[10] In the letter to Marfield relating to MAYA, this date reads 10 October 2014.

25

*We refer to our letter of 18 March 2015 in which we asked the Seller (you) to provide confirmation within 7 days from the date of the letter that the sum of US$5,000,000 will be remitted to Buyer's bank account by 16:00 (GMT) on Wednesday 1 April 2015.  The deadline for you to provide such a confirmation is by 25 March 2015, today, but we note we have not received any response from you?*

*Please can you confirm as a matter of urgency that the Seller will be remitting the sums set out in our letter by 16:00 (GMT) on Wednesday 1 April 2015, failing which we are instructed to commence arbitration proceedings without further notice to you.*

78. **1 April 2015**: Mr Highlands Senior writes to Campbell Johnston Clark as follows:

*Reference your mail of 26th March 2015 regarding Shanara Maritime International SA and Marfield Limited Incorporated.*

*We should by close of business today have received final instructions on these matters.*

*We will revert accordingly.  Sorry about this delay.*

*Thanks for all your help and attention.*

Campbell Johnston Clark reply:

*We refer to your email received earlier today (1 April 2015).  We look forward to receiving your confirmation by 16:00 (GMT) today, the stipulated deadline, that the Sellers have remitted the sums set out in our letters of 18 March 2015.*

79. **15 April 2015**: Mr Highlands Senior writes to Campbell Johnston Clark with reference to MARANGO (no equivalent message was received with reference to MAYA) as follows:

*We refer to the above and inform you that we consider that the MOA for the Sale of the Vessel is still current.*

*We informed representatives of [Grupo R] of the follow circumstances before the MOA was agreed of the problems we encountered with the terminated Charterer [OSA].*

*On 28th February 2014, acting in pursuance of its powers under Mexican Law, the Mexican prosecutor's office, the [PGR], took over OSA and arrested all assets owned by OSA or in its possession, including the Vessel ("the PGR Arrest") Caballo Marango.*

*On or about 2nd March 2014, the PGR handed over OSA's administration to the [SAE], a separate governmental department charged with the management of assets which have been arrested by a division of the Mexican Government, including the PGR.*

*On or about 9th April 2014, the PGR applied for OSA to be put into "concurso"/ administration.  On 8th July 2014, OSA was formally placed into "concurso"/ administration (the "Concurso"), with a second arrest/ injunction being placed on the assets owned by OSA or in its possession (including the Vessel) ("the Concurso Arrest").*

*OSA is presently subject to the Mexican Concurso, which is overseen by a judge and a "conciliador"/conciliator.  OSA's Business affairs are being managed by  the SAE within the context of the PGR arrest and the Concurso.*

*This arrest of the Panama owned and registered vessel Caballo Marango is an act of misappropriation by the Mexican Government who have ignored the fact that the vessel was under control of Captain Mauricio Cruz the Owners representative in the 28th February 2014.*

*At a meeting in May, Representatives of Grupo R SA de CV attended with Shanara at the office of the PGR to meet with the Head of the PGR Unit Mr Hugo Louis Reynard who was shown the original documentation that the vessel was the property of Shanara.  The statement was made by him that the vessel would be released the following week.*

*Subsequently Grupo R SA de CV with all the above information paid Five Million US Dollars down payment on the vessel.  Unfortunately it never was released.*

*Since then we as Owners have been fighting with the Mexican Government-PGR-SAE-OSA-Ministry of Economic Affairs to secure the release of the vessel Caballo Marango and deliver it to Grupo R SA de CV in accordance with the MOA.*

*We are informed now that the Concurso Judge will release the vessel by the end of April.*

*I understand that our Lenders have assured Grupo R SA de CV of their support.*

*If however you do not agree the MOA is current, please give us the reasons in view of the above circumstances.*

*We thank you for your help and assistance in this matter.*

80.  **16 April 2015**: Campbell Johnston Clark reply as follows:

*We refer to your email of 15 April 2015.  The Seller appears to be under the misapprehension that the MOA is still in force and capable of being enforced, although you singularly fail to substantiate this position and instead rely on a bare assertion.*

*More importantly though, the Seller has failed to address, at all, our clients' letter of 28 January 2015 in which it is, as Buyer, terminated the MOA with immediate effect also the bareboat charterparty.  The basis of the termination was set out in detail in that same letter and our subsequent letter of 18 March 2015 which also clearly demanded that the Seller return the deposit immediately together with any interest accrued thereon.  The Seller has failed to explain why it has not repaid the deposit together with interest.  Our letter of 18 March 2015 also made clear that the Seller is obliged to compensate the Buyer for its losses and for all expenses together with interest and our client reserves all its rights in this respect.*

*The chronology of events set out in your message, about which we make no comment, does not affect the respective parties' legal position under the MOA in any way nor does it preclude the Buyer from relying on the terms and conditions of the MOA for their full meaning and effect.  The MOA was terminated by the Buyer and therefore the contract for the sale of the Vessel has fallen away; it cannot be reversed.*

*If we do not receive confirmation from the Seller within three working days from the date of this letter (i.e. by close of business (London time) on Tuesday 21 April 2015) that remittance in full of the deposit plus any accrued interest will be made in short order to the Buyer whose bank details are set out in its letter of 28 January 2015, we are instructed to commence arbitration proceedings and seek security for the Buyer's claims in such jurisdiction(s) as may be appropriate, without further notice to you.  Such proceedings will include a claim for recovery of interest and costs in addition to the deposit plus accrued interests and losses and/or expenses.*

*Although the seller does not make reference to the "CABALLO MAYA" in its message of 15 April 2015, our client adopts the same position above in respect of the "CABALLO MAYA".*

*The Buyer continues to reserve all its rights, remedies and defences whether arising under the MOA, at more, or otherwise.*

81.  **21 April 2015**: Mr Highlands Senior replies to Campbell Johnston Clark as follows:

*For the Sake of Good Order can you send us your confirmation that the MOAs for the vessels Caballo Marango and Caballo Maya are officially terminated.*

*Can you also define the following:*

- *Interest Outstanding*
- *Expenses*
- *Losses*

*Your attention appreciated.*

82. **28 April 2015**: Campbell Johnston Clark reply reiterating their previously stated position.  It is not necessary to quote their message verbatim.  Suffice it to say that they note that Grupo R's position have been very clearly set out in their letters of 28 January and 18 March, copies of which are attached; they note that Coastline have not confirmed that they would return the Deposits and interest; they repeat their demand for the Deposits; they claim interest at US Prime (3.25%) plus 3.0% on the Deposits; they assert that interest has accrued from 25 June 2014 (when the Deposits were paid) to 29 April 2015 in the sum of US$529,109.59; and they claim legal costs.

83. **10 July 2015**: Coastline do not reply and Campbell Johnston Clark serve notices of arbitration and of the appointments of their arbitrator Ms Kay.

84. **24 July 2015**: Ince & Co (who at the time were the solicitors for the Sellers before, in due course, being replaced by MFB)  give notices of the appointments of Mr Gault.

85. **April 2017**: MAYA is eventually released, according to evidence given by Mr Garza and Mr Mohamed.

86. **April 2018**: MARANGO is eventually released, according to evidence given by Mr Garza and Mr Mohamed.

87. **May 2019**: Mr Highlands informed us at the hearing that the Vessels were then in Galveston, Texas.  Neither of them had been sold.

**SUMMARY OF THE ISSUES**

88.    We indicated the nature of Grupo R's case at the beginning of the previous
       section.    As we intimated, the Sellers' case is more complex.    It may be
       summarised as follows:

    a)    The Sellers admitted that if Grupo R had validly terminated, they were
          entitled to repayment of the Deposits, as provided for in Cl. 14 of the MOAs.
          However, they said, the terminations were not valid for two reasons, set out
          in b) and c) below, each aimed at the same result.  It was these two reasons
          which were the main focus of the arbitration.

    b)    Any rights to terminate acquired on the cancelling dates (5 and 10 October
          respectively) were lost because Grupo R failed to exercise them within a
          reasonable time.

    c)    Alternatively, the parties conducted themselves on the basis that Grupo R
          would not be able to exercise the rights to terminate on account of delays
          caused by the restraint of the Vessels or, at least, would not be able to
          exercise the rights on that account without reasonable notice, and Grupo R
          were estopped from doing so.

    d)    If the terminations were not valid, what are the consequences in relation to
          Grupo R's claims and the Sellers' counterclaims?

    We deal with each of these issues below.  As they were all raised by the Sellers,
    in each section below we set out their position on each issue first, followed by
    Grupo R's position, regardless of the order in which each point we describe was
    made in the course of the arbitrations.

**FAILURE TO TERMINATE WITHIN A REASONABLE TIME**

***The issue as pleaded in the Submissions***

89.    In simple terms, the Sellers' case was that Grupo R waited from 5 October 2014
       (in the case of MARANGO) and 10 October 2014 (in the case of MAYA) until 28

January 2015 before purporting to terminate the MOAs.  The time which had elapsed was unreasonable.  The way Mr Eaton put it was that "*rights to terminate are to be exercised or lost, not warehoused indefinitely*".

90. The first basis on which this case was put was that there was an implied term that the right to terminate must be exercised within a reasonable time.  The Sellers pleaded that this term was to be implied because it was necessary for business efficacy, pursuant to the officious bystander rule and/or to give effect to the true construction of the MOAs.  The purported cancellations were not made and/or communicated within a reasonable time and were therefore invalid.

91. Grupo R's pleaded response was to deny any such implied term: in the case of ongoing delay in delivery, Grupo R were free to decide whether and when to cancel: it was their right to decide how much delay they were prepared to tolerate, and the point at which enough was enough.  In any event, they acted entirely reasonably and therefore complied with the term asserted by the Sellers.  It was entirely reasonable for Grupo R to wait for a period of some months in the hope that the Vessels would be released from the PGR arrests.

### The Sellers' Case on Implied Term

92. Mr Eaton amplified on the Sellers' pleaded case in his Skeleton Argument, presented just before the hearing.  He argued that the requirement that a term will only be implied where necessary was amply satisfied here: the implication followed readily from the commonplace principle that, where a contract does not specify a time within which a thing is to be done, it is to be done within a reasonable time. This principle is most frequently stated in the context of the performance of contractual obligations, but is equally applicable where one party is given a contractual option to terminate.

93. Thus, in *KKKK v Belships* (1939) 63 Lloyd's Rep 175, Branson J held that there was an implied term in a time charter that a right to terminate under a war clause must be exercised within a reasonable time after the outbreak of a relevant war. Conspicuously, Mr Eaton argued, the judge's reasoning was not based on any factors peculiar to time charters or war clauses, but on the general principles that (i) a term will be implied where necessary but not otherwise, and (ii) a reasonable

time will be allowed where a contract does not specify a time.   In his oral submissions, Mr Eaton drew our attention to the judge's conclusion:

> *In other words the charterers and the shipowners would be entitled here to a reasonable time within which to ascertain that war had broken out and within which to consider and decide the question whether, seeing that war had broken out, they thought it was in their interest to continue to implement the contract or not.*

94.   In the context of ship sale, in *The 'Great Marine' [1990] 2 Lloyd's Rep 245 @ 249*, it was common ground, and accepted by the Judge, that the Sellers' right to terminate for non-payment was exercisable only within a reasonable time (the contract in that case was on Norwegian Saleform terms).

95.   In the present case, Mr Eaton argued that since the Buyers' right under Cl. 14 to terminate for the Sellers' default is the mirror image of the Sellers' right under Cl. 13 to terminate for the Buyers' default, it would be strange, and would produce a distinctly unbalanced bundle of contractual rights and obligations, if the Buyers' right to terminate was not subject to the same limit; and, since the implied term rests upon general and well-established principles (see above) which are just as applicable to the Buyers' right to terminate as they are to the Sellers' right, there is no principled basis for drawing any distinction between Cl. 13 and Cl. 14 in this respect.

96.   Mr Eaton took us to the Court of Appeal decision in *CMA CGM S.A. v. KG MS 'Northern Pioneer' [2003] 1 Lloyd's Law Reports 212*.   This was a case about cancellation of a time charter under a war clause.   We comment that the appeal was against a refusal of the Commercial Court judge to grant permission to appeal against an arbitration award (the judge having granted permission to appeal against his refusal).   Thus, the primary focus of the Court of Appeal judgments was on the approach to be adopted under s. 69 of the Arbitration Act 1996, rather than on the substantive issues.

97.   For present purposes, it is unnecessary for us to go into the facts of the case. Suffice it to say that the arbitrators had found that the charterers had not validly terminated under the war clause for four separate reasons.   The third (on which the charterers sought leave to appeal) was that under the clause (which did not contain an express deadline for giving notice), the right to cancel had to be exercised within a reasonable time of the event in question; and the fourth was that the charterers had not given notice of cancellation within a reasonable time.

31

98.  Mr Eaton drew our attention to the following passage in the judgment of Lord Phillips:

> *A time charter-party is a joint adventure. The shipowner provides the use of his ship in accordance with orders given by the charterer. The charterer pays hire for the services provided by the shipowner. The suggestion that such a charter may permit a prolonged period during which one or both of the parties remains at liberty to terminate the charter is in conflict with business efficacy, as so forcefully demonstrated by Sir John Donaldson. If circumstances arise giving rise to a right to terminate the charter business efficacy requires that the right be exercised promptly. If the shipowner continues to provide the services of his ship, or the charterer continues to make use of those services beyond such time as would reasonably be needed to react to those circumstances, the inference will normally be that he has decided not to exercise the right to terminate the charter. In such circumstances the principles of election, waiver and estoppel will normally preclude the party in question from thereafter terminating the charter. Thus the requirements of business efficacy that justify the implication of a term that the right to withdraw be exercised within a reasonable time will normally produce the same result as a consequence of the application of the principles of election, waiver, and estoppel.*

99.  As mentioned above, Mr Eaton invited us to apply the ordinary principle in a commercial contract that if it does not specify a time within which the relevant thing has to be done, it has to be done within a reasonable time. He added that the idea that the thing has to be done within a reasonable time applies to non-contractual rights to terminate as well as contractual rights to terminate: a right to terminate a contract for misrepresentation or for duress or for undue influence can be lost by lapse of time if the right is not exercised for a considerable period.

100.  He then concluded that, since the proposition that a right to terminate can be lost if it is not exercised within a reasonable time is based upon an ordinary rule applicable to commercial contracts, and since that ordinary rule is also capable of applying to a non-contractual right to terminate, it was in his submission clearly equally capable of applying in the context of a buyer's termination right under a ship sale contract.

101.  Mr Eaton accepted that there was no authority to support this submission, but he pointed out that both Counsel and the Judge in *The 'Great Marine'*, referred to above, took it for granted that the right to cancel had to be exercised within a reasonable time applied to a seller's right in the context of a ship sale contract. Mr Eaton reiterated his argument in his Skeleton to which we have referred above that since the Buyers' right under Cl. 14 to terminate for the Sellers' default is the mirror image of the Sellers' right under Cl. 13 to terminate for the Buyer's default, it would be odd if the Buyer's right to terminate was not subject to the same limit.

32

102. Mr Eaton addressed us on the sole legal authority relied upon by Mr Coburn, in Court of Appeal in *Moel Tryvan Ship Company, Limited v Andrew Weir & Co* [1910] 2 K.B. 844. He pointed out the age of the authority and that the judgments were against the background of a 150-year history of discussion and decisions which had an impact on the judges' views. He submitted that the approach of the Court of Appeal, at least of Kennedy LJ (who provided the fullest judgment), was perhaps coloured by a concern in that era that the "*reasonable time*" was too vague and open-ended a concept to have any real place in a commercial contract. He contrasted this with modern times, when it is, he said, perfectly commonplace for the concept of a reasonable time to play a role even in commercial contracts: one need only cite *The Antaios* and *The Northern Pioneer*, which are both about time charterparties, commercial contracts, and indeed the clear assumption taken as read in *The Great Marine*, which is a ship sale contract, a commercial contract. So, Mr Eaton suggested, things have rather moved on in the modern world since Lord Justice Kennedy's concern about having anything to do with reasonable time.

103. Mr Eaton also drew our attention to the opening words of Farwell L.J.'s judgment

> *I am of the opinion that on the true construction of this charterparty taken as a whole the parties have expressed, not indeed in so many words but with reasonable clearness, the limits of the time within which the power of cancellation is to be exercised, and the limit on the true construction of the clause is that it may be exercised at any moment up until the point at which the ship arrives at the load port.*

104. Mr Eaton also took us to a passage in the judgment of Cozens-Hardy M.R. on which Mr Coburn had relied:

> *Under the charterparty the shipowners were bound to take their ship to Newcastle, however much behind time it might arrive. If it arrived before December 15 the charterer was bound to load. If it arrived after that date the charterers were not bound to load, though they had the right to load. Whether they should load or not would depend upon whether on the arrival of the ship rates had risen or fallen, and also upon whether they had a cargo ready. The cancelling clause is obviously inserted for the exclusive benefit of the charterers, and I fail to see how, as a matter of business, the charterers can tell whether it would be to their interest to cancel before the arrival of the ship. I decline to hold that there is any implied condition that the option shall be exercised within a reasonable time after the cancelling date.*

Mr Eaton submitted that this analysis was really based upon the true construction of the express wording of the charterparty and the cancellation clause.

105. In a similar vein, Mr Eaton drew our attention to the following words in the judgment of Kennedy L.J.:

> *If I am right in this view there is no room for an implication of a duty on the charterers' part to exercise their right of option within "a reasonable time" (whatever that might be construed to mean) after the date has been reached which ends the absolute right of the shipowners to have their ship loaded when she arrives at Newcastle.*

106. The nub of Mr Eaton's case on *Moel Tryvan* was, therefore, that all the Court of Appeal judges based their decision on the true construction of the express terms of the cancelling clause, namely that the right to cancel was exercisable at any moment up until the arrival of the ship at the load port. From this, it necessarily followed that there would be no room for the implication of a term which set a different time limit, whether reasonable or otherwise: you cannot imply a term which is inconsistent with the express terms.

107. As we have already indicated above, Mr Eaton submitted that *Moel Tryvan* did not reflect modern thinking. Further, the *dicta* in a voyage charter case such as *Moel Tryvan* should not rightly be broadened out to establish a proposition that the right of a buyer to terminate under the Norwegian Saleform 2012 is not subject to a reasonable time qualification: this is not a voyage charterparty case. This is not a short-term contract for the provision of services by carrying a cargo on a single voyage. It is not a case like the situation which the Court of Appeal described in *Moel Tryvan* where the commercial venture is subject to constantly fluctuating charter rates and coal prices, fluctuating day by day and indeed possibly even within a day, which fluctuations may have a significant effect on the commercial viability of the entire venture. The judges made the point, Mr Eaton observed, that the charterer is entitled to see what the state of the market is when the ship actually turns up, but that is in the context of volatile coal sale markets, and volatile charterparty markets, which are constantly fluctuating.

108. This, Mr Eaton submitted, is not that kind of short-term contract against volatile markets: we are concerned here with 328 million dollar contracts for the outright sale of highly specialist sophisticated ships which were regarded by Grupo R, as their witnesses told us, as major assets which they were buying as part of the contribution to the strategic growth of their business. The idea that in that context Grupo R could not be expected to make up their mind whether or not to exercise the right to cancel until the ship was tendered is not commercial. It may have

34

made commercial sense in the context in the *Moel Tryvan* case to say that you cannot be expected to make your mind up until the ship arrives, but there are not similar considerations here.  Indeed, the idea that the buyers are entitled to keep the right to terminate open until the ship is tendered is very similar to the idea that was rejected in *Belships* that the option to terminate under the war clause can be kept open for as long as the war continues.

### Grupo R's Case on Implied Term

109. It was common ground between the parties that there is no legal authority on the implied obligation of a buyer of a vessel under the Norwegian Saleform to terminate within a reasonable time after the cancelling date if he wishes to exercise his right to cancel.  However, Mr Coburn submitted in his Skeleton Argument that the Sellers' case was essentially the argument rejected by the Court of Appeal in *Moel Tryvan*.  He argued that although that was a voyage charter case, the rationale for the Court of Appeal's decision applies equally to an MOA.

110. In *Moel Tryvan*, the charterers had "*the option of cancelling this charterparty*" if the ship had not arrived ready to load by the cancelling date.  The Court of Appeal rejected the contention that the option had to be exercised within a reasonable time after the cancelling date, concluding instead that the charterers could cancel at any time up to the actual arrival of the ship.

111. The main reasons for that conclusion were as follows:

    a)   The option to cancel is for the exclusive benefit of the charterer;

    b)   The mere passing of the cancelling date does not put the charterer in a position to make an informed decision about whether it is in his interests to cancel. Cozens-Hardy MR said @ p.854:

    > *...I fail to see how, as matter of business, the charterers can tell whether it will be to their interest to cancel before the arrival of the ship.*

    Kennedy LJ said @ p.857:

    > *… from the mercantile point of view so vague a stipulation as that of "a reasonable time" under which in some way the conflicting interests of shipowner and charterer are to be harmonized, and under which the charterer, as indeed is the present case, would be asked to anticipate, days, or weeks, or possibly months ahead, what his interests*

35

> might be when the ship arrives, would certainly be deemed unpractical and unbusinesslike.

c) The mere passing of the cancelling date does not remove the owners' obligation to tender the ship at the loading port, so the charterers have the right to await the tender of the ship before making their decision.  That rules out any prior "*reasonable time*" deadline.

112. Mr Coburn submitted that these reasons apply equally in the context of an MOA:

a) The option to cancel is for the exclusive benefit of the buyer;

b) The mere passing of a cancelling date does not put the buyer in a position to make an informed decision about whether it is in his interests to cancel. That will depend on what happens next;

c) The passing of a cancelling date does not remove the seller's obligation to tender the ship, with the consequence that the buyer has the right to await the tender of the ship; and

d) The suggested "*reasonable time*" obligation is just as vague and unsatisfactory in an MOA context as in a charter context.

113. Mr Coburn reiterated and amplified on his Skeleton Argument in his opening oral submission as follows:

> … the mere passing of a cancelling date doesn't somehow automatically put the charterer, or we would say the buyer, in a position to make an informed decision about whether it is in its, his or her interests to cancel.  The passing of the date is what gives you the right, but in and of itself it doesn't tell you much if anything about whether it's going to be in your interest to exercise it, and what you really want to know is: when am I actually going to get the ship?  And the Court of Appeal held in the Moel Tryvan case that you were entitled to wait until you knew the answer for sure, i.e. when the ship had actually been tendered.

114. Mr Coburn also advanced the proposition that what we are concerned with in this case is a "*plain vanilla*" cancelling clause exactly parallel to "*plain vanilla*" cancelling clauses in charterparties; and it is a long-established principle that there is, in an ordinary charter with an ordinary cancelling clause, no implied term requiring the charterer to cancel within a reasonable time after the cancelling date.

115. Mr Coburn also submitted to us that the cases on withdrawal under a time charter such as *The 'Laconia'* and *The 'Antaios'* were of no relevance. He directed us to the judgment of Staughton J in *The 'Oro Chief'* [1983] 2 Lloyd's Rep 509. In that case, the time for delivery of and payment for the vessel under a contract on the Norwegian Saleform expired on 6 April 1983. The buyers failed to tender the purchase price in exchange for the documents which the contract required to be handed over on completion and the owners purported to cancel. Mr Coburn pointed out to us the following passage in the judgment @ p.519:

> ..., reliance is placed on the notice of readiness on March 15. It is said ... that cancellation could only take place promptly, or within a reasonable time, after the expiry of the three-day period from notice of readiness mentioned in cl. 3 of the contract. No other notice of readiness was subsequently given. But it is clear that the owners continued striving to achieve delivery and payment. To say, as Mr Rix did, that the notice of readiness receded in the background of everyone's mind is, at best, plainly wrong.

> I was referred to the case of The Laconia ... and The Scaptrade ... as to what is the proper time for cancellation in the event of non-payment of hire under a time charter. The time for exercise of the right to cancel under a continuing contract such as a time charter is an altogether different topic from the time for cancellation of a contract for the sale of ship. In the present case, the question is whether the owners must be taken to have waived or abandoned this right to cancel because they did not exercise it within three working days of March 15. On the facts, and particularly in the light of the terms in which extensions were granted on March 24 and April 5, they did nothing of the kind.

As Mr Coburn put it, that was a "*curt dismissal*" not only of any analogy with time charter cases (the point which we are now addressing) but also, on the facts of that case, of any question of waiver or abandonment.

116. Mr Coburn drew our attention to a passage in Lord Phillips' judgment which Mr Eaton had not taken us to in which he quoted from Sir John Donaldson's judgment in *The 'Antaios'*:

> I know of no authority for the proposition, and I do not think that I have ever heard it suggested before, that a shipowner can extend the time for reaching a decision whether or not to withdraw beyond what is reasonable in all the circumstances by the simple device of announcing that his failure to decide is without prejudice to his rights. If Mr Pollock is right, and the owner can extend his option to withdraw the vessel in this way, chaos would result. Ships would be hove to at sea or tied up in port, no one knowing whether they were going to perform the chartered service ... An interval of nearly a month before the owners could be forced to elect would be wholly unacceptable commercially.

Mr Coburn submitted that the reference to "*forcefully demonstrated*" in Lord Phillips' judgment in *The 'Northern Pioneer'* was a reference to Sir John Donaldson's warning in the above passage that "*chaos would result*". He urged us to accept that no chaos was going to result if Grupo R were right in this case: they were simply advancing in the MOA context what has already been the law

for over 100 years in the charter context: it does not cause chaos, precisely because we are concerned with a completely different sort of context: we are talking about tender of a ship right at the beginning under a contract, not withdrawal under an ongoing time charter where both parties have to play their part and the ship is, with any luck, being engaged in profitable employment.  So when we see Sir John Donaldson's reference to "*chaos*", we should understand even more clearly why Staughton J in *The 'Oro Chief'* rejected any analogy with the time charter cases and rejected reliance on quotations from the well-known cases in that context.

117. With regard to the decision in *KKKK v Belships*, Mr Coburn reminded us that the option to cancel in the time charter in that case was mutual and that one of the points mentioned in *Moel Tryvan* was that different considerations may arise in relation to a mutual option[11].

118. Mr Coburn argued that if you are concerned with a war cancellation clause, there is no natural endpoint for the exercise of the option in the way that there is in relation to the sort of cancelling clause that we are concerned with in the present case, or the sort of cancelling clause that *Moel Tryvan* was concerned with.  In our case there is a natural endpoint which is the actual tender of the ship.  In the case of war, on the other hand, there is no natural endpoint of that sort unless one goes to the extreme of saying that it is the end of the war.

119. Mr Coburn directed our attention to the following passage in the judgment of Branson J in *KKKK v Belships*:

> *It seems to me that the ordinary rule that one applies in the case of a commercial contract where no time is fixed, is applicable to the present case, because what the parties would have had to decide, if and when a war broke out, would be: in view of the outbreak of war, is it our desire to go on with this contract?  As Sir Robert Aske put it, no doubt what is contemplated by people who are envisaging the outbreak of war between Great Powers is that there will immediately be such a dislocation of business as to make it right that both parties to a contract should have a right of reconsidering their position and determining whether, in the changed circumstances, that is to say, whether in view of the outbreak of war, they are prepared to go on implementing a contract which had been made in peace-time and was intended to be operative in peace time.*

---

[11] Although Mr Coburn did not take us to the relevant passage, this would appear to be a reference to the concluding remarks of Kennedy L.J., in which he cautioned against applying dicta in an earlier case in which both the charterer and the owner had the option on the happening of a certain event to cancel the charterparty.

Mr Coburn submitted that a major immediate *"dislocation of business"* was enough to allow one to decide what to do, and that this was very different from the case of ongoing delay, where *"the ship is forever just beyond the horizon"*.

### Findings on Implied Term

120. Having reviewed the parties' respective submissions, we now set out our conclusions on the question whether there was an implied term that the right to terminate must be exercised within a reasonable time.

121. We start by noting that Mr Eaton very properly reminded us of Lord Justice Scrutton's famous dictum in *Reigate v Union Manufacturing*, adopted by Branson J in *KKK v Belships*,:

> A term can only be implied if it is necessary in the business sense to give efficacy to the contract.

Branson J enlisted that dictum as support for his observation that –

> … it always seems to me to be most important that the Courts should abstain from implying terms into contracts unless it is perfectly plain that the parties really intended the contract to have that term."

122. We have endeavoured to apply this test when considering cl. 14 of the MOAs. To remind ourselves, the relevant part of that clause reads:

> Should the Sellers fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date the Buyers shall have the option of cancelling this Agreement …

So, the two inter-related questions we have asked ourselves are: can the clause work without the term which Mr Eaton asks us to imply, and is it perfectly plain that the parties really intended the MOAs to have that term?  Our answers to those questions are, respectively, yes and no.

123. We certainly espouse the principle that if a contract gives a party the right to do something but does not give a deadline for doing it, it would in all probability, depending on all relevant circumstances and factors, be right to imply a term as to that deadline, which might well be *"a reasonable time"*.  Against that background, it is a straightforward matter of common sense that such a deadline be implied in a time charter in the case the outbreak of war: to adopt Sir John Donaldson's words, chaos would result if in those circumstances certainty as to

39

the continuing existence of the charter were not achieved in fairly short order. We respectfully adopt Branson J's words of agreement with Counsel for the Owners in *KKKK v Belships* which we quoted above.

124. On the other hand, in the present case, it appears to us quite clear that, if the option to cancel the MOAs had been triggered under cl. 14 by the Sellers' failure to be ready to validly complete a legal transfer by the Cancelling Dates of 5 and 10 October 2014, then on the true construction of each of the MOAs there was a deadline for exercising the option, namely the moment when, following giving of Notice or Readiness, the Sellers tender the requisite documents and have complied will all necessary steps to validly complete a legal transfer.

125. At that moment, Grupo R would be obliged to pay the Purchase Price under cl.3 of the MOAs.  Accordingly, if by then they had not opted to cancel, they would themselves be in breach of cl.3 and the Sellers would themselves have the right to cancel the MOAs under cl. 13.

126. Thus, in *Moel Tryvan*, just as the arrival at Newcastle of the vessel marked the limit of time when, in the Court of Appeal's judgment, the charterers had to decide whether or not to cancel, so, in our case the moment of tender which we have just identified marked the limit of time when Grupo R had the right to cancel under cl. 14.

127. Thus, adapting the words of Farwell LJ at the start of his judgment, we are of the opinion that on the true construction of the MOAs, taken as a whole, the parties have expressed, not indeed in so many words, but with reasonable clearness, the limits of time within which the power of cancellation is to be exercised by Grupo R.  It follows that, as this is the reasonable construction of the MOAs, no question of reasonable time arises: there is no scope for the implication of a term.

128. As we have mentioned, Mr Eaton sought to persuade us that the Court of Appeal judgment in *Moel Tryvan* should be viewed with caution as it represented an outdated view not in accord with modern thinking.  We see no basis for accepting this submission, not least because Mr Eaton was unable to point to any subsequent, let alone modern, judgment criticising *Moel Tryvan*.

129. As we have noted above, Mr Eaton invited us to distinguish a commercial venture such as a voyage charter in *Moel Tryvan*, subject to fluctuating market rates, from the case under consideration.   Mr Coburn suggested that this was unconvincing, and we agree with him.  He suggested that the value of the ships will go up and down on the S&P market; the market into which the ships are going to be used will fluctuate; rates will fluctuate; in general, prospects for employment may change; in the present sort of case, for example, what Pemex might want to do at one stage of the story could be different from what they would want to do at a different stage in the story.  No expert evidence was offered by either party on the behaviour of the markets, but on the basis of our own trade experience and, indeed, as a matter of common sense, we are bound to agree with Mr Coburn.

130. Mr Eaton deployed in support of his argument the passage (quoted above) in the judgment of Lord Phillips in *The 'Northern Pioneer'* to the effect that a time charter-party is a joint adventure.  We regard the passage as providing support, not for his case, but rather for Mr Coburn's: it offers a cogent basis for distinguishing between the nature of a time charter and that of a contract for the sale of a vessel.  The former, as a joint adventure, requires the parties to work together on a continuing basis throughout the lifetime of the charter, whereas the latter in essence requires one-off acts of performance: tender of the vessel in exchange for the price.

131. As we have mentioned, Mr Eaton submitted that we are concerned here with contracts for 328 million dollars for the outright sale of highly specialist sophisticated ships which were regarded by Grupo R, as their witnesses told us, as "*major assets*" which they were buying as part of the contribution to the strategic growth of their business.  The idea that in that context Grupo R could not be expected to make up their mind whether or not to exercise the right to cancel until the ship was tendered was, Mr Eaton said, not commercial.  Again, Mr Coburn begged to differ: if anything, the size of the contracts under consideration pointed to a longer, not a shorter, deadline.  We would agree, were it relevant to assess what a reasonable time would be.

132. As noted above, given the decision in *The 'Great Marine'* that the Sellers' right to terminate for non-payment was exercisable only within a reasonable time, Mr

41

Eaton argued that since the Buyers' right under Cl. 14 to terminate for non-delivery is the "*mirror image*" of the Sellers' right under Cl. 13 to terminate for the Buyer's default, it follows that the Buyers' right to terminate for non-payment is exercisable only within a reasonable time.  The relevant passage in *Strong and Herring, Sale of Ships* not only notes that *The 'Great Marine'* dealt with potential cancellation by the Sellers and that there is no case law that the authors are aware of which deals with a cancellation by the Buyers of a contract for the sale of a second-hand ship; it also suggests that the implication of a term that any cancellation must be exercised within a reasonable time is –

> *… more understandable if the potential cancellation is by the Sellers.  The Buyers will usually have made detailed business arrangements in anticipation of prompt delivery – a new crew, a drydocking, a cargo or a ballast voyage to deliver the vessel into a charter. The Sellers will have made no such plans where it is the Buyers who delay their decision.*

133. Finally, we cannot but detect a certain irony in the Sellers' approach to this issue. If they were right that Grupo R had to exercise their right to cancel under cl. 14 within a matter of weeks, failing which they would lose that right and that such right was a mirror image of the Sellers' right to cancel under cl. 13, one may ask why they regarded themselves as entitled to cancel under cl. 13 when they purported to do so in their Defence and Counterclaim Submissions, almost nine months after Grupo R's messages of 28 January 2015.

134. In conclusion on this topic, **WE FIND** that there was no implied term of each of the MOAs that Grupo R had to cancel within a reasonable period of time after the Cancelling Date had passed, failing which they lost their right so to cancel; on the contrary, they retained that right up to the moment that each Vessel was tendered for delivery.

### *Had a Reasonable Time elapsed before 28 January 2015?*

135. The above finding renders academic the question whether a reasonable time had already elapsed before Grupo R purported to cancel on 28 January 2015. However, for completeness, and in case we are hereafter found to be wrong in our above finding, we now address this topic.  Again, we record first Mr Eaton's position, followed by Mr Coburn's.

136. In their Defence Submissions, the Sellers did not specify when the reasonable time had elapsed according to their case, other than that it was evidently before 28 January 2015.  In his Skeleton Argument, Mr Eaton noted Lord Wilberforce's statement in *The 'Laconia' [1977] AC 850 @ 872* that *"a reasonable time"* would often be *"a short time - viz the shortest time reasonably necessary for the shipowner to hear of the default and issue instructions"*.  He then continued:

> True, Staughton J in The 'Oro Chief' [1983] 2 Lloyd's 509 @ 519 was willing to countenance a less rigorous approach in the context of shipsale, holding that sellers had not lost their right to terminate by failing to exercise it within 3 working days. But the delay in this case was of an entirely different order: 115 days in the case of 'Marango', and 110 in the case of 'Maya'. On any analysis, this was in both cases more than sufficient to satisfy the requirement for Buyer to be afforded a reasonable period in which to decide whether or not to exercise the rights of termination which had accrued on 5 and 10 October 2014 respectively.

137. Further on, Mr Eaton comes to the nub:

> Sellers suggest that, even being generous, a period of 1 month was more than sufficient time for Buyer to make up its mind whether or not to terminate. Alternatively, even if the Tribunal considers that this is too short, the concept of a reasonable time cannot legitimately be stretched to cover the period from 5/10 November[12] 2014 to 28 January 2015.

138. When tackling the topic in his oral submissions at the hearing, Mr Eaton said:

> … it may well be the case that what is a reasonable time for the exercise of a right to terminate the contract depends upon context, and as Mr Coburn pointed out to you this morning, Staughton J in The 'Oro Chief' said that ship sale was a different context from a time charterparty. That's all right so far as it goes, but I would ask you to note that in the passages which Mr Coburn showed you in The 'Oro Chief', which is a ship sale case, Staughton J doesn't say considerations of reasonable time are just completely irrelevant in a ship sale case.  What he said is, the context is different and in the context of a ship sale on the facts of that case he concluded that a reasonable time had not expired before the right was exercised and therefore the right had not been lost.  But he did not say that questions of reasonable time just don't arise.  He did not say there is no reasonable time qualification at all.  Granted that what is a reasonable time may depend upon context, whatever the context is, whenever a tribunal is concerned with questions of reasonable time, the question is going to be, what is a reasonable time for the doing of some particular thing?  The context which we are concerned with is, what is a reasonable time for the exercising of a right to terminate?  In that context, I would submit the basic yardstick ought to be, what is a reasonable period of time for the buyer to make up its mind what it's going to do?

139. In an answer to a question put by the Chairman (namely, to what extent did the parties consider that the reasonable time test is influenced by the period between the conclusion of the MOAs and the cancelling dates), there was in Mr Eaton's submission no straight-line correlation between a reasonable time for the exercise of the right and the period of time between the signing of the contract

---

[12] Evidently this was a typographical error for October.

and the contractual cancelling date. Indeed, what is a reasonable time for the exercise of the right to cancel primarily falls to be judged by reference to the situation at the time when the right to cancel arises and afterwards going forwards, whereas the period between the contract signing and the moment when the right to cancel arises looks back in the other direction, so looking in different ways. In his submission, there is no direct relationship.

140. Mr Eaton conceded that it may be that a party with a right to terminate is reasonably entitled to more time to decide what to do in the context of a $328 million ship sale contract than it would be in the context of a time charter, but in his submission on any reasonable analysis a reasonable time had expired before the Buyers purported to terminate 28 January.

141. The nearest which Mr Eaton got to being specific as to when a reasonable time had expired was when he stated that his primary submission was that it had done so before Grupo R purported to reserve their rights on 12 December – and that they could not extend time beyond what was reasonable simply by reserving their rights in that manner. In support, he referred us to the words, quoted above, of Sir John Donaldson on the topic in *The 'Antaios'*.

142. For their part, Grupo R contended in their Reply Submissions that even if the term was implied, it was entirely reasonable for them to wait for a period of some months in the hope that the Vessels would be released from the PGR arrests. In his Skeleton Argument, Mr Coburn expanded on this contention, stating that "*reasonable*" would mean reasonable in all the circumstances, and here Grupo R acted reasonably in all the circumstances: there was nothing unreasonable about holding off from cancellation until it had become tolerably clear that the delay was going to continue indefinitely.

143. For our part, we conclude that the notices of cancellation of 28 January 2015 were served before a reasonable period could be said to have expired after the contractual Cancellation Dates of 5 and 10 October 2014. This conclusion is reached on the basis of a consideration of all the circumstances. It would in our view be wrong to attempt to approach the test of what was a reasonable time in too analytical manner and therefore the factors which we set out as follows

should be viewed as not set in stone but rather as contributors to the general impression which built up to inform our decision:

a)   As Mr Eaton was at pains to establish when cross-examining Mr Garza and Mr Mohamed, it was abundantly obvious that Grupo R were very keen to buy the Vessels.  The Sellers would at all material times have appreciated that Grupo R would abandon the purchases only with reluctance and after hesitation.  It was not a case where they would expect Grupo R to seize an opportunity to get out of the deal promptly if the Sellers failed to tender the Vessels on time – quite the contrary.

b)   As Mr Eaton was also at pains to establish when cross-examining Mr Garza, these contracts, with a total consideration of $328M, were "*major contracts*" which were intended to replace one of Grupo R's two existing offshore vessels and to increase their fleet for the long term.  Again, these were factors which, as the parties would have always anticipated, would make a decision to cancel a weighty one, to be taken, as we have said, with reluctance and after hesitation.

c)   As we noted when introducing our lengthy exposition of the events underlying this dispute, optimism and pessimism as to a successful completion of the MOAs succeeded each other frequently in roller-coaster fashion.  It is hardly surprising, therefore, that against this context both sides would find it difficult to read the signs and it was therefore to be anticipated that decisions might be delayed in the hope, or fear, that a turn of events might sway expectations one way or the other.

d)   As for Grupo R's reservation of rights of 12 December 2014, clearly Sir John Donaldson's dictum (namely, that a shipowner cannot extend the time for reaching a decision whether or not to withdraw beyond what is reasonable in all the circumstances by the simple device of announcing that his failure to decide is without prejudice to his rights) must apply to the buyer of a ship in Grupo R's position.  However, that begs the question when the time for reaching a decision has expired and, as we say, our conclusion is that it had not on that date, nor for that matter by 28 January 2015.

45

e)   Nevertheless, the existence of the reservation, and in particular the non-reaction to it, does to us have an evidential significance: the mere fact that Coastline did not react adversely in any way, let alone protest by asserting that it was too late to cancel, is in our estimation a clear pointer to the fact that, at that time, they were in no doubt that it was not too late. Their reaction ("*Thank you for your mail or Friday 12th December 2014 and the enclosures. Thanks for all your help and attention.*") is to us not the reaction of a party to a very substantial contract who takes exception to its counterpart's message.  We found Mr Highlands' efforts to deal with this difficulty in the Sellers' case unconvincing and we consider that this is a factor which we are entitled to take into consideration when determining whether, in all the circumstances, a reasonable time had by then already elapsed.

f)   This conclusion can only be reinforced by the complete lack of any reaction whatsoever to the actual notices of cancellation of 28 January 2015.

g)   The same observation applies to Coastline's silence following Campbell Johnston Clark's letters of 18 March and, eventually, to the responses of 1 and 15 April to the chasing emails of 25 March.  It is particularly noteworthy that the message of 15 April, albeit fairly detailed in its summary of the history, does not even attempt to suggest that the cancellation notices were too late, let alone uncontractual.   Equally noteworthy is Mr Highlands Senior's enquiry of 21 April asking, without protest, Campbell Johnston Clark to confirm the official termination of the MOAs and enquiring as to the extent of Grupo R's claims.

h)   Indeed, it was only when Defence Submissions, drafted by Counsel, were served on 16 October 2015 that the "*reasonable time*" defence emerged for the first time.

144.  Accordingly, **WE FIND** that, if we are wrong in our finding that there was no implied of each of the MOAs that Grupo R had to cancel within a reasonable period of time after the Cancelling Date had passed, in any event the notices of cancellation of 28 January 2015 were served before a reasonable time for serving such notices had expired.  It follows that, subject to the next issue which falls for our consideration, such notices were valid and took effect in accordance

with their terms so as to cancel the MOAs and trigger Grupo R's entitlement to the immediate release of the Deposits together with interest earned in accordance with cl. 14.

**WAIVER/ESTOPPEL**

***The Sellers' Case***

145. As an alternative to their contention that Grupo R had not served their cancellation notices within a reasonable period, the Sellers pleaded that in failing to cancel the MOAs reasonably soon after the Cancelling Dates of 5 and 10 October, Grupo R had waived their right to do so and/or represented that they were not going to do so, in reliance upon which the Sellers did not take steps to market the Vessels to other potential purchasers, so that it was inequitable for Grupo R to seek to resile from that position by purporting to cancel the MOAs.

146. As a further alternative, the Sellers pleaded that Grupo R represented and/or there was a mutual understanding and/or convention that the MOAs would not be cancelled by reason of delays caused by the PGR arrests, alternatively would not be so cancelled without reasonable notice.   They relied upon that representation, convention and/or mutual understanding, in that they agreed not to stand by their cancellation of the MOAs and/or the MAYA MOA and/or they did not market the Vessels to other potential purchasers and/or arranged for works to be carried out to the Vessels at Grupo R's request.  It would therefore be inequitable, in all the circumstances, for Grupo R to cancel the MOAs and/or the MAYA MOA by reason of delay caused by the fact that the Vessels were still under arrest by or the control of the PGR, either at all, or (in the alternative) until a reasonable period after Grupo R had informed the Sellers that they were no longer willing to wait for the Vessels to be released by the PGR.

147. The upshot of these contentions was that the notices of 28 January 2015 were sent prematurely and/or Grupo R were not entitled to send them.

148. Understandably, the irony that this way of pleading the defence contradicted the Sellers' primary argument that the notices were sent too late was not lost on

anyone.  However, we see nothing inherently objectionable in a party pleading alternative cases which may contradict each other.

149. In his Skeleton Argument, Mr Eaton expanded on his case on waiver, explaining that we are concerned here with waiver by election, which arises where a party is in the position of having alternative but inconsistent rights and must choose between them.  A party which has a right to terminate a contract is in such a position, since it may either exercise the right, in which case the contract ends, or choose to treat the contract as continuing, in which case the party is said to *"affirm"*. The choice is irrevocable.

150. In most cases, the party with the right to terminate has genuine freedom which choice to make. But it must make a choice, since the parties' future rights and obligations will be very different depending upon whether the contract is terminated or affirmed: in case of termination, rights and obligations cease to attach to actual performance of the contract and are transferred instead to damages in lieu of performance; in case of affirmation, actual performance remains due.

151. Certainty about the nature of the parties' rights and obligations is essential: the contract cannot remain suspended in some sort of limbo. So, while the party with the right to terminate is given a period of time in which to make a decision, it will be taken to have affirmed if it delays for an unreasonable period without exercising the right to terminate.

152. These principles are most frequently encountered where one party to a contract has a right to terminate for the other party's renunciatory/repudiatory breach. But they are equally applicable in other circumstances in which one party has a right to terminate, since the same analysis that a choice must be made between inconsistent rights arises whether the right to terminate arises by reason of breach or on some other ground.    Thus, a right to terminate for misrepresentation, duress, or undue influence will be lost by delay in exercising it.

153. As for Mr Eaton's case on estoppel by representation, in his Skeleton Argument he noted that there is considerable overlap between waiver and estoppel, since both, in the context of a right to terminate a contract, rest upon an unequivocal

representation by the relevant party that it is not going to exercise the right. The points of difference between the two are that, first, knowledge is relevant to waiver, but not to estoppel and, secondly, reliance by the party to whom the representation was made is a necessary ingredient of estoppel, but not of waiver.

154. Mr Eaton contended that Grupo R's delay of about 3½ months before purporting to exercise their Cl. 14 rights was more than sufficient to engage these principles: either the rights were lost by reason of an implied term, and/or Grupo R's excessively prolonged failure to exercise them amounted to a representation that it was not going to do so, sufficient to constitute a waiver and/or to ground an estoppel.

155. For evidence on reliance in the context of estoppel, Mr Eaton referred us to Mr Highlands' witness statement to the effect that other potential buyers were interested in the Vessels, and Coastline would have negotiated with these if Grupo R had given timely notice of termination. Instead, Coastline remained loyal to Grupo R, believing that it remained as committed to the MOAs as they were.

156. Mr Eaton then went on to assert that Grupo R's assertion that the delay was not unreasonable was not credible. He suggested that, even being generous, a period of 1 month was more than sufficient time for Grupo R to make up its mind whether or not to terminate. Alternatively, even if the Tribunal considered that this was too short, the concept of a reasonable time cannot legitimately be stretched to cover the period from 5 or 10 October 2014 to 28 January 2015.

157. Mr Eaton then addressed an assertion, pleaded in Grupo R's Reply Submissions, that their reservation of rights of 12 December prevented any waiver or estoppel from arising. He denied this for two reasons.

158. First, if, as he had already submitted, a reasonable time was 1 month, or, indeed, any time less than about 8 or 9 weeks (i.e., the period from 5 or 10 October to 12 December 2014), then a reasonable time had already expired, and the rights to terminate had already been lost, by the time Grupo R purported to reserve its rights. On no analysis could a reservation of rights revive rights which had already been lost.

159. Secondly, where the facts would otherwise ground a waiver or estoppel, a party cannot prevent that waiver or estoppel from taking effect by the simple expedient of reserving rights: *Segal v Thoseby [1963] 1 QB 887 @ 897; Bremer v Mackprang [1979] 1 Lloyd's Rep 221 @ 225, 230.*

160. Mr Eaton submitted that in the specific context of waiver or estoppel arising from delay, a party with an accrued right to terminate cannot extend the time for making a decision whether or not to exercise the right beyond what would otherwise be a reasonable time by stating that its failure to announce a decision is without prejudice to its rights: *The 'Antaios' [1983] 2 Lloyd's Rep 473 @ 480.*

161. Mr Eaton also argued that Grupo R's right to terminate the MOAs was qualified by estoppel by convention.  This form of estoppel arises where the parties to a contract have proceeded on the basis of a common understanding or assumption.  One party will be estopped from resiling from that understanding or assumption if to do so would be unjust or unconscionable, typically because the other party has relied upon the understanding or assumption in a way which would make it unjust for the other party to depart from the understanding or assumption.

162. The common assumption or understanding may be either shared by both parties simultaneously or made first by one party and then acquiesced in by the other, provided that it *"passes across the line"* between the parties.

163. The common assumption or understanding may be one of law, rather than of pure fact.  In particular, estoppel by convention can apply to questions of private right under a contract, such that one party will be estopped from relying on a construction of the contract, even if that construction would otherwise be correct, if the parties have acted on the basis of a common assumption or understanding that their contractual rights are different from what they would be under that construction: e.g., *The 'Vistafjord' [1986] 2 Lloyd's Rep 343.*

164. Mr Eaton submitted that the requirements for an estoppel by convention were satisfied in this case based upon the June 2014 events, the key facts being that:

a)   The Sellers, having terminated the MOAs for non-payment of the Deposits on 18 June 2014, and again on 20 June 2014, were persuaded by Grupo R to withdraw those terminations and to treat the MOAs as valid and binding;

b)   The context was, as both parties knew, that the Vessels had been under arrest since March 2014, and it would not be possible for the Sellers to deliver the Vessels under the MOAs while that state of affairs persisted;

c)   The Sellers had proposed, on no fewer than three occasions before they terminated on 18 June 2014 that, given the ongoing delays caused by the arrests, the contracts should be terminated: see the Sellers' messages of 5 and 16 May 2014 and 6 June 2014;

d)   Grupo R, however, had stated its continuing interest in the Vessels, notwithstanding the delays caused by the arrests, and had not wanted to terminate;

e)   Grupo R repeated its interest after 18 June 2014, notwithstanding that the arrests and delays were still continuing, with no definite or even reasonably certain end in sight, and persuaded the Sellers to withdraw their terminations;

f)   The arrests and delays were still continuing, still with no definite or even reasonably certain end in sight, as at 25 June 2014, when the Sellers confirmed that the MOAs remained valid and binding.

165. Drawing on those facts, Mr Eaton argued that a reasonable person, looking objectively at the parties' conduct, would have understood that, whatever Grupo R's strict legal rights might be on the true construction of the MOAs, they would not be able to terminate the MOAs on account of delays caused by the arrest.

166. A significant part of the period between contracting in March 2014 and the Cancelling Dates in October 2014 had already elapsed, and there was no clarity that the Vessels would be released by the Cancelling Dates. The Sellers were clearly concerned about the situation, and had repeatedly expressed their wish to terminate the MOAs because of the arrests.  It would not have made sense to

51

a reasonable person to think that the parties were reinstating the MOAs in June 2014 on the basis that they might be terminated again, on account of the same ongoing arrest delays, in a few months' time in October 2014: and a reasonable person would have concluded that the parties were conducting themselves on the basis of a common assumption or understanding that Grupo R would not be able terminate on account of delays caused by the arrests.

167. Commenting now on Grupo R's position, Mr Eaton noted that their Reply Submissions had suggested that this interpretation of the parties' conduct was uncommercial, because it involved the possibility that Grupo R, having paid $10M in Deposits, might have been left waiting *"indefinitely"* for the Vessels to be released.

168. This suggestion that the estoppel could have locked the parties into unperformable MOAs until the end of time is, Mr Eaton contended, a bad point. If the arrests had continued *"indefinitely"*, then there would ultimately have come a time at which the law would have treated the MOAs as discharged by frustration. (Since frustration takes effect by operation of law, not by the exercise of a unilateral right of termination conferred upon one of the parties, the estoppel would not exclude frustration.) Grupo R knew this perfectly well, since it relied upon frustration itself as a final backstop basis for its claim to recover the Deposits (see below).

169. Alternatively, Mr Eaton suggested, if a reasonable person would have thought that the estoppel must be subject to some limitation in time, then the true construction of the estoppel was that Grupo R would not be able to terminate on account of delays caused by the arrests without reasonable notice.

170. On that point, Mr Eaton noted that Grupo R's Reply Submissions suggested that they had given reasonable notice before they purported to terminate the MOAs, relying on Grupo R's reservation of rights messages of 12 December 2014.

171. Mr Eaton commented that this suggestion was rather difficult to understand. Those messages asserted that Buyer already had, as at 12 December 2014, existing and accrued rights to terminate (an assertion which, on either construction of the estoppel, was simply wrong) and purported to reserve those rights. But the messages said nothing whatsoever about when, or under what

circumstances, Grupo R would regard themselves as free to exercise the alleged rights.  The messages were not at all in the form of notices to the Sellers that Grupo R intended, at some point in the future, to exercise rights which were, as at the date of the messages, subject to an estoppel.

172.  What was necessary, if Grupo R wanted to bring the effect of the estoppel to an end by giving reasonable notice, was a clear statement that they would terminate if the Vessels had not been released or delivered by a specified date falling a reasonable period after 12 December 2014. That would have given the Sellers proper notice of where they stood.  Grupo R did not provide such notices: the messages of 12 December 2014 did not provide the Sellers with any meaningful information about Grupo R's intentions.  As Mr Highlands said in his statement, the subsequent purported terminations of 28 January 2015 came out of the blue.

173.  For similar reasons, any suggestion that, if Grupo R's purported terminations on 28 January 2015 were invalid, they validly terminated by their subsequent messages in March-April 2015 was unsound.  None of those documents gave any notice, let alone reasonable notice, of future termination.  On the contrary, they were all backwards looking: Grupo R claimed in them that they had already validly terminated the MOAs on 28 January 2015.  In none of them did they seek to bring the effect of the estoppel to an end by giving advance notice of a future termination.

174.  Mr Eaton asserted that the Sellers relied upon the parties' common assumption or understanding by withdrawing their 18/20 June 2014 terminations of the MOAs and agreeing to treat the MOAs as valid and binding.  He referred us, in particular, to Mr Highlands' evidence.

175.  He then went on to  note that Grupo R had in their Reply Submissions asserted that the Sellers' terminations of 18 and 20 June 2014 were invalid.  If this was intended to foreshadow a case that the Sellers' withdrawal of the terminations did not constitute sufficient reliance to support an estoppel by convention, then, Mr Eaton stated, that was wrong:

a)    The First Set of MOAs had not been replaced by the Second Set by the time the Sellers terminated on 18 June 2014: the Sellers did not receive the Second Set signed by Grupo R until after they had already sent notice of

termination.   The Sellers' termination of 18 June 2014 was therefore effective.

b)   Since the contracts had already been terminated, the Second Set did not take effect when the Sellers received signed versions from Grupo R later on 18 June 2014.  Although the parties ultimately signed three different sets of documents, they were all on the same terms (aside from the substantively immaterial point about whether the buyer would be Grupo R itself or its nominee), and there was in substance only ever a single set of contracts. Those contracts had been terminated before Sellers received the new documents on 18 June 2014.

c)   Even if the Second Set did take effect on 18 June 2014, that did not affect the time for payment of the Deposits.  Time under cl. 2 ran from signing of contracts, not signing of documents.  Again, there was only ever a single set of contracts, and six Banking Days from signing of these had lapsed before 18 and 20 June 2014.  So, even if the Second Set took effect on 18 June 2014, the Sellers' termination on 20 June 2014 was valid.

d)   It does not ultimately matter whether or not the Sellers' terminations were strictly valid.  It is well settled law that foregoing a right which the relevant party believes is valid constitutes good consideration for a contract, even if the right is invalid in law: *'Chitty' @ 4-053.*  By parity of reasoning, foregoing such a right constitutes sufficient reliance to support an estoppel.

### *Grupo R's Case*

176. On these issues, Grupo R started their pleaded case in their Reply Submissions by asserting that the alleged representation/understanding/convention on which the Sellers relied was inadmissible by virtue of the Entire Agreement Clause (cl. 18) in the MOAs which we have quoted above.  We shall address this discrete topic below.

177. Quite apart from that assertion, Grupo R stated that there was no representation, understanding or convention as alleged by the Sellers, whose case involves an obvious *non-sequitur* and leads to absurdity.  The alternative case, that there

54

was a representation, understanding or convention concerned with the needs for reasonable notice failed to take into account the fact that the Sellers had not asserted that anything was said or understood regarding reasonable notice.  In the event, Grupo R did give fair warning of the prospect of cancellation by its messages of 12 December 2014.  There was nothing unfair about Grupo R's exercise of their contractual right.

178. In his Skeleton Argument, Mr Coburn stated that all that the evidence shows was that at this relatively early stage of the overall story (June 2014) Grupo R remained interested in buying the ships. That was common ground.

   a)   The parties never discussed what would happen if hope of release within an acceptable timeframe were to fade away.

   b)   It was impossible to interpret Grupo R's continued interest in the Vessels in June 2014 as giving rise to any kind of representation, etc., about the position seven months later, when the problem of getting the Vessels released had proved intractable and there was the prospect of indefinite delay.

   c)   Grupo R's position throughout was consistent with their ability, in that event, to exercise their right of cancellation.

179. Mr Coburn submitted that the written correspondence did not go beyond the above.  The phone conversation between Mr Mohamed and Mr Maringer on 20 June 2014 added nothing, whichever version of it is accepted:

   a)   The Sellers offered no direct evidence of that call - Mr Maringer had not given any evidence.  Mr Mohamed, by contrast, was giving evidence.  In any event, the documents were usually the best guide.

   b)   Even if the Sellers' second-hand version of the conversation in Mr Highlands' statement were accepted, it would make no difference.  Nothing in that account evidenced the representation, understanding etc. now alleged.

c)  The conversation was followed by the payment of the Deposits by Grupo R and the confirmation by Coastline that the MOAs were "*firm and active*". There was no reference to any representation etc. such as now alleged.

d)  If there had been any important representation, understanding or convention, somehow restricting Grupo R's right to rely on its contractual rights under the MOA, there would be some record of it in the documents.

180. It could also be noted that the Sellers' pleaded case referred only to the PGR, whereas their own evidence stated that there were further arrests, after June 2014, attributable to the civil/insolvency aspect.  *A fortiori* from the above, there was no evidence of any representation etc. of the sort alleged but extending to any form of arrest.

181. If it was necessary to go further, Mr Coburn suggested that the following points could be added.

182. Commercial Absurdity of Primary Case:

a)  The first half of the Sellers' third case – that, come what may, Grupo R had to await release by the PGR - was commercially implausible.  Indeed it had only to be stated to be rejected.  Nothing said by either party at any stage could possibly be interpreted as showing a common understanding that Grupo R would wait indefinitely for the Vessels to be released by the PGR.

b)  The Sellers' case did not rely on any express statement that Grupo R would wait indefinitely – Grupo R obviously said no such thing.  As already stated, Grupo R simply remained interested in the Vessels while there remained hope of release within an acceptable timeframe.  It was impossible to interpret such interest as any kind of representation or understanding that Grupo R would be obliged to tolerate indefinite delay.

c)  Although Grupo R were prepared within reason to lend their assistance in trying to get the Vessels released (for example by arranging meetings with PGR, as mentioned above), there was and could be no suggestion that they

somehow assumed responsibility, let alone sole responsibility, for getting the Vessels released.

183. The Reasonable Notice Alternative:

    a)    The "reasonable notice" alternative implicitly recognised the difficulty of any suggestion that Grupo R were obliged to wait indefinitely.

    b)    While this alternative case did not suffer from the same obvious lack of commerciality, the same fundamental objection remained: the case was based on nothing other than the fact of Grupo R's continued interest in the Vessels while there remained hope of release within an acceptable timeframe.

184. Further, Mr Coburn contended, again no reliance/inequity can be established. The Sellers had pleaded reliance/inequity in relation to (a) not standing by their cancellation; (b) not marketing; (c) arranging for work to be carried out.  In brief as to these:

    a)    The Respondents had not validly cancelled the MOAs. Even if they had, they lost nothing by reinstating them.

    b)    As to "marketing", Mr Coburn noted that the Sellers had not pleaded that any such marketing (even if it had occurred) would have resulted in a consummated sale on good terms; further, if the Sellers could not conclude a contract for the sale of the Vessels with a third party after Grupo R's January 2015 cancellation, there was no reason to think that they would have been able to do so before that, let alone on terms that would have committed a buyer to wait years on end.

    c)    There was no evidence of work being done on the Vessels on the basis of any representation etc.; and in any event the Sellers lost nothing by improving their own Vessels.

185. Reasonable notice was given:

a)   Further, it again remained the case that Grupo R had acted reasonably.  In particular, Grupo R did give reasonable notice prior to cancellation, and thus acted consistently with the representation, understanding or convention alleged.

b)   In fact, the pleader of the Defence on this topic appeared to have been unaware of the notices sent by Grupo R on 12 December 2014.  Those notices gave fair warning of the prospect of cancellation.  Grupo R then allowed an interval of some 1½ months to elapse before actual cancellation. During that period the Respondents offered no update, still less any reason to hold on further.

c)   Thus the idea that Grupo R's cancellation at the end of January 2015 somehow came unfairly out of the blue is unsustainable.   It is also inconsistent with Coastline's reaction, as summarised above. At the time they appeared, unsurprisingly, to be resigned to the cancellation.

d)   For completeness, Grupo R relied if necessary on the further messages communicating their decision to cancel sent on 18 March, 16 and 28 April 2015 and on the Claim Submissions.

e)   In other words if, strictly contrary to Grupo R's primary case, the MOAs were not validly cancelled on 28 January 2015, they were validly cancelled by the subsequent repeated communication of Grupo R's decision to cancel, in particular on 18 March, alternatively 16 April, alternatively 28 April, alternatively 4 September 2015 (the Claim Submissions).

f)   This arose because, even on their own case, the Sellers did not purport to treat Grupo R's 28 January 2015 messages as a repudiation. The Sellers' case as expressed in Mr Highlands' statement was that the alleged "repudiation" was accepted in the Defence Submissions (served October 2015).

g)   Thus the Sellers needed to contend that all the messages communicating Grupo R's decision to cancel were premature and not preceded by sufficient notice that Grupo R was "*no longer willing to wait for the Vessels*

58

*to be released by the PGR*". That, Mr Coburn suggested, was an impossible contention.

### Findings on Waiver/Estoppel

186. Having reviewed the parties' respective submissions, we now set out our conclusions on waiver/estoppel.

187. The first point made by Mr Eaton, as set out in our summary above, is that the doctrine of waiver by election effectively compelled Grupo R to exercise their right to terminate under cl. 14 within a reasonable period after it arose (on 5 and 10 October 2014), failing which they were taken to have affirmed the MOAs. We have to reject this contention.

188. First, it contradicts our finding that, on the true construction of the MOAs, the parties had agreed that Grupo R had until the tender of delivery of the Vessels to decide whether or not to cancel; further, that there was no implied term that they had to cancel within a reasonable period of time after the Cancelling Dates had passed. We do not see how the doctrine of waiver by election can be deployed to defeat the parties' agreement.

189. Secondly, were we wrong in rejecting the implied term argument, we have found that in any event the notices of cancellation of 28 January 2015 were served before a reasonable time for serving such notices had expired and we see no basis for applying a different test in determining what a reasonable time was for the purposes of waiver by election.

190. Next, Mr Eaton argued that Grupo R's right to cancel was lost by reason of their delay of about 3½ months before purporting to exercise their Cl. 14 rights, which was more than sufficient to trigger estoppel by representation. We do not accept that this was a delay which can form the basis of estoppel when, as we have found, it was perfectly justified under the terms of the MOAs. No balanced assessment of Grupo's conduct and communications could justify any inference that were, in effect, saying that they would not exercise their Cl. 14 rights.

59

191. As there was no relevant representation, it becomes irrelevant to assess whether there is any basis for finding that there was reliance on the Sellers' part. Nonetheless, we are satisfied that Mr Highlands' evidence, to which Mr Eaton referred us, provided no cogent basis for any such finding.  That evidence, as to the strength of the market and the potential for selling the Vessels to *"many interested buyers"*, failed to convince us, not least because there was a complete absence of any communications between the parties, let alone the Sellers and interested buyers, relevant to the topic in the critical period of the immediately following the Cancellation Dates.

192. Furthermore, the Sellers offered no evidence as to their attempts to market the Vessels after the MOAs were cancelled on 28 January 2015 or of any radical change in market conditions between, say, the first two weeks of November 2014 (i.e. when, according to the Sellers' case, the reasonable period to cancel expired) and 28 January 2015 which might explain the lack of such attempts. The Chairman questioned Mr Highlands about this at the close of his evidence but Mr Highlands' answer failed to enlighten us.

193. The only specific mention in Mr Highlands' witness statement as to marketing possibilities at the relevant time was:

> *I believe we would only have been able to release the vessels quicker if we had agreed to sell them to a Mexican company like the Aleman Group.*

194. Mr Coburn put this to Mr Highlands in cross-examination:

> *Overall it is unrealistic, isn't it, to suggest that at either of those stages, June or October, you would have been able not only to agree but also perform a sale to a third party?*

Mr Highlands answered:

> *I disagree.  In June we had offers from parties who were prepared to take the risk of the vessels' further detention as part of any purchase price.  They would buy the vessels as is, where is, which would effectively mean this whilst the vessels would have remained under arrest the owners would be able to sell them.  And that was specifically said to us.*

Mr Highlands did not answer as to the position in October, but he had the following further exchange with Mr Coburn:

> *Q.  You didn't want to do a deal with the Aleman family, did you?*
>
> *A.  For honourable reasons.  Were we being presented, under the scenario under 109, where the Aleman family would buy us out, for want of a better choice of words, and would assume the risk of lifting the arrest because of their political connections.  The downside was no doubt they would wish to get a discounted price in exchange for their actions. In answer to your question did we want to do a deal with them, no we didn't.  We didn't like the honour code and the behaviour of being forced to do that.  Was it a bad idea to reject*

*their offer, which would have taken cash out of the situation?  In retrospect possibly.  But at the time we didn't want to deal with basically a blackmailing party.*

*Q.  They never made any firm offer, did they?*

*A.  They never made a firm offer at that stage because after an exploratory talk we were quite categoric we didn't want to deal with them on principle.  Subsequent to that they have came back and made us an offer recently.*

195.  The upshot appeared clear to us: the only potential buyers specifically mentioned by Mr Highlands were not, in fact, a viable option for the Sellers.  In conclusion on this aspect, therefore, if, despite our contrary finding, Grupo R's failure to exercise their cl. 14 cancellation rights promptly amounted to estoppel by representation, the Sellers did not rely upon it.

196.  We can deal briefly with Mr Eaton's denial of Grupo R's contention that their reservation of rights of 12 December prevented any waiver or estoppel from arising.  First, contrary to Mr Eaton's case, we have found that the reservation of rights of 12 December was not sent after a reasonable period had already expired, so the impossibility of reviving lost rights does not arise.   Secondly, as we have found that the facts do not ground a waiver or estoppel, the principle that a party cannot prevent that waiver or estoppel from taking effect by the simple expedient of reserving rights becomes moot.  Finally, the reservation of rights of 12 December did not extend the accrued right to terminate beyond what would otherwise be a reasonable time because, as we say, that right in any event remained extant as at the notices of cancellation of 28 January 2015.

197.  As for Mr Eaton's argument that Grupo R's right to terminate the MOAs was qualified by estoppel by convention, to our mind the clearest evidence of the lack of the common assumption or understanding alleged by the Sellers was their lack of protest at either the reservation of rights of 12 December 2014 or the notices of cancellation of 28 January 2015 themselves or the subsequent communications from Grupo R's solicitors.   If the Sellers had genuinely understood that, whatever Grupo R's strict legal rights might be on the true construction of the MOAs, they would not be able to terminate the MOAs on account of delays caused by the arrest (or, as their secondary case, would not be able to terminate without reasonable notice), that lack of protest is wholly inexplicable.  Indeed, Mr Highlands' attempt to explain it was unsatisfactory.

198. We do not accept Mr Eaton's enumeration of the key facts on which he relied to satisfy the requirements for an estoppel by convention.

   a)   The termination for non-payment of the Deposits on 18 June 2014 was the termination of the First Set of MOAs, not with Grupo R but with their Portuguese nominees.   From the surrounding circumstances, it is abundantly clear to us that the termination was part and parcel of the novations of the MOAs taking place at the time: evidently, and rightly, the Sellers did not wish to have the First Set extant when the intention was to replace them with the Second Set.

   b)   The termination of 20 June 2014 was in reality not for non-payment of the Deposits but rather a negative reaction to Mr Mohamed's proposal the previous day for amendments to the MOAs.   Regardless of the motive for the termination, there is no evidence that the Sellers were persuaded to withdraw the termination of the Second Set on the strength of a representation or promise by Grupo R or a common assumption or understanding that Grupo R would not exercise its express rights to cancel if delivery did not take place by the Cancelling Dates in contracts which had only just been signed a week earlier.   The evidence is that the sole *quid pro quo* for the reinstatement of the MOAs was the immediate payment of the Deposits.

   c)   Although the context certainly was, as both parties knew, that the Vessels had been under arrest since March 2014, and it would not be possible for the Sellers to deliver the Vessels under the MOAs while that state of affairs persisted, we have seen nothing to persuade us that this context was tantamount to a common assumption or understanding that, come what may, and despite the express terms of the Second Set of the MOAs, just signed, Grupo R were committed to not cancelling, and therefore to not recovering the Deposits, however long the arrests of the Vessels might continue.   To reach a contrary conclusion would require compelling evidence, which is simply not there.

   d)   Similar comments apply to the fact that the Sellers had proposed on three occasions before they terminated on 18 June 2014 that the MOAs be

62

terminated.  Given the non-payment of the Deposits, they were on those occasions fully entitled to terminate whether Grupo R agreed or not. Accordingly, they were fully entitled to, but did not, seek to impose a condition upon their agreement to maintain the MOAs in force, namely that Grupo R could not cancel, and therefore recover the Deposits, however long the arrests of the Vessels might continue.

e)   Grupo R's expressions of continuing interest in the Vessels, notwithstanding the delays caused by the arrests, and of their desire not to terminate, were a million miles from establishing a common assumption or understanding that, come what may, and despite the express terms of the Second Set of the MOAs, just signed, they were committed to not cancelling, and therefore to not recovering the Deposits, however long the arrests of the Vessels might continue.

f)   Similar comments apply as at 25 June 2014, when the Sellers confirmed that the MOAs remained valid and binding.

199.  Mr Eaton submitted to us that the common assumption or understanding for which he contended would not have implied an indefinite commitment to the continued existence of the MOAs because there would ultimately have come a time at which the law would have treated the MOAs as discharged by frustration. We were not convinced: he suggested that Grupo R knew this perfectly well, since it relied upon frustration itself as a final backstop basis for its claim to recover the Deposits.  That does not mean that the concept of frustration was part of the common assumption or understanding of the parties in June 2014.  To put it at its mildest, we strongly suspect that it was not.

200.  It follows that we do not accept Mr Eaton's submission that it would not have made sense to a reasonable person to think that the parties were reinstating the MOAs in June 2014 on the basis that they might be terminated again, on account of the same ongoing arrest delays, in a few months' time in October 2014.  What, we suggest, would have made sense, would be for a person in the Sellers' position who thought as Mr Eaton contends would not have given Grupo R an unqualified option to cancel in the terms of cl. 14 when concluding and signing the Second Set of MOAs.

201. Our above observations concern Mr Eaton's primary position on estoppel by convention.  His alternative position was that, if a reasonable person would have thought that the estoppel must be subject to some limitation in time, then the true construction of the estoppel was that Grupo R would not be able to terminate on account of delays caused by the arrests without reasonable notice.  Although this has the merit of a less absolutist, and therefore less uncommercial, approach, we see nothing in the evidence which might justify it any more than the primary position.  However, even if we had been satisfied on that point, we agree with Mr Coburn, and disagree with Mr Eaton, as to the effect of the Grupo R's reservation of rights messages of 12 December 2014.

202. Mr Eaton said that what was necessary, if Grupo R wanted to bring the effect of the estoppel to an end by giving reasonable notice, was a clear statement that they would terminate if the Vessels had not been released or delivered by a specified date falling a reasonable period after 12 December 2014. That would have given the Sellers proper notice of where they stood.  Grupo R did not provide such notices: the messages of 12 December 2014 did not provide the Sellers with any meaningful information about Grupo R's intentions.

203. We regard this as unrealistic and uncommercial.  The messages of 12 December 2014 were clear (and therefore reasonable) notices that Grupo R regarded themselves as entitled, as of then, to cancel the MOAs and recover the Deposits, that they expressly reserved their right to exercise that entitlement and that delay in so exercising did not constitute waiver of that right.  Given that we have already found that Grupo R indeed had that right, we regard the messages as clear warning that the right might be exercised in the future.  We see no reason why, to be valid reasonable notice for the purposes of Mr Eaton's common assumption or understanding, it was necessary to say more: the tenor of the messages was that such common assumption or understanding (were it to have existed, despite our finding to the contrary) no longer held good and cancellation might occur at any time.

204. The only question on Mr Eaton's alternative case then would be: was the time elapsed between the giving of the reservation of rights notices on 12 December 2014 and the giving of the cancellation notices on 28 January 2015, i.e. 47 days,

64

reasonable notice?  To put it another way, had the cancellation notices been given the next day, on 13 December 2014, would that have been reasonable notice?  In the context, probably not; but we have no hesitation in finding that 47 days was reasonable notice.  Equally, we do not accept Mr Highlands' assertion that the notices of 28 January 2015 *"came out of the blue"*; had that been his reaction at the time, we can only repeat our previous observations: why did he not protest?

205. In view of our above findings, it is unnecessary for us to comment on the legal effect of Grupo R's subsequent messages.

206. In conclusion on this part of the case, **WE FIND** that Grupo R did not waive their right to terminate the MOAs under cl. 14 or at all and/or represent that they were not going to do so; further, that Grupo R did not represent and/or there was no mutual understanding and/or convention that the MOAs would not be cancelled by reason of delays caused by the PGR arrests, alternatively would not be so cancelled without reasonable notice.

### *Entire Agreement Clause*

207. In view of our above finding, the final argument on waiver/estoppel raised by Grupo R does not arise.  Nevertheless, for the sake of completeness we address it.

208. As we mentioned above, Grupo R started their pleaded case in their Reply Submissions by asserting that the alleged representation/understanding/ convention on which the Sellers relied was inadmissible by virtue of the Entire Agreement Clause (cl. 18).

209. In his Skeleton Argument, Mr Eaton argued that Grupo R's reliance on this provision was misconceived.

210. First, he submitted, while the meaning and effect of any clause ultimately depends upon the true construction of its particular wording, the generally understood function of an entire agreement clause is to preclude a party from trawling through the pre-contractual negotiations to try to build a case based on collateral contract or terms otherwise agreed outside the contractual text.

211. As such, an entire agreement clause looks backwards, to the pre-contract stage. The wording of cl. 18, with its reference to superseding agreements *"previous"* to the MOAs and to no reliance at time of contracting, confirms that it is backwards looking. But, Mr Eaton submitted, the Sellers' estoppel case was not based on any pre-contractual events: it was focussed on events in June 2014, well after the time of contracting.

212. Mr Eaton continued that it was no answer that the parties signed the Third Set in July 2014. What was relevant for cl. 18 was the date of contracting, not the date of signing a particular document: again, there was in substance only ever a single set of contracts, concluded well before the Third Set was signed in July 2014. And in any event, the parties, as they were free to do, dated the Third Set 21 March 2014. Since that was the date which the parties selected as the effective date, that was the date by reference to which cl. 18 took effect. Again, the Sellers' estoppel case was not based on events before that date.

213. Secondly, Mr Eaton contended that the wording of cl. 18 was ineffective to exclude estoppel by convention in any event. Estoppel by convention is based upon a common assumption or understanding, not on a unilateral representation or promise by the party which is estopped: *'Chitty' @ 4-108*. Accordingly, the Sellers' case was not based upon any *"statement, representation, assurance or warranty"*. Nor was it based on any *"agreement"*: if there had been an agreement, there would have been a collateral contract or a contract term otherwise agreed outside the text.

214. Mr Eaton stated that it was established in this respect that an entire agreement clause, unless it contained suitable specific wording, will not exclude claims based upon rectification or misrepresentation: *'Chitty' @ 3-061 & 7-145/6*. The same principle applied in relation to estoppel by convention: e.g., *Shoreline v Mears [2013] EWCA Civ 639@ Para 17*.

215. We understand the crux of Mr Eaton's first point to be that as the date of contracting was 21 March 2014 and the events relied upon for the Sellers' estoppel case occurred after that date, the entire agreement clause simply does not "bite" because, as he says, it looks backwards, to the pre-contract stage. Thus, it appears to us, the point stands or falls on the question whether there

was a single date of contracting, namely 21 March 2014 or whether there was a new date of contracting when the Second Set was concluded, alternatively when the Third Set was concluded.

216. Dealing with the latter alternative first, although the issue did not appear to be fully argued before us, we can certainly see a viable argument in favour of the contention that the Third Set did not amount to fresh contracts, newly entered into. Neither party had purported to terminate or cancel the Second Set and on the evidence before us the Third Set came into existence for two reasons only, first, so that Grupo R would have signed originals of the MOAs and, secondly, to make a minor technical correction with regard to the MARANGO. Accordingly, for present purposes, and without making a firm finding on the point, we are inclined to disregard 16 July 2014 (the date on which the Third Set came into existence).

217. The position with the Second Set, on the other hand, appears to us quite different.

218. In the first place, the buyers named in the Second Set were different legal entities from those named in the First Set, so the suggestion that there was contractual continuity from 21 March 2014 would appear incorrect.

219. In the second place, although the Second Set first came into existence on 16/18 June, the Sellers' own pleaded case, right or wrong, was that it only survived for a few days before they cancelled it, only to reinstate it later. Specifically:

a) they sent notices of cancellation for failure to pay the deposits on 20 June,

b) Grupo R sought to have the MOAs "*reinstated*",

c) Mr Mohamed asked Mr Maringer to persuade the Sellers to permit the MOAs to be "*reinstated, notwithstanding the fact that the Sellers had cancelled them*", and

d) On 23 June 2014, the Sellers notified Grupo R that if the Deposits were remitted within the stated deadline, "*the Sellers would consider the*

*Agreements to be valid and in force; and if not, the Agreements would be terminated*".

Furthermore, in his submissions on estoppel by convention, Mr Eaton expressly made it part of his argument that the Sellers terminated on 20 June.

220. Our understanding of that pleaded case is that at that time the Sellers regarded the MOAs as contractually terminated but capable of reinstatement, and that reinstatement happened after the sequence of matters constituting representation and/or mutual understanding and/or convention on which the Sellers relied for their estoppel case had ended.  Whether that pleaded case represented a correct legal analysis does not appear to us to matter: if it was the Sellers' understanding that they were reinstating the MOAs on 25 June 2014 (when they had received the Deposits and the MOAs became "*firm and active*"), it is that understanding which in our estimation is relevant for present purposes. In any event, such understanding was certainly arguably correct: the Sellers had indisputably cancelled the MOAs and Grupo R's conduct in requesting their reinstatement signified acceptance of the reality of such cancellation.

221. Mr Eaton also contended that the consensual dating of the MOAs 21 March 2014, the application of cl. 18 must be viewed by reference to that date.  The mere fact that the parties retained that date in all three Sets of the MOAs does not detract from the fact that the Second Set, and *a fortiori* the Third Set, were in reality concluded, and in the case of the Second Set reinstated, at the later dates which we have indicated.

222. Thus far, we have addressed the first point made by Mr Eaton.  The second point was that the wording of cl. 18 was ineffective to exclude estoppel by convention in any event.  That is a matter of construction.  Mr Eaton referred us to a wealth of authority.  We certainly accept that Mr Eaton has an arguable case on the point.  However, a discussion of the authorities which would do justice to the point would appear to us to be disproportionate, given that it would have no bearing on the outcome in view of our finding that there was no estoppel by convention.

68

**FRUSTRATION**

223. References have been made above to frustration.  The doctrine of frustration first arose in Grupo R's Reply Submissions, when they argued that even if their cancellations were invalid, the MOAs were frustrated by delay prior to any acceptance by the Sellers of any repudiation by Grupo R, and Grupo R accordingly remained entitled to the return of the Deposits on the basis of a total failure of consideration and/or pursuant to section 1(2) of the Law Reform (Frustrated Contracts) Act 1943.  Given our finding that the cancellations were valid, and the fact that Mr Coburn did not expand on this topic in his Skeleton argument, we do not propose to explore it.

**THE COUNTERCLAIM**

224. Although, as stated above, on 1 February 2016 we ordered that quantification of the counterclaim be deferred, the parties asked us to address one matter of principle.  Given that our findings on liability defeat the  counterclaim, we shall address the points raised only fairly briefly.

225. The matter of principle concerns cl. 13 of the MOAs.  To repeat, this says:

> *13. Buyers' default*
> *Notwithstanding anything herein to the contrary, should Buyers fail to* [sic] *any of its obligations under this Agreement, Sellers shall have the right to cancel this Agreement and to retain the Deposit … , which shall be Sellers sole and exclusive remedy.*

226. Had we found in the Sellers' favour on their substantive defences, Mr Eaton accepted that their sole and exclusive remedy for the exercise of their <u>contractual</u> right to cancel was indeed the retention of the Deposits.  However, he submitted that this did not impact upon the Sellers' <u>common law</u> right to treat Grupo R's breach (had we found that there was such a breach) as a repudiation and to terminate under common law – and to claim damages accordingly, as well as being entitled to a declaration that the Sellers were entitled to retain the Deposits.

227. In reply, Mr Coburn pointed out that the wording of cl. 13, quoted above, does not appear in the standard form.  We would comment here that the standard printed wording of cl. 13 of the Norwegian Saleform includes the following words, which were deleted from the MOAs by the parties:

> *If the Deposit does not cover their loss, the Sellers shall be entitled to claim further compensation for their losses and for all expenses incurred together with interest.*

Without drawing our attention to that fact, Mr Coburn commented on the words used in cl. 13 as follows:

> *They obviously make this a different regime from the standard-form regime, and the clear intention is that the sellers cannot advance a claim based on a proposition that we failed to perform, one that we repudiated and that was accepted, and get damages over and above the retention of the deposit, said to be their sole and exclusive remedy.*

228. On this point, Mr Eaton relied on *Chitty* at §22-049 and on the Court of Appeal decision in *Griffon Shipping LLC v Firodi Shipping Ltd (The 'Griffon')* [2014] 1 Lloyd's Law Reports 471.   In our view, neither authority supports Mr Eaton's position: neither addresses the position where, as here, (a) the parties have expressly and unambiguously excluded any remedy other than the retention of the Deposits, and (b) such exclusion is expressed to extend to Grupo R's failure "*to [perform][13] any of its obligations under this Agreement*".   *The 'Griffon'* was a case where the buyers of a vessel under an MOA failed to pay the deposit by the agreed deadline and the sellers held them in repudiation, cancelled the MOA and claimed the deposit; the buyers asserted that the sellers were only entitled to damages, being the difference between the contract and market price.   For present purposes, we do not need to discuss the Court of Appeal judgment at length: suffice it to say that it was held that the sellers were entitled to the deposit. The key passage in the judgment of Tomlinson LJ is at the start of paragraph 10 @ p.475 of the report, which reads:

> *The basic  fallacy in this argument is that limb 1 of clause 13 does not prescribe what is to happen if the deposit is unpaid.  It does no more than afford to sellers an express contractual right or rights exercisable in the event that the deposit is not paid.  These contractual rights are to be distinguished from those which arise under the general principles governing discharge by breach…*

In our case, on the other hand, cl. 13 <u>does</u> prescribe what is to happen if Grupo R fail to perform any of their obligations, namely, the Sellers can keep the Deposits – no more and no less.   *The 'Griffon'* can be clearly distinguished for this reason.

229. Mr Eaton accepted that the Sellers only expressly accepted Grupo R's repudiation when serving their Defence and Counterclaim Submissions.

---

[13] We have inserted the word "*perform*", which clearly was omitted from the clause as a result of a typographical or clerical error.

However, he argued that acceptance of repudiation did not have to be in any particular form and sometimes inactivity in the face of a repudiation may suffice. He relied on the decision of the House of Lords in *The 'Santa Clara'* [1998] AC 800.  Again, we take the view that this decision can be distinguished from our case.  It is authority for the proposition that an act of acceptance of a repudiation requires no particular form: it is sufficient if the relevant communication or conduct clearly and unequivocally conveys to the repudiating party that the aggrieved party is treating the contract as at an end.  Further, a failure to perform may sometimes signify to a repudiating party an election by the aggrieved party to treat the contract as at an end.

230.  In our case, until service of the Defence and Counterclaim Submissions there was no communication from the Sellers which clearly and unequivocally conveyed to Grupo R that the Sellers were treating the MOAs as at an end; nor was there a failure to perform which so signified: the continuing failure to perform after 28 January 2015 signified nothing, given that it was no different from the failure to perform before that date.  This may be contrasted with, for example, the situation where, following the buyer of a ship renouncing the MOA by declaring an inability to pay, the seller does not present delivery documents the form of which had been agreed with the buyer and which were to have been presented the day after the renunciation.

231. Furthermore, when in the Defence and Counterclaim Submissions the Sellers conveyed to Grupo R that they were treating the MOAs as at an end, they did not do so in terms of accepting Grupo R's repudiation; instead, they expressly invoked their right to cancel under cl. 13 and, accordingly, their entitlement under their Counterclaim, had we found in their favour, would be restricted to the retention of the Deposits, as expressly provided for in cl. 13.

232. On a different point, Mr Coburn argued that on *The 'Golden Victory'* principles, damages would be assessed at nil or nominal anyway, given that the MOAs would have been frustrated at some point prior to any obligation to pay, given the very protracted delay.   Mr Eaton submitted that this issue should not be considered at this stage and we agree with him.

233. In conclusion, were we to have found in favour of the Sellers on liability, **WE FIND** that their entitlement under their Counterclaim would have been to a declaration that they were entitled to retain the Deposits.

## INTEREST

234. Having found that Grupo R is entitled to the release of the Deposits, we address the question of its entitlement to interest.

235. Cl. 14 of the MOAs entitled Grupo R to "*interest earned, if any*".  By the time of the hearing, the Sellers had not furnished an account of any such interest and at the conclusion of the hearing we directed that such account be provided.  On 23 May 2019, Grupo R's solicitors reported to us that the Sellers' solicitors had advised that "*... the two accounts in which it is said that the deposit sums have been held are non-interest bearing and, therefore, no interest has been earned on the deposits*".  The next day, we ordered the Sellers to provide evidence of this.  They then produced bank statements showing that the bank accounts credited with the Deposits were indeed non-interest bearing.  However, the statements also showed that some of the funds were transferred out of the accounts and no information was given as to what happened to them and, specifically, whether interest was earned in some other account or accounts. Grupo R's solicitors observed:

> We note that the Respondents have provided excerpts of bank statements from OCBC Bank and DBS Bank which appear to show receipt of the two deposits of US$ 5 million. However, the bank statements also show that much of the money was withdrawn within a very short time after being deposited. By way of example, the OCBC Bank statement (Caballo Maya deposit) shows that in less than 7 days between when the deposit was received on 24 June 2014 to 30 June 2014, almost US$1.5 million was withdrawn. Furthermore, by 31 December 2014, only US$15,169.58 remained of the US$5 million deposit. No information/evidence has been provided as to where these sums were transferred and whether any interest was earned on these transferred sums in their new location(s).
>
> We also note that MFB state that the bank statements for the two bank accounts show that both were non-interest bearing. The OCBC and DBS Bank statements simply shows that no credit interest was paid – not necessarily that the bank accounts were non-interest bearing.

We directed the Sellers to provide full evidence which would enable us to determine whether any interest had been earned on the Deposits.  They responded:

> (1) the deposits were spent by them over time on day-to-day business expenses, and (2) the deposits were not in whole or in part transferred into interest-bearing accounts.  It

*follows that the deposits earned no interest in the period from 24 June 2014 to 28 January 2015 or the period thereafter.*

For their part, Grupo R maintained their position that we determine that Grupo R were entitled to discretionary interest pursuant to s.49 of the Arbitration Act 1996 throughout the period from the Deposits being placed on 23 June 2014 to date. We are of the view that different considerations apply, on the one hand, to the period before the cancellation of the MOAs and, on the other, to the period after that cancellation. We address the second period below. As to the first, the parties expressly agreed that Grupo R were in these circumstances to receive "*interest earned, if any*" – no more and no less. We are bound by that agreement. In the face of the Sellers' statement that no interest was earned, supported by the bank statements referred to above and the further response, quoted above, to our direction, we have no choice but to decline to award interest on the Deposits from the date on which they were paid to the date of cancellation of the MOAs.

236. When on 28 January 2015 Grupo R cancelled the MOAs and demanded the immediate refund of the Deposits together with interest earned, if any, the contractual provision with regard to interest thereupon ceased to apply: from that point, or rather, in our estimation two days later to allow time for the Sellers to comply with the demand, the Sellers were in breach and accordingly are liable to pay interest. In accordance with s.49 of the Arbitration Act 1996, **WE FIND** that the justice of the case renders it appropriate to award interest at the rate of 4.5% p.a., such interest to be compounded with quarterly rests, from 30 January 2015 until the date of payment.

## COSTS

237. As the Claimants Grupo R has been completely successful, it is appropriate that we award and direct that the Sellers bear their own costs and pay Grupo R its legal costs in both references on the basis for which section 63(5) of the Arbitration Act 1996 provides, such costs to be assessed by us if not agreed, and we expressly reserve our jurisdiction for that purpose.

238. It also follows that the Sellers bear the fees of the Tribunal, split equally between the two references.

73

We hereby certify that the foregoing 73 pages are a true and complete copy of the Reasons for our Award dated 30 May 2019.

DATED and made in London 26TH June 2019

..........................

**SARRA KAY**

..........................

**SIMON GAULT**

..........................

**DAVID LUCAS**

74

# ATTACHMENT 2

# CHEESWRIGHTS

SCRIVENER NOTARIES | LLP

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **ANDREW JONATHAN CLAUDET** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY the genuineness of the signature of **DANIELLA ISABEL HORTON** subscribed to the certificate hereunto annexed marked "A", such signature being in the own, true and proper handwriting of the said Daniella Isabel Horton, honorary secretary of **THE LONDON MARITIME ARBITRATORS ASSOCIATION** of London, England;

AND I DO FURTHER CERTIFY the genuineness of the impression of the seal of **THE LONDON MARITIME ARBITRATORS ASSOCIATION** aforesaid, affixed to the said certificate.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this tenth day of July in the year two thousand and nineteen.



Regulated by the Faculty Office of the Archbishop of Canterbury

Bankside House, 107 Leadenhall Street, London, EC3A 4AF
tel 020 7623 9477   email notary@cheeswrights.co.uk
www.cheeswrights.co.uk

Canary Wharf office tel 020 7712 1565

Cheeswrights LLP is a limited liability partnership incorporated in
England and Wales with registered number OC426084



International
Union
of Notaries



SCRIVENER
NOTARIES

| | | |
|---|---|---|
| | **APOSTILLE**<br>(Convention de La Haye du 5 octobre 1961) | |
| **1.** | **Country:**<br>Pays / Pais: | United Kingdom of Great Britain and Northern Ireland |
| | **This public document**<br>Le présent acte public / El presente documento público | |
| **2.** | **Has been signed by**<br>a été signé par<br>ha sido firmado por | Andrew Jonathan Claudet |
| **3.** | **Acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public |
| **4.** | **Bears the seal / stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | The Said Notary Public |
| | **Certified**<br>Attesté / Certificado | |
| **5.** | **at**<br>á / en     London | **6.** **the**<br>le / el día     10 July 2019 |
| **7.** | **by**<br>par / por | Her Majesty's Principal Secretary of State<br>for Foreign and Commonwealth Affairs |
| **8.** | **Number**<br>sous no / bajo el numero | APO-1546495 |
| **9.** | **Seal / stamp**<br>Sceau / timbre<br>Sello / timbre | **10.** **Signature**   A. Khan<br>Signature<br>Firma |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country

**To verify this apostille go to www.verifyapostille.service.gov.uk**



## LMAA

**THE LONDON MARITIME
ARBITRATORS ASSOCIATION**

The Baltic Exchange | 38 St. Mary Axe | LONDON EC3A 8BH

### CERTIFICATE

8 July 2019

*TO WHOM IT MAY CONCERN*

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**AND**
**IN THE MATTER OF AN ARBITRATION**

**BETWEEN**

**CORPORATIVO GRUPO R S.A. DE C.V.**

**Claimant (Buyer)**

and

**MARFIELD LIMITED INCORPORATED**

**Respondent (Seller)**

**"CABALLO MAYA"**

**MEMORANDUM OF AGREEMENT 21 MARCH 2014**

### FINAL ARBITRATION AWARD

*I, Daniella Horton, being the Honorary Secretary of the London Maritime Arbitrators Association, hereby certify that the Award dated 30 May 2019 and Reasons for and forming part of the Final Arbitration Award annexed hereto are the original Award and the original Reasons made in this reference and issued by Ms Sarra Kay and Mr Simon Gault, both being Full Members of the LMAA, and Mr David Lucas, being a Supporting Member of the LMAA. I further certify that the signatures to the original Award and original Reasons are the authentic signatures of Ms Kay, Mr Gault, and Mr Lucas.*

Yours sincerely,

**Daniella Horton**
Honorary Secretary

Telephone: +44 (0)20 7283 7701 | Facsimile: +44 (0)20 7283 7702 | E-mail: info@lmaa.london
Website: www.lmaa.london



IN THI

AND

IN TH

B E T



<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>

<u>**AND**</u>

<u>**IN THE MATTER OF AN ARBITRATION**</u>

**B E T W E E N :**

**CORPORATIVO GRUPO R S.A. DE C.V.**

Claimant (Buyer)

**- and –**

**MARFIELD LIMITED INCORPORATED**

Respondent (Seller)

**"CABALLO MAYA"**

**MEMORANDUM OF AGREEMENT 21 MARCH 2014**

---

### FINAL ARBITRATION AWARD

---

1.  The Claimant ("**Grupo R**") is a company incorporated in Mexico.

2.  The Respondent ("**Marfield**") is a company incorporated in Panama. It was at all relevant times the owner of the offshore support vessel "CABALLO MAYA" (the "**Vessel**").

3.  By a Memorandum of Agreement (the "**MOA**") dated 21 March 2014, Marfield agreed to sell and Grupo R agreed to buy the Vessel. Grupo R paid to Marfield a deposit of US$5,000,000 (the "**Deposit**"). The Vessel was never delivered and Grupo R claimed back the Deposit. Marfield did not return the Deposit and disputes have arisen under the MOA.

4.  The MOA contains an arbitration agreement, cl.16, which reads as follows:

1

***Law and Arbitration***
*This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.*

*The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration Proceedings are commenced.*

*The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such an appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both Parties as if the sole arbitrator had been appointed by agreement.*
...

5.   On 9 July 2015 Grupo R appointed Ms Sarra Kay as their arbitrator. On 24 July 2015, Marfield appointed Mr Simon Gault as their arbitrator. On 1 March 2019, Ms Kay and Mr Gault appointed Mr David Lucas as third arbitrator and chairman of the Tribunal.

6.   The seat of this arbitration is London.

7.   A hearing took place in London on 7-9 May 2019, at which both parties were represented by counsel and solicitors.

8.   The tribunal having carefully considered all the parties' submissions, both written and oral, and all the documentary evidence and other materials submitted to them, and having conferred and found themselves to be in agreement with one another, for the reasons set out in the accompanying Reasons which are to be read with and form part of this award, **DO MAKE, ISSUE AND PUBLISH THIS OUR UNANIMOUS AWARD**, as follows.

9.   **WE AWARD AND DECLARE AS FOLLOWS:**

(A)   That Marfield shall forthwith pay to Grupo R the amount of US$5,000,000 (five million United States Dollars), being the amount of the Deposit.

2

(B)   That interest shall be payable forthwith on the said amount of US$5,000,000 at the rate of 4.5% p.a., such interest to be compounded with quarterly rests, from 30 January 2015 until the date of payment.

(C)   That Marfield's Counterclaim for a declaration that it is entitled to retain the Deposit fails.

(D)   That cl. 13 of the MOA would preclude any entitlement of Marfield to damages.

(E)   That Marfield shall bear its own legal costs and shall pay Grupo R's legal costs in the reference on the basis for which section 63(5) of the Arbitration Act 1996 provides, such costs to be assessed by us if not agreed, and we expressly reserve our jurisdiction for that purpose.  Interest shall be payable thereon at the rate of 4.5% per annum with quarterly rests from the date of the date of the Award until payment.

(F)   That Marfield shall bear the fees of the Tribunal, which we quantify in the sum of £43,297.50, and if they have first been paid by Grupo R, such sum shall be refunded immediately and in full by Marfield together with interest thereon at the rate of 4.5% per annum with quarterly rests from the date of payment until the date of reimbursement.

(G)   That this our Final Award is final as to all matters determined herein but **WE HEREBY RESERVE** to ourselves jurisdiction to determine by further award or awards:

(i)      An assessment as to costs; and

(ii)     Quantification of Marfield's claim for damages in the event of our Award being successfully challenged.

3

**DATED and made in London** *30 May* **2019**

..........................
**SARRA KAY**

..........................
**SIMON GAULT**

..........................
**DAVID LUCAS**

<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>

<u>**AND**</u>

<u>**IN THE MATTER OF AN ARBITRATION**</u>

**B E T W E E N:**

**CORPORATIVO GRUPO R S.A. DE C.V.**

Claimant (Buyer)

**- and –**

**MARFIELD LIMITED INCORPORATED**

Respondent (Seller)

**"CABALLO MAYA"**

**MEMORANDUM OF AGREEMENT 21 MARCH 2014**

---

**REASONS FOR AND FORMING PART
OF THE FINAL ARBITRATION AWARD**

---

<u>**INTRODUCTION**</u>

1.    The Claimant Corporativo Grupo R S.A. de C.V. ("**Grupo R**") in the arbitration to which these Reasons relate seeks repayment from the Respondent Marfield Limited Incorporated ("**Marfield**") of a deposit of US$5 million plus interest paid under a Memorandum of Agreement (the "**MOA**") for the sale and purchase of the offshore support vessel "CABALLO MAYA" ("**MAYA**"), which was never delivered.    Marfield counterclaims for damages for repudiation and/or renunciation of the MOA and a declaration that it is entitled to retain the deposit. The arbitration has been run in parallel with an arbitration concerning another offshore support vessel, "CABALLO MARANGO" ("**MARANGO**") wherein the Claimant is also Grupo R and the Respondent is Shanara Maritime International

1

S.A. ("**Shanara**").  Unless the context indicates otherwise, we shall refer below to Shanara and Marfield together as the "**Sellers**".

2. The two arbitrations relating to MARANGO and MAYA (together, the "**Vessels**") are very closely related, with identical arguments being raised in each.  However, although the arbitrations have by agreement been held concurrently, they have not been consolidated and two separate Final Awards are being published. Likewise, a separate set of Reasons has been prepared for each Award. However, both sets of Reasons are substantially identical.

3. Grupo R originally also had a claim for compensation for loss and expense, but this has not been pursued.

4. At a certain stage, the Sellers indicated an intention to amend their counterclaims to include not only the claims for damages and declarations that they were entitled to retain the deposits on the Vessels (the "**Deposits**") but also claims arising out of alleged breaches by Grupo R of the arbitration agreements, but this also has not been pursued.

5. The arbitrators in the two arbitration proceedings are the same: Ms Sarra Kay (appointed by Grupo R on 9 July 2015), Mr Simon Gault (appointed by the Sellers on 24 July 2015) and Mr David Lucas (appointed as third arbitrator and chairman by Ms Kay and Mr Gault on 1 March 2019).

6. Upon his appointment, Mr Lucas provided the parties with a disclosure statement to the effect, *inter alia*, that until 31 December 2017 he had been a partner of Hill Dickinson LLP, the solicitors who took over the conduct of the arbitration on behalf of Grupo R from Campbell Johnston Clark on 19 October 2018.  No objection was taken by the parties.

7. The MOAs contain agreements providing for arbitration in London in accordance with the Arbitration Act 1996 and the LMAA Terms current at the time when the arbitration proceedings are commenced.  The arbitrations were commenced on 10 July 2015 and therefore the LMAA Terms 2012 are applicable thereto.

2

8. The parties completed exchange of written Submissions by 27 November 2015 and exchanged Questionnaires in accordance with the LMAA Terms in January 2016.

9. On 1 February 2016, the Tribunal (as then constituted) directed *inter alia* that quantification of the counterclaim be deferred and that the two arbitrations be heard concurrently.

10. Witness statements were prepared and signed in late 2016. After that, the arbitrations advanced very slowly until the hearing, which took place during three days from 7 to 9 May 2019. Grupo R were represented by Michael Coburn QC and the Sellers by Nigel Eaton QC. Witness evidence was heard as described below.

**DRAMATIS PERSONAE**

11. We list in this table the entities and individuals primarily featuring in the arbitration, together with their abbreviated names used below:

| Abbreviated name | Full name | Description |
|---|---|---|
| Coastline | Coastline Maritime Pte Ltd | A management company in Singapore, owned by Coastline Group Inc of Panama; entities within the group own Marfield and Shanara |
| Grupo R | Corporativo Grupo R S.A. de C.V. | The Claimants in both arbitrations. They operate a fleet of vessels involved in the offshore industry in the Gulf of Mexico |
| Marfield | Marfield Limited Incorporated | The Owners of MAYA[1] |
| Mr Garza | Mr José Ramiro Garza Vargas | Chief Executive of Grupo R based in Mexico City and a witness at the hearing |
| Mr Garza Senior | Mr José Ramiro Garza Cantu | President of Grupo R and father of Mr Garza |
| Mr Highlands | Mr David T Highlands | Operations Director of Coastline based in Singapore and a witness at the hearing |

---

[1] One feature of this case to which some time was devoted at the hearing was the allegedly somewhat obscure and convoluted legal position with regard to MAYA. We do not propose to discuss it but would simply note that some references appeared in the documents before us to an MOA concluded on 18 March 2011 between Marfield and a company called GGM Shipping S.A. de C.V. ("**GGM**") for the sale of MAYA. A deposit of $41M was apparently paid, but not the rest of the price of $130M and the MOA was terminated by Marfield on 18 November 2013. It appears that there was, at the very least, some form of collaboration between GGM and OSA. We also gathered that there was an arbitration between GGM and Marfield. The circumstances surrounding the involvement of GGM were said to be somewhat murky but we regarded them as ultimately irrelevant to the issues before us.

3

| Mr Highlands Senior | Mr Terry Highlands | The General Manager of Coastline and father of Mr Highlands |
|---|---|---|
| Mr Maringer | Mr Steve Maringer | A broker at Clarksons Offshore New York who introduced the Sellers/Coastline to Grupo R |
| Mr Mohamed | Mr Raschid Mohamed Sánchez | Business Development Director of Grupo R based in Mexico City and a witness at the hearing |
| Mr Schulz | Mr Julian Schulz | A Project Manager at Coastline based at the relevant time in Mexico; he provided a signed witness statement but did not give evidence at the hearing: when cross-examined, Mr Highlands informed us that Mr Schulz was no longer an employee |
| OSA | Oceanografía S.A. de C.V. | A Mexican operator of offshore vessels owned by a Mr Amado Yanez and used by Pemex and bareboat charterers of the Vessels prior to the start of negotiations between the parties to these arbitrations |
| Pemex | Petróleos Mexicanos | The Mexican state-owned petroleum company which had contracted with OSA for the employment of the Vessels and to whom Grupo R intended to charter the Vessels |
| PGR | Procuraduría General de la República | The Mexican Attorney General's office and the authority responsible for investigating financial crimes |
| SAE | Servicio de Administración y Enajenación de Bienes | The Mexican authority responsible for the administration and control of assets in the possession of the state |
| Shanara | Shanara Maritime International S.A. | The Owners of MARANGO |

## DOCUMENTS

12.   The documentation placed before the Tribunal for the hearing was fairly extensive, running to more than 2,000 pages (admittedly, with an element of duplication), with the *inter-partes* correspondence alone running to almost 800 pages.  The Tribunal did not attempt to review the entirety of the documentation, but did consider all documents referred to by the parties in their Submissions and Skeleton Arguments and during the course of the hearing.

## THE MOAs

13.   The MOAs for both Vessels were on the Norwegian Saleform 2012.  They went through three iterations in circumstances which we describe in the chronology

4

below.  All three iterations bore the date 21 March 2014, even though only the first (the "**First Set**") came into existence and was signed and exchanged on that date[2]; the second (the "**Second Set**") came into existence and was signed and exchanged on or about 16 June 2014; and the third (the "**Third Set**") came into existence and was signed and exchanged on or about 16 July 2014.  The MOAs in the Third Set are the final and definitive contracts out of which our jurisdiction derives and on which the parties have based their submissions.  The terms of each of the MOAs in the Third Set are substantially the same as each other, save for the identity of each of the Sellers, the consideration (US$178M in the case of MARANGO and US$150M in the case of MAYA) and the Cancelling Date (5 October in the case of MARANGO and 10 October in the case of MAYA).

14.   The relevant terms of each MOA are as follows:

> 2. *Deposit*
> *As security for the correct fulfilment of this Agreement the Buyers shall make an advance payment to the Sellers of US$5,000,000 … ('the Deposit") within six (6) Banking Days after the date that:*
>
> (i)  *This Agreement has been signed by the Parties and exchanged in original or by e-mail or telefax.*
>
> 3.  *Payment*
> *On … delivery of the Vessel, but not later than three (3) Banking Days after the date that Notice of Readiness has been given in accordance with Clause 5 … the balance of the Purchase Price and all other sums payable on delivery by the Buyers to the Sellers under this Agreement shall be paid in full free of bank charges to the Sellers' Account.*
>
> 5.  *Time and place of delivery and notices*
>     (a)        …
> *Cancelling Date (see Clause 14): [5][10][3] October 2014 …*
>
>     (b)        …
> *When the Vessel is at the place of delivery and both physically and documentarily ready for delivery in accordance with this Agreement, the Sellers shall give the Buyers a written Notice of Readiness for delivery.*
>
> 13. *Buyers' default*
> *Notwithstanding anything herein to the contrary, should Buyers fail to [sic] any of its obligations under this Agreement, Sellers shall have the right to cancel this Agreement and to retain the Deposit … , which shall be Sellers sole and exclusive remedy.*
>
> 14. *Sellers' default*
> *Should the Sellers fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date the Buyers shall have the option of cancelling this Agreement …*

---

[2] As will be explained below, the Buyers under the MOAs in the First Set were not Grupo R but rather Portuguese nominee companies of Grupo R.

[3] As mentioned above, in the case of MARANGO, the Cancelling Date was 5 October; in the case of MAYA, the Cancelling Date was 10 October.

*In the event that the Buyers elect to cancel this Agreement, the Deposit together with interest earned, if any, shall be released to them immediately.*

*Should the Sellers fail to give Notice of Readiness by the Cancelling Date or fail to be ready to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for their documented loss and for all expenses together with interest …*

*18. Entire Agreement*
*The written terms of this Agreement comprise the entire agreement between the Buyers and the Sellers in relation to the sale and purchase of the Vessel and supersede all previous agreements whether oral or written between the Parties in relation thereto.*

*Each of the Parties acknowledges that in entering into this Agreement it has not relied on and shall have no right or remedy in respect of any statement, representation, assurance or warranty (whether or not made negligently) other than as is expressly set out in this Agreement.*

## BAREBOAT CHARTERS

15.  The disputes under consideration arise exclusively under the MOAs and our jurisdiction is based solely of the arbitration agreements in the MOAs.  However, it is relevant to note that the MOAs were part of an overall transaction between the parties which included bareboat charters (the "**Charters**") of the Vessels for a period of six months plus a further period of six months at charterers' option.

16.  The overall transaction was originally concluded on the date indicated above, namely 21 March.  The time for delivery into the Charters was stated to be not before 1 April, so that it was originally envisaged that the initial six months' term would expire on or shortly after 1 October.  Upon the expiry of the Charters, the Vessels would be delivered under the MOAs.  It is against this timetable, as envisaged on 21 March, that the parties agreed the cancelling dates in the MOAs of 5 and 10 October.

## EVENTS

17.  The nature of Grupo R's case in each arbitration is simple: Notices of Readiness for MARANGO and MAYA were not tendered by each Cancelling Date as specified in cl. 5(a) of each MOA, namely 5 and 10 October respectively, so Grupo R were entitled to cancel, as they did on 28 January 2015, and recover the Deposits.  Were the arbitrations only concerned with Grupo R's claims, the recital of relevant facts would be brief indeed.  On the other hand, the nature of the Sellers' case is more complex and by its nature requires a consideration of

6

the relevant communications and events over a protracted period, not least because optimism and pessimism as to a successful completion of the MOAs succeeded each other frequently and in roller-coaster fashion. We accordingly now set out the events leading to the arbitrations in some detail. Since the Sellers' case requires judgments as to the parties' respective perceptions, the "feel" of their communications may on occasion be relevant and we have therefore quoted extensively from them *verbatim.* Unless otherwise stated, all dates are in 2014[4]. We omit reference to the fairly lengthy and detailed exchanges relating to the technical inspections of the Vessels.

18. **September/October 2013**: OSA, the bareboat charterers of the Vessels under charters concluded in 2008 and 2011, cease paying hire thereunder.

19. **24 January**: Tradewinds report a probe by Mexican officials into OSA's dealings with Pemex.

20. **Early February**: OSA are alleged to have defrauded Citibank of about US$400-560M.

21. **27 February**: on or about this date, Coastline terminate the OSA charters of the Vessels by notice.

22. **28 February**: the PGR issue an "*Aseguramiento*" whereby they take control of OSA's assets. Mr Highlands Senior calls Mr Amado Yanez and tells him of Coastline's decision to terminate the charters of the Vessels, to which Mr Yanez agrees.

23. **2 March**: the PGR transfer control of OSA to SAE.

24. **2 March**: representatives of Shanara take repossession of MARANGO.

25. **3 March**: Mr Highlands reports to Mr Maringer that Coastline have terminated the charters of the Vessels with OSA, repossessed the Vessels and put them up for sale.

---

[4] Given that the protagonists were based in Mexico, Singapore and New York and were on occasion in other locations (including London) and that time zones of transmission or receipt of emails are usually not apparent, it is possible that on some occasions the dates indicated below for email communications may be out of kilter by a day either way.

26. **6 March**: representatives of Marfield take repossession of MAYA.

27. **7 March**: Mr Highlands, Mr Highlands Senior, Mr Garza, Mr Mohamed, Mr Maringer and Grupo R's in-house counsel meet in Grupo R's office in Mexico City to discuss the possible sale and purchase of the Vessels.  Mr Highlands explains the background to the termination of the charters with OSA and the Vessels' unavailability in the light of the PGR "*Aseguramiento*".  Mr Garza seeks reassurance of the steps being taken by Coastline to secure the release of the Vessels in the near future so that Grupo R can employ them with Pemex.  Mr Garza gave evidence at the hearing that when negotiating terms with Coastline from this point until such terms were agreed on 21 March, he knew that Coastline were also speaking at the same time to other potential buyers of the Vessels.

28. **12 March**: following the meeting and an initial offer letter for MARANGO alone, submitted on 10 March, Grupo R submit to Coastline an updated offer for both MARANGO and MAYA.  The main features of the offer are:

- Bareboat charters for six months, with charterers' option to extend for another six months;

- Advance payments on delivery of $3.1M for MARANGO and $2M for MAYA, to be treated as on account of the base purchase prices;

- Base purchase prices of $172M and $153M respectively;

- Hire of $62,500/day and $52,500/day respectively, also to be treated as on account of the base purchase prices.

29. **14 March**: following further negotiations, Grupo R and Coastline sign a letter recording Grupo R's intention to proceed in accordance with the above offer, save that the advance payments be prior to delivery and in the amounts of $5M for each Vessel, the base purchase prices be $178M and $150M respectively and the hire be $65,000/day for each Vessel.  Mr Garza told us in evidence that he was prepared to pay the higher prices and daily charter rate because Grupo R were keen to buy the Vessels.

8

30.  **21 March**: following further exchanges, at a meeting in Mexico City MOAs and Charters for the Vessels are signed between the Sellers on the one hand and Portuguese nominee companies of Grupo R (and not Grupo R themselves) on the other.  This is the First Set, as referred to above.  Mr Garza gave evidence that at this time he was aware of the "*Aseguramiento*" but thought that it and the legal problems with the Vessels would be on a short-term basis: he did not have any idea that it might take "*as long as it was*" to sort out.

31.  **27 March**: the PGR arrest the Vessels.

32.  **28 March**: Mr Mohamed and his colleague Luis Figueroa[5] meet Mr Highlands, Mr Highlands Senior and Mr Maringer in Mexico City.  Mr Highlands and Mr Highlands Senior report on the arrests.  Mr Mohamed realises that this will affect the deliveries under the Charters.

33.  **31 March**: Mr Highlands Senior writes to Grupo R saying:

     *… how upset and sorry we are with the problems encountered by us on the Charter and Sale of our Vessels with the ongoing work for Pemex.*

     *Last Wednesday, 26th March 2014 we had discussion with Mr Emilio Lozoya and Mr Carlos Roa[6] on the problems with the failure of OSA and the collapse of the company leaving all the workers without employment.*

     *We did not discuss our agreements with your company and have not indicated any contract to Mr Lozoya and Mr Roa but now we are of the view that we should have a discussion on a direct basis with Mr Lozoya and ask him if he could arrange for the Minister of Justice also to attend so we can achieve the situation of your company Grupo R putting the ships back to work and giving the people in Carmen jobs and hope for the future.*

     *I will be in Mexico City next week with my son David and we are available to discuss all to meet at your convenience.*

     *I thank you for your patience and understanding in this very confusing situations.*

34.  **1 April**: Mr Garza replies:

     *We understand the situation, we confirm our interest in continue the agreement as soon as all the legal matters are resolved, please keep us inform how the things are developing.*

     Mr Garza told us at the hearing that he thought that at this time he knew that the PGR had arrested the Vessels on 27 March but that, this notwithstanding, he was still interested in proceeding with the purchase of the Vessels.

---

[5] Head of Legal at Grupo R.

[6] Mr Lozoya was the CEO of Pemex at the time; when examined at the hearing, Mr Garza said that Mr Roa was "*the main advisor*", presumably of Mr Lozoya.

35. **4 April**: at a meeting at Grupo R's office, Mr Highlands informs Mr Mohamed that the Vessels remain under arrest.

36. **9 April**: on or about this date, the PGR apply for a "*Concurso*".  Mr Garza gave evidence that he understood this to be a procedure whereby the assets of OSA would be seized and sold if necessary to repay its debts, and that part of the process would involve trying to restructure OSA to keep it as a going concern. We were given to understand that the process was under the supervision of a judge in Mexico City.  When Mr Highlands gave evidence, he told us that the PGR –

> … had basically no rules to which they could be held accountable to on a day-to-day basis, whereas a concurso was administered by a court-appointed judge, we felt we could appeal to him, which was more optimistic than dealing with the PGR as was.

37. **11 April**: Mr Mohamed sends a message to Mr Highlands and Mr Highlands Senior asking for an update as to the release of the Vessels.

38. **15 April**: Mr Highlands Senior reports to Mr Mohamed that he has had a meeting with the PGR to arrange the finalisation of the release of both Vessels, from which Mr Mohamed understands that the PGR will release the Vessels shortly.

39. **21 April**: at a Pemex conference, Mr Mohamed and Mr Garza meet a number of Pemex executives who mention that they need the Vessels for their operations, but that the detention must be resolved by Coastline with the proper authorities as Pemex could not get involved.

40. **24 April**: Mr Highlands Senior reports to Mr Mohamed that Coastline  have been busy making representations to the PGR both informally and through the "*legal route*".  He asks whether Grupo R has had any success with Pemex in being able to put the Vessels back to work for Pemex.  Mr Mohamed replies that Pemex have mentioned in meetings with Mr Garza that they do require the Vessels for their operations but that the legal status over the Vessels is out of their hands and that needs to be solved with the proper authorities.  He asks for an update in that regard, to which there is no response.

41. **2 May**: Mr Maringer informs Mr Highlands Senior that Mr Garza has suggested a meeting with Coastline on 13 May in Mexico City.  Furthermore, he reports that Mr Mohamed has reiterated on the phone that Grupo R -

   > ... is ready to act on both vessels and that they will perform even if no Pemex contract is in hand.

42. **5 May**: Coastline propose cancellation of the MOAs and Charters in the following terms:

   > As you are aware that we have experienced delays in the completion of the Charters and MOA/Purchase of our vessels due to the problems in Mexico with the Oceanografia/SAE/ PGR situation.
   >
   > We have taken actions through the Courts in Campeche and have been granted a suspension on the PGR which will finalise in June.
   >
   > As you are aware you have not been able to go forward due to these circumstances. It is better that we the Owners cancel the Charter Partys for the Caballo Maya and the Caballo Marango as we have gone past due cancelling date on all four items.
   >
   > We remain in the future open to any proposals that you wish to make regarding the purchase of the vessels as we are no longer interested in chartering the vessels only in selling the vessels.

   Mr Garza told us that this message was the first time he learnt of the Campeche court proceedings.  He also agreed that this email made Grupo R aware that the Vessels would not be released until June; further, that at this time it was apparent that by then there was insufficient time left to complete the six-month charterparties before the MOA cancelling dates.

43. **16 May**: following a telephone conversation the previous night, Mr Highlands Senior reports to Messrs Garza and Mohamed as follows:

   > The PGR and SAE through their legal team have been presented with original documentation both in the Courts of Campeche and in their office in Mexico City showing the following:
   >
   > [The letter then sets out the ownership structure for each of the Vessels.]
   >
   > After these presentations the SAE and the PGR have to report to their Attorney General Office.  Meanwhile we are progressing through the Courts in Campeche to have a hearing on the Marfield Case (Caballo Maya) on 2nd June 2014 and Shanara Case (Caballo Marango) on 9th June 2014.
   >
   > Once we have judgement in our favour we then have to apply to the judge in Mexico City who is in charge of the Concurso Mercantil (Corporate Re-organisation) to have his permission to release the vessels.
   >
   > As you can see for us to honour the Charters and the MOAs for the two vessels is it not possible also Grupo R under the circumstances cannot lodge the deposit all take on the Charters of the vessels as they cannot be delivered free and clear of liens.
   >
   > Therefore in accordance with the following:

11

[The letter then lists both MOAs and Charters, each of which is "*cancelled by mutual agreement*". The letter concludes:]

*We very much regret this unfortunate situation concerning the wrongful detention and seizure of our vessels by the PGR/SAE but we can only take actions as we have described.*

When giving evidence, Mr Garza confirmed that despite Coastline's proposal that the contracts be cancelled by mutual agreement, he still wanted to buy the Vessels.

In his witness statement, Mr Garza said that accordingly a conference call was then arranged between Mr Highlands, Mr Highlands Senior, Mr Maringer, Mr Mohamed and Mr Garza; during the call it was agreed that the Charters and MOAs would in fact continue (in evidence, Mr Garza agreed that this was at Grupo R's suggestion) and that Grupo R would organise a meeting with the PGR at the request of Coastline. Mr Garza amplified on this evidence at the hearing, explaining that he made it clear that Grupo R did not want to cancel the Charters and the MOAs; further, it was agreed that they would continue in force. Mr Garza stated in evidence that he explained at the meeting that Grupo R still wanted to buy the Vessels notwithstanding the court case and the legal issues.

Mr Maringer follows up on this conference call confirming that all parties have agreed that the contracts will remain in effect, that Grupo R will work to arrange a meeting with the PGR (something which they agreed during the conference call to try to organise) and that the parties will regroup next week.

44. **19 May**: Mr Highlands Senior writes to Mr Maringer:

*Very much appreciate the efforts that everyone is making and the interest that Grupo R have in the vessels also their intentions to contact the PGR at Attorney General level to find out what they can.*

*On our side we keep supplying information to the PGR/SAE as required. We are also pursuing matters through the Courts in Campeche but all very slow.*

*As we stated on the phone the PGR/SAE are asking if they could make an arrangement on the two vessels well we could put the vessels back to work for Pemex via the Oceanagrafia set up with the SAE, Mr Maza.*

*This is an option for us and our Lenders are supportive of this scheme.*

*We do not share their view. Our Best Position is if Mr Garza sees the PGR and finds out their situation where this will give Grupo R confidence to proceed.*

*On our side to enable us to proceed we have offered to change the MOA's to where we have a 10% deposit held in Escrow once this is done we can block the advances been made to us by the SAE/PGR and say to talk to Grupo R they hold the ships.*

12

> *Otherwise if we cannot do this then we should in good sense end the MOA's and Barecon Charter Party by mutual consent.*
>
> *My regret are that this situation has taken place but our two ships are (2) two in (72) seventy two ships and detained by the PGR/SAE.*
>
> *I trust our comments meet with your opinion.*

45. **End May/beginning June**: following arrangements made by Mr Garza Senior (who knows the Attorney General), Coastline and Grupo R meet the PGR.  Mr Highlands said in his witness statement that the PGR representative expressed himself content that the Vessels belong to the Sellers, that the matter would be reviewed with the Attorney General and the Vessels would be released four days later.

46. **3 June**: Mr Highlands Senior writes to Grupo R to thank them for assisting with the PGR and continues:

> *We subsequently have had two further meetings with Oceanografia Legal Team and Mr Hugo Ruis Raynard of the PGR.*
>
> *There is a deal been offered to us for the two ships on a charter basis with a new revitalised Oceanografia when the company will be taken over by other investors.  There is pressure for us to go ahead with this so the ships can go back to work for Pemex.  The PGR could immediately release the ship if we agree to the Oceanografia proposal.*
>
> *Our position is this, the ownership of the ships is not in dispute now.  The so called Sale Agreement with Oceanografia produced by their Lawyers is not even signed and they have the wrong company the MOA and the Deposit payments was GGM Shipping S.A. de C.V. owned by Martin Diaz Alvares and his cousins Mr Javier Rodrigues Borgio.  The MOA was cancelled as they could not finance the contract.  GGM Shipping S.A. de C.V. is not Oceanografia S.A. de C.V. as claimed.*
>
> *We are of the opinion that the best way to move forward and prevent the new company is for us to proceed immediately on the MOA signed in March.*
>
> *The best plan is for Mr Garza Senior to talk with his people in the PGR/ Ministry as before then move forward to prevent this new revitalised Oceanografia using the ships.*
>
> *Trust you can resolve problems.*

47. **6 June**: Mr Maringer writes to Mr Garza and Mr Mohamed saying that he has attempted to contact Mr Mohamed all week with no success.  He reports that:

> *Mr Highlands is asking for feedback/update from Grupo R based on the recent meetings with the PGR.  Plus, he is again getting pressure from the SAE to work for them directly. Please can someone contact me with update?*

Later that day, Mr Highlands Senior writes to Mr Mohamed as follows:

> *I have been informed of the latest news in Mexico reference my ships, the PGR and the latest Sale of Oceanografia to Mr Aleman et [sic]*

13

> *As we have not had any resolution on our contracts for my vessels, can we not arrange to cancel the contract as we have now waited almost eleven weeks and we are under severe political pressure to allow the vessels back to work with SAE/PGR charterers.*
> *I have tried to contact you but understand you are away on businesses.*
> *Very difficult situation.*

When giving his evidence, Mr Garza told us that Mr Mohamed showed him this message and that, despite its content, he was willing to proceed and pay the $5M Deposits.

48. **14 June**: this message notwithstanding, the parties continue to talk and on 14 June Mr Maringer reports to Mr Highlands and to Mr Highlands Senior that Mr Garza has asked if they would send a letter on Coastline letterhead to Grupo R which he had drafted as it would help with the Attorney General and meetings with the SAE.  The text of the letter (which Mr Highlands Senior duly provided two days later) reads as follows:

> *Reference is made to the contracts we have to charter and purchase our vessels Caballo Maya and Caballo Marango (the Vessels).*
>
> *I want to inform you that the Mexican Government through the Procuraduría General de la República (PGR) and the Servicio de Administración y Enajenación de Bienes (SAE), have been insisting us to charter the Vessels to Oceanografía.*
>
> *We would like to confirm that our position is to honour the contracts we have signed with Corporativo Grupo R S.A. de C.V. and we are doing everything in our hands to make the Vessels free and clear in order to proceed with our agreements.*
>
> *Any additional assistance you can provide in order to resolve the situation as soon as possible is highly appreciated.*

49. **16 June**: Mr Schulz reports to his colleagues on his discussion with Mr Mohamed as follows:

> *Make them offer – I raised that we didn't believe that the contract was valid without payment he said they had a different opinion that he had discussed this with Mr Toban and Mr Garza and suggested we make an offer.  I said what about just looking at Marango. He said we should send them something even a simple email that says what we propose.*
>
> *We talked again about the intent to do short term charter of the Marango to create some income and to keep the support of Pemex he asked if it was with Grupo R I told him that would be the ideal situation.  That we would have to see how to make that work.  They intended to take the vessels to their in Tampico and rename them as part of Grupo R fleet. I suggested that we get working 1st and once all is resolved then they look at the Grupo R branding later I told him we will get all the OSA stuff off asap.  Also we could do a lot of this if not all with the vessels working and everyone getting paid.*
>
> *On the contract with Grupo R I told him how it wasn't valid without payment he said that they have a different opinion.  I believe they have discussed this with Steve from Clarkson's.  I explained how various other companies are offering to make payment to get the vessels and that the financial pressure was significant for us.  Also explained that if we*

*looked at sorting the Marango first and get her working we could focus on the fight to resolve the Maya. Told him the feedback from Fortress[7] is they will pay and wait.*

*I informed him that most parties now agree that is if there is a dispute on the Maya it must be arbitrated in London not in Mexico. And we agreed that she could work while this is being done however the most pressure here is created by the vessels being off hire. He also raised that he didn't think they would go near the arbitration because we would be able to claim damages and that it was clear they have not complied with the MOA.*

*Talked about working to get the Marango sorted 1st and then having to fight on the Maya preferably while she working is creating income. I told him I had discussed this with the SAE lawyer and we hope to be pushing this way next week.*

*Explained the MOA was with GGM – went through the relevant information and he agreed that if the requirements of the MOA had not been meet that there is no equity I explained we have the information that explains where the money was used and this has been provided to relevant parties but the main issues is that the agreements where with GGM and not OSA and that SAE have said they are separate companies also that it was always explained that way to us. Hugo they survey work together however it was we he was trying to force the deal with OSA. He agreed that it seems clear to him.*

*Bare cons with OSA – I confirmed that the contracts for the vessels well with Oceanografia not GGM.*

*My general feeling is that they want to sort this out but are being very cautious. When talking about making an offer he seemed genuine.*

As mentioned above, also on 16 June Mr Highlands Senior provides the signed letter to Grupo R which Mr Garza requested two days earlier. At the same time, he provides copies, signed by him of new versions of the MOAs and the Charters, this time with the buyers and charterers named as Grupo R. This is the Second Set referred to above. The purpose of novating the contracts from the unknown Portuguese nominees to the well-known Mexican company Grupo R is to assist in persuading the Mexican authorities and Pemex to release the Vessels.

The final development on 16 June is that Mr Highlands Senior sends an email to Grupo R as follows:

*I understand from our recent discussions and actions that there are a number of people in the PGR and SAE who consider that Coastline Group Incorporated, Marfield Ltd Incorporated and Shanara Maritime International SA the regarded Owners of vessels Caballo Maya and Caballo Marango are the property and ownership of Mr Terence Highlands. As you are aware we wish to proceed with our MOAs and Charter Agreements on the two vessels.*
*To commit and move matters forward, would it be a more simple solution if we moved immediately to complete the purchase on the Caballo Marango and put it to work with Pemex as discussed.*
*We will demonstrate opposition of ownership etc on Caballo Maya and push for the vessels Caballo Maya's release by the PGR and SAE.*
*Your comments appreciated.*

---

[7] We were told by Mr Highlands that Fortress is a US investment fund which at the time had indicated that it had raised $3 billion on the stock market to invest in offshore oil and gas shipping and it had expressed an interest in buying the Vessels.

50. **17 June**: Mr Garza requests a revised version of the letter on Coastline letterhead to Grupo R.

51. **18 June**: Mr Mohamed sends to Mr Maringer and Mr Highlands the MOAs and Charters (the Second Set) for MARANGO and MAYA duly signed on behalf of Grupo R.

On the same day, Mr Highlands sends emails to Mr Mohamed formally addressed to the Portuguese nominees of Grupo R which had been the buyers under the original MOAs concluded on 21 March. The emails cancel those MOAs "*due to non payment of the deposit*".

52. **19 June**: Mr Mohamed sends an email to Coastline stating that Grupo R are willing to proceed with the cash deposits of $5M per Vessel –

> *even though the vessels are not free and clear, nor in good physical and legal conditions. Please find attached the amendment No. 1 to the Barecons and the MOAs for both vessels duly signed from our side. Please send us a signed copy of the documents and the information of the guarantee in order to proceed with the transfers.*

For present purposes, we do not need to consider the suggested changes to the Charters. In brief, the more significant of the proposed amendments to the MOAs were as follows:

a) The Deposit was to be paid within 6 banking days of the amendment, rather than 6 banking days after the MOA had been signed;

b) A counter-guarantee for the Deposit was to be given;

c) Some remedial works were to be carried out;

d) Notice of readiness was not to be tendered before 5 days after the bareboat charter period had ended; and

e)  The cancelling date was to be extended from to 7 days after the expiry of the charter, subject to the right to accelerate closing.

53. **20 June**: Mr Highlands Senior responds on behalf of the Sellers as follows:
> *The owners note your request for an addendum to the MOAs.*

16

*The owners note your reference to a "request" for payment of the deposits. It is the owners position that the payment of the deposit is a legal requirement on the buyers.*

*As you state you will not proceed without a contract amendment all guarantee and you have such a low opinion on the vessels condition and legal status, please find attached the notice of cancellation on the MOAs for buyers default.*

*Under a separate cover we will copy you on our notices to Pemex withdrawing the vessels.*

The attached notices of cancellation for each of the Vessels recite the stipulation in each MOA that the Deposit has to be paid within six banking days after the date on which the agreement has been signed, namely 21 March 2014.   As neither Deposit has been received, each notice states:

*The Sellers hereby cancel the sales contract due to non-payment of the deposit.*

This prompts Mr Mohamed to email Mr Highlands Senior proposing a conference call.   In the event, the participants to the call are only Mr Mohamed and Mr Maringer.   Mr Mohamed states that Grupo R still want to buy the Vessels and requests that Coastline withdraw the cancellation notices.   As we have said, Mr Maringer did not give evidence, but in his witness statement Mr Highlands says that he was given an account of the conversation by Mr Maringer: Mr Mohamed had said:

*…Pemex had asked Grupo R to participate in a process which might, if the Grupo R owned or had the right to use the Vessels, lead to the Vessels being utilised by Pemex again.   Mr Mohamed further reiterated that Grupo R wished to hire and purchase the Vessels in accordance with the agreements, notwithstanding the arrests.   Mr Maringer was further told that if Pemex wished to utilise the Vessels then Grupo R would need to continue to assist in having the Vessels released from the arrests.   Mr Mohamed also asked Mr Maringer to persuade the Sellers to permit the Agreements to be reinstated, reflecting our mutual understanding that they had been cancelled.*

54.   **23 June**: following that call, the Sellers send letters to Grupo R reading as follows:

*If the deposit of US$5000000 as per clause 2 is remitted on 23rd June 2014 and received by Wednesday 25th June 2014, the Sellers will consider both contracts to be valid and in force as per the MOA and Barecon terms and conditions.*

At the same time, Mr Highlands sends Grupo R a copy of Shanara's letter addressed to Pemex and bearing the date 18 June reading as follows:

*By this letter we confirm that Shanara Maritime International, SA and Corporativo Grupo R, S.A. de C.V. or nominee, has firm and valid contracts with us to charter and purchase the vessel Caballo Marango …*

*This is subject to Grupo R, S.A. de C.V. meeting their contractual requirements and commitments to Shanara Maritime International SA.*

*Corporativo Grupo R, S.A. de C.V. or nominee has the exclusive right to present a commercial offer to PEMEX Exploracion y Produccion for the above-mentioned vessel.*

17

*This letter is valid until 1/7/2014.*

A similar letter is sent for MAYA.

Thereupon, Mr Garza authorises the payments of the Deposits and the remittances are effected.

55. **25 June**: the two Deposits are received.  The Sellers confirm that the MOAs are "*firm and active*".  When cross-examined at the hearing, Mr Highlands informed us that the funds went into "*the general Shanara Coastline account*".

56. **30 June**: Mr Maringer sends a report to Mr Highlands and Mr Highlands Senior as follows:

> *An update from Grupo R:*
>
> *A)  Two other companies have offered the "MAYA" and "MARANGO" to Pemex: ProPetro (Protexa/Fortress) and Sapura.  Each company has given documents to Pemex claiming access to the vessels but we all know that there must be a subject in that document for Owners' approval.  Grupo R will let this play out over the next week but please note that Terry and/or David may receive a few more calls from other market participants.  Please name Grupo R as your partner and you are welcome to say that firm contracts are in place between Coastline and Grupo R.*
>
> *B)  The meeting hosted by Mr Lozoya with the PGR and SAE was postponed.  Grupo R while waiting for the new date.*
>
> *C)  As a result of B), Mr Garza arranged and met with the Federal Minister of Finance last week (he reports to the President of Mexico.).  The SAE is part of the this ministry and thus the Minister is the senior boss of the entire division.  According to Grupo R, the meeting was positive and we should get more details this week.*
>
> *D)  Grupo R are prepared to perform additional inspections on the "MAYA" or the "MARANGO" to move the process forward to commence the bareboat.  Please advise if you wish them to inspect.*

57. **2 July**: Mr Highlands Senior writes to Mr Robert Gibbons of Fortress:

> *Thanks for your mail reference MOAs for our vessels Caballo Maya and the Caballo Marango.*
>
> *We are not in a position to go ahead with signature etc with this as we have other commitments.*
>
> *Mr Raschid Mohamed at Grupo R is now responsible for the vessels.  You can contact him direct as I understand you have been in contact with Grupo R.*

58. **3 July**: Mr Mohamed writes to Mr Highlands:

> *Pemex is requesting us to deliver originals of the letters that you issue for us to present in the commercial process Pemex is running.*
>
> *They want the letters notarised and apostilled.*

18

> *Could you please help us to get those documents?  We need to present them as soon as they can be available.*

59. **4 July**: Mr Highlands immediately obliges and sends the letters, duly notarised and apostilled, to Mr Mohamed.

60. **7 July**:  Mr Highlands writes to Mr Mohamed:

    > *For your guidance Fortress/Protexa have admitted that they cannot proceed.*
    >
    > *Sapura still pushing us but the letter should end that.*
    >
    > *Do you have an indication of when Pemex will award the contract?*
    >
    > *I am aware of an in field date of November.*

61. **8 July**: OSA is placed in administration and a second arrest or injunction is placed on assets owned by it or in its possession, including the Vessels.

62. **14 July**: while in Singapore on other business, Mr Mohamed suggests a meeting with Mr Highlands.  During the meeting, Mr Highlands says there is no news with regard to the release of the Vessels.

63. **16 July**: Coastline send to Mr Mohamed the original copies of the MOAs and Charters for both Vessels, duly signed.  This is the Third Set, referred to above. It was common ground at the hearing that the MOAs in this Third Set are the contracts under which the references herein arise.  Mr Mohamed explained in his witness statement that a mistake in the Second Set was corrected in the Third Set to reflect the fact that MARANGO was not inspected and accepted, but had defects which needed correcting before she would be in a deliverable condition.

64. **24 July**: Mr Highlands writes to Mr Mohamed:

    > *The latest update on the PGR.*
    >
    > *We were informed late on the 23rd that we had proven our ownership of the vessels, Caballo Maya and Caballo Marango.*
    >
    > *They will be released from the PGR sometime next week.*
    >
    > *Contrary to very specific commitments despite clear statements on ownership, they will only return the vessels to OSA (in administration by SAE).  They cite that as they took possession from OSA, they must reverse the process.*
    >
    > *Any issues whether contractual or other, between the owners (former) charterers are then commercial and civil, not subject to the PGR criminal procedure.*
    >
    > *Naturally a direct return of the vessels to us as Owners is preferred.*

19

*Should the vessels go to OSA, we intend to exercise our cancellation and repossession rights.*

*Notices were issued in February and our repossession agents have been on the vessels since March.*

*It should be noted that we have flag state return to port notices and the class suspensions on both vessels to prevent them being sent to work.*

*We would ask your assistance with the following:*

*Could you use your influence to try and have the vessels delivered to us as owners directly. We will prevail in the latter scenarios but as ever, this will take more time.*

*It may also be the case that rogue elements of the former OSA management loyal to the former shareholder may push an agenda to attempt to solicit work from Pemex.*

*Could you inform Pemex that the vessel will only be available through your goodselves.*

*As ever, thank you for any kind assistance in advance.*

65.  **29 July**: Mr Highlands writes to Mr Mohamed:

*I wanted to keep you up to date.*

*We have come under a lot of pressure to do a deal with the Aleman group.*

*We have been told by their legal counsel that unless we sell to them, the PGR will not lift the arrest.*

*Naturally we believe this is a bluff.*

*Any advice or guidance you could give?*

*Please advise.*

66.  **13 August**: Mr Mohamed writes to Mr Schulz:

*As commented by phone, please find attached the information we need for meeting. It would be ideal to have support documentation for every step.*

*This is a unique opportunity to explain the situation.*

The attached documents are draft summaries of the relevant history with regard to each of the Vessels, with blanks left by Mr Mohamed for completion with the relevant details.   On the same day Mr Schulz passes this email and the attachments to Mr Highlands Senior, explaining:

*Please see attached document from Raschid.  Mr Garza has been requested to meet someone very senior within the government to discuss why the vessels should be released to us.*

*All the parts in yellow are my comments some of the questions I have answered. If it is easier you can write on it a copy and send it back I will complete and send it back to him they need it for 1st thing tomorrow Mexico.*

*Raschid is happy to have any other details we think relevant included but wants to keep it fairly simple.*

20

*They don't want to change the format because they will have to convert back to Spanish later.*

On the same day, Mr Schulz emails drafts of the completed documents back to Mr Mohamed, followed up by a further message with extra information provided by Mr Highlands Senior.

67. **16 August**: Mr Maringer writes to Mr Highlands and Mr Highlands Senior:

*I received a call this afternoon from Raschid.  As you both know, Mr Garza Sr. Has been summoned to a high-level government meeting next week to discuss the situation on the two vessels.*

*As a result, Garza Sr. has asked Clarksons to obtain from Coastline copies of your bareboat/ purchase option contracts with Oceanografia for both the Marango and the Maya.*

*Garza Sr. wants to have the contractual and legal confidence of his position when he faces in the "senior government official" next week.*

*Please advise if you can send a scanned copy to me or to Raschid directly for their confidential review.*

68. **18 August**: Mr Schulz sends to Grupo R over 80 pages of documentation, consisting of the completed summaries which Mr Mohamed requested on 13 August together with supporting documents.

69. **10/11 September**: by chance, Mr Garza and Mr Mohamed meet Mr Highlands at a conference in Oslo.  Mr Highlands provides an update regarding the status of the Vessels and whether they will be released; he adds that he will be meeting OSA to see if a deal can be done to get the Vessels released.   In his witness statement, Mr Mohamed recalled Mr Highlands saying that the situation with the PGR was "*still a mess*".  When examined at the hearing, Mr Garza agreed that Mr Highlands was not able to give any indication as to when the Vessels were going to be released.

70. **5 and 10 October**: after 11 September, there is then a long hiatus and the cancelling dates under both MOAs pass without further communications between the parties.  However, on 10 October Mr Maringer passes to Mr Garza and Mr Mohamed a report from Reuters to the effect that Grupo Aleman has agreed to buy OSA.  He asks what effect, if any, this news has on "*our project*".

71. **18 October**: Mr Schulz writes to Mr Mohamed:

21

*I am currently in London meeting with Terry.  We had some feedback late in the week that maybe things might start to change with the Alemans officially pulling out of the save OSA plan.*

*We had some positive things said but nothing to get excited about yet.*

*Our feel is that things maybe starting to swing but now would be a really good time for any pressure that can be put on from your end.*

*I am due back in Mexico City on Tuesday.  If you are back in maybe we can get together and I can give a full update.*

72.  **20/21 October**: Mr Mohamed replies that he is in London too and suggests a meeting the next day.  A brief meeting duly takes place, attended by Mr Mohamed, Mr Highlands and Mr Schulz.  Mr Mohamed stated in his witness statement that Mr Highlands and Mr Schulz said that the Vessels were still detained by the PGR "*but according to them they were on the verge of being released*" and Mr Mohamed reported on this to Mr Garza afterwards.  In his statement, Mr Garza noted that "*Coastline had made similar promises previously*" and when examined at the hearing he agreed that he was not very confident that the Vessels were about to be released: indeed, he was becoming pessimistic.  On the other hand, when he gave his evidence to us, Mr Highlands said that the email of 18 October described above reflected Coastline's collective feeling of "*cautious optimism*".  He pointed in particular to the reference in Mr Schulz's email to "*the Alemans officially pulling out of the save OSA plan*" as "*a piece of political obstruction placed in our way*", the removal of which was "*to our benefit*".

73.  **12 December**: in his witness statement, Mr Garza noted that as the weeks went by, he felt that Grupo R had little choice but to think about cancelling: they could not wait indefinitely.  He added that he had internal discussions during November and the decision was made, as a first step, to make clear to Coastline that Grupo R was reserving its rights in respect of cancelling.

Accordingly, on 12 December (when, Mr Garza acknowledged at the hearing, nothing had changed since the October meeting), Grupo R send  to Coastline and Mr Maringer an "*official communication*" relating to each of the Vessels addressed to each of the Sellers.  The substance of each letter is the same and the letter to Shanara relating to MARANGO reads as follows:

*We refer to the MOA and the Bareboat Charterparty.*

22

*Pursuant to Clause 5 of the M0A, the Seller is obliged to tender Notice of Readiness for delivery not before 1 October 2014. The Cancelling Date under the MOA is 5 October 2014[8].*

*Should the Seller fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date, the Buyer shall have the option (but not the obligation) of cancelling the MOA. On cancellation of the MOA, the Buyer shall be entitled to an immediate refund of the Deposit, together with interest.*

*The Seller has failed to give Notice of Readiness and/or complete a legal transfer of the Vessel by the Cancelling Date i.e. 5 October 2014. Accordingly, the Buyer is now entitled to cancel the MOA and seek an immediate refund the Deposit, plus interest earned thereon.*

*We, the Buyer, hereby expressly reserves the right to cancel the MOA. Any delay in exercising his right (or any other right and/or remedy under the MOA and/or Bareboat Charterparty and/or at law) shall not be construed as constituting a waiver of that right and/or any other right or remedy under the MOA and/or Bareboat Charterparty and/or at law, nor preclude or restrict any further exercise of the right to cancel the MOA and/or any other right or remedy.*

*All the Buyer's Rights under the MOA and/or the Bareboat Charterparty and/or at law are expressly reserved.*

74. **14 December**: Mr Highlands Senior replies:

   *Thank you for your mail or Friday 12th December 2014 and the enclosures.*

   *Thanks for all your help and attention.*

In his witness statement, Mr Highlands said that in the light of Grupo R's conduct up to that time and their representations that they wished to go ahead with the agreements, he thought nothing of Grupo R's reservation of rights:

   *I just thought that these were sent as part of an internal compliance procedure which Grupo R had to follow and did not expect that Grupo R would then purport to cancel the Agreements.*

At the hearing, Mr Highlands was challenged about this statement by Mr Coburn, who put it that it was "*a bit thin*": he invited Mr Highlands to accept that the letters of 12 December were sent to make it explicit that the right to cancel had arisen and that Grupo R was entitled to cancel and to get the Deposit back. Mr Highlands responded:

   *rightly or wrongly, our belief at the time was that time had passed and we didn't put any credence to this.*

He did not agree that it was "*perfectly obvious*" that Grupo R had started to think about cancellation. He responded:

   *Maybe it's black and white, but our thoughts were if they wished to cancel they would have done so, and this wasn't a cancellation. That was how we viewed it.*

---

[8] In the letter to Marfield relating to MAYA, in both places where it is mentioned this date reads 10 October 2014.

In summary, he thought it was okay just to ignore the message.

75. **28 January 2015**: there being no further news in the meantime, Grupo R send to Coastline and Mr Maringer a further "*official communication*" relating to each of the Vessels addressed to each of the Sellers.  The substance of each letter is again the same and that to Shanara relating to MARANGO reads as follows:

> *We refer to our letter of December 12th, 2014.*
>
> *Pursuant to Clause 5 of the MOA, the Seller is obliged to tender Notice of Readiness for the delivery not before 1 October 2014. The Cancelling Date under the MOA is 5 October 2014[9]. A deposit in the sum of US$5,000,000.00 was paid by the Buyer to the Seller on or around 25 June 2014.*
>
> *The Seller has failed to give Notice of Readiness in accordance with Clause 5 or failed to be ready to validly complete a legal transfer by the Cancelling Date.  Accordingly, we, the Buyer, hereby cancel the MOA with immediate effect.*
>
> *The Buyer now calls on you, the Seller, to make an immediate refund of the Deposit in the sum of US$5,000,000.00 together with any and all interest earned on the Deposit.  The Deposit should be paid into the following account:*
>
> *[Details set out]*
>
> *In addition, the Owners agreed that the Vessel would be delivered into the Bareboat Charterparty on or around 1 April 2014 and/or within a reasonable time thereafter. Wrongfully and in repudiatory breach of the Bareboat Charterparty, Owners failed to deliver the Vessel on 1 April 2014 or at all.  Accordingly, Charterers hereby accept Owners' repudiatory breach of the Bareboat Charterparty and terminate the Bareboat Charterparty with immediate effect.*
>
> *We look forward to receiving your confirmation, by return, that the Deposit has now been refunded.*
>
> *In the meantime, all the Buyer's rights and/or remedies under the MOA and/or the Bareboat Charterparty and/or at law remain expressly reserved.*

No reply is received to either letter.  At the hearing, Mr Highlands said that it was a surprise when Coastline received the letter, but agreed with Mr Coburn that neither he nor his father nor others at Coastline expressed surprise or indignation; further, he accepted that there was no accusation that Grupo R had gone back on any understanding, but admitted that perhaps they should have done.

76. **18 March 2015**: solicitors for Grupo R, Campbell Johnston Clark, come on the scene for the first time and send  to Coastline a letter relating to each of the

---

[9] In the letter to Marfield relating to MAYA, this date reads 10 October 2014.

Vessels addressed to each of the Sellers.  The substance of each letter is again the same and that to Shanara relating to MARANGO reads as follows:

> *We are London solicitors instructed for and on behalf of the Buyer in relation to a claim arising under the MOA entered into between the Seller and the Buyer for the sale and purchase of Vessel.  Please direct all future correspondence concerning this matter to our London office.*
>
> *Pursuant to Clause 5 of the MOA, the seller was obliged to tender Notice of Readiness for delivery not before 1 October 2014.  If the seller failed to give notice of readiness by 5 October 2014[10] (the "Cancelling Date") and/or was not ready to complete a legal transfer by the Cancelling Date, then pursuant to Clause 14, the Buyer became entitled to cancel the MOA.*
>
> *An advance payment in the sum of US$5,000,000.00 (USD five million) (the "Deposit") was paid by the Buyer to the Seller on or around 23 June 2014.*
>
> *The Seller failed to give a Notice of Readiness in accordance with Clause 5 and failed to be ready to validly complete a legal transfer of title by the Cancelling Date.  Accordingly, on 28 January 2015, pursuant to Clause 14 of the MOA, the Buyer exercised its right to cancel the MOA and called upon the Seller to return the Deposit immediately together with any interest accrued thereon.  This was communicated clearly to the Seller by letter dated 28 January 2015 which was sent by email, fax and courier and the copy of which is enclosed.*
>
> *As a result of the Seller's failure to give a Notice of Readiness for delivery and/or to be reviewed to validly complete a legal transfer of title by the Cancelling Date, the Buyer has suffered losses and/or expenses, which is the Seller is obliged to compensate the Buyer pursuant to Clause 14.  The Buyer will confirm shortly what its losses and expenses are in this respect.*
>
> *To date, despite the Buyer's letter of 28 January 2015, the Deposit with any accrued interest thereon has not been returned to the Buyer and remains outstanding.  This sum is indisputably due to the Buyer and is well overdue.  There is no defence of justification whatsoever for the Seller's delay in effecting immediate remittance of the deposit with accrued interest.*
>
> *Accordingly, take note that should you, the Seller, fail to provide confirmation within 7 days from the date of this letter that the sum of US$5,000,000.00 will be remitted to Buyer's bank account detailed in the enclosed letter by **16:00 (GMT) on Wednesday 1 April 2015**, we are instructed to commence arbitration proceedings without further notice to you.  Such proceedings will include a claim for recovery of interest and costs in addition to the Deposit Plus accrued interest and losses and/or expenses.*
>
> *If arbitration proceedings prove necessary, we are instructed to secure the Buyer's claims against the Seller's assets in any appropriate jurisdiction(s).*
>
> *Please acknowledge receipt of this letter and really look forward to receiving confirmation that US$5,000,000.00 together with any interest will be remitted to the Buyer's bank account before 16:00 (GMT) on 1 April 2015.*
>
> *The Buyer reserves its rights, relatives or defences whether arising under the MOA, at the law, or otherwise.*

77.  **25 March 2015**: at 17:49 Campbell Johnston Clark send to Coastline an email relating to each of the Vessels.  The substance of each email is again the same and that relating to MARANGO reads as follows:

---

[10] In the letter to Marfield relating to MAYA, this date reads 10 October 2014.

*We refer to our letter of 18 March 2015 in which we asked the Seller (you) to provide confirmation within 7 days from the date of the letter that the sum of US$5,000,000 will be remitted to Buyer's bank account by 16:00 (GMT) on Wednesday 1 April 2015.  The deadline for you to provide such a confirmation is by 25 March 2015, today, but we note we have not received any response from you?*

*Please can you confirm as a matter of urgency that the Seller will be remitting the sums set out in our letter by 16:00 (GMT) on Wednesday 1 April 2015, failing which we are instructed to commence arbitration proceedings without further notice to you.*

78. **1 April 2015**: Mr Highlands Senior writes to Campbell Johnston Clark as follows:

*Reference your mail of 26th March 2015 regarding Shanara Maritime International SA and Marfield Limited Incorporated.*

*We should by close of business today have received final instructions on these matters.*

*We will revert accordingly.  Sorry about this delay.*

*Thanks for all your help and attention.*

Campbell Johnston Clark reply:

*We refer to your email received earlier today (1 April 2015).  We look forward to receiving your confirmation by 16:00 (GMT) today, the stipulated deadline, that the Sellers have remitted the sums set out in our letters of 18 March 2015.*

79. **15 April 2015**: Mr Highlands Senior writes to Campbell Johnston Clark with reference to MARANGO (no equivalent message was received with reference to MAYA) as follows:

*We refer to the above and inform you that we consider that the MOA for the Sale of the Vessel is still current.*

*We informed representatives of [Grupo R] of the follow circumstances before the MOA was agreed of the problems we encountered with the terminated Charterer [OSA].*

*On 28th February 2014, acting in pursuance of its powers under Mexican Law, the Mexican prosecutor's office, the [PGR], took over OSA and arrested all assets owned by OSA or in its possession, including the Vessel ("the PGR Arrest") Caballo Marango.*

*On or about 2nd March 2014, the PGR handed over OSA's administration to the [SAE], a separate governmental department charged with the management of assets which have been arrested by a division of the Mexican Government, including the PGR.*

*On or about 9th April 2014, the PGR applied for OSA to be put into "concurso"/ administration.  On 8th July 2014, OSA was formally placed into "concurso"/ administration (the "Concurso"), with a second arrest/ injunction being placed on the assets owned by OSA or in its possession (including the Vessel) ("the Concurso Arrest").*

*OSA is presently subject to the Mexican Concurso, which is overseen by a judge and a "conciliador"/conciliator.  OSA's Business affairs are being managed by  the SAE within the context of the PGR arrest and the Concurso.*

*This arrest of the Panama owned and registered vessel Caballo Marango is an act of misappropriation by the Mexican Government who have ignored the fact that the vessel was under control of Captain Mauricio Cruz the Owners representative in the 28th February 2014.*

> *At a meeting in May, Representatives of Grupo R SA de CV attended with Shanara at the office of the PGR to meet with the Head of the PGR Unit Mr Hugo Louis Reynard who was shown the original documentation that the vessel was the property of Shanara.   The statement was made by him that the vessel would be released the following week.*
>
> *Subsequently Grupo R SA de CV with all the above information paid Five Million US Dollars down payment on the vessel.  Unfortunately it never was released.*
>
> *Since then we as Owners have been fighting with the Mexican Government-PGR-SAE-OSA-Ministry of Economic Affairs to secure the release of the vessel Caballo Marango and deliver it to Grupo R SA de CV in accordance with the MOA.*
>
> *We are informed now that the Concurso Judge will release the vessel by the end of April.*
>
> *I understand that our Lenders have assured Grupo R SA de CV of their support.*
>
> *If however you do not agree the MOA is current, please give us the reasons in view of the above circumstances.*
>
> *We thank you for your help and assistance in this matter.*

80. **16 April 2015**: Campbell Johnston Clark reply as follows:

> *We refer to your email of 15 April 2015.   The Seller appears to be under the misapprehension that the MOA is still in force and capable of being enforced, although you singularly fail to substantiate this position and instead rely on a bare assertion.*
>
> *More importantly though, the Seller has failed to address, at all, our clients' letter of 28 January 2015 in which it is, as Buyer, terminated the MOA with immediate effect also the bareboat charterparty.  The basis of the termination was set out in detail in that same letter and our subsequent letter of 18 March 2015 which also clearly demanded that the Seller return the deposit immediately together with any interest accrued thereon.  The Seller has failed to explain why it has not repaid the deposit together with interest.  Our letter of 18 March 2015 also made clear that the Seller is obliged to compensate the Buyer for its losses and for all expenses together with interest and our client reserves all its rights in this respect.*
>
> *The chronology of events set out in your message, about which we make no comment, does not affect the respective parties' legal position under the MOA in any way nor does it preclude the Buyer from relying on the terms and conditions of the MOA for their full meaning and effect.  The MOA was terminated by the Buyer and therefore the contract for the sale of the Vessel has fallen away; it cannot be reversed.*
>
> *If we do not receive confirmation from the Seller within three working days from the date of this letter (i.e. by close of business (London time) on Tuesday 21 April 2015) that remittance in full of the deposit plus any accrued interest will be made in short order to the Buyer whose bank details are set out in its letter of 28 January 2015, we are instructed to commence arbitration proceedings and seek security for the Buyer's claims in such jurisdiction(s) as may be appropriate, without further notice to you.  Such proceedings will include a claim for recovery of interest and costs in addition to the deposit plus accrued interests and losses and/or expenses.*
>
> *Although the seller does not make reference to the "CABALLO MAYA" in its message of 15 April 2015, our client adopts the same position above in respect of the "CABALLO MAYA".*
>
> *The Buyer continues to reserve all its rights, remedies and defences whether arising under the MOA, at more, or otherwise.*

81. **21 April 2015**: Mr Highlands Senior replies to Campbell Johnston Clark as follows:

*For the Sake of Good Order can you send us your confirmation that the MOAs for the vessels Caballo Marango and Caballo Maya are officially terminated.*

*Can you also define the following:*

- *Interest Outstanding*
- *Expenses*
- *Losses*

*Your attention appreciated.*

82. **28 April 2015**: Campbell Johnston Clark reply reiterating their previously stated position.  It is not necessary to quote their message verbatim.  Suffice it to say that they note that Grupo R's position have been very clearly set out in their letters of 28 January and 18 March, copies of which are attached; they note that Coastline have not confirmed that they would return the Deposits and interest; they repeat their demand for the Deposits; they claim interest at US Prime (3.25%) plus 3.0% on the Deposits; they assert that interest has accrued from 25 June 2014 (when the Deposits were paid) to 29 April 2015 in the sum of US$529,109.59; and they claim legal costs.

83. **10 July 2015**: Coastline do not reply and Campbell Johnston Clark serve notices of arbitration and of the appointments of their arbitrator Ms Kay.

84. **24 July 2015**: Ince & Co (who at the time were the solicitors for the Sellers before, in due course, being replaced by MFB)  give notices of the appointments of Mr Gault.

85. **April 2017**: MAYA is eventually released, according to evidence given by Mr Garza and Mr Mohamed.

86. **April 2018**: MARANGO is eventually released, according to evidence given by Mr Garza and Mr Mohamed.

87. **May 2019**: Mr Highlands informed us at the hearing that the Vessels were then in Galveston, Texas.  Neither of them had been sold.

## SUMMARY OF THE ISSUES

88.  We indicated the nature of Grupo R's case at the beginning of the previous section.   As we intimated, the Sellers' case is more complex.   It may be summarised as follows:

   a)   The Sellers admitted that if Grupo R had validly terminated, they were entitled to repayment of the Deposits, as provided for in Cl. 14 of the MOAs. However, they said, the terminations were not valid for two reasons, set out in b) and c) below, each aimed at the same result.  It was these two reasons which were the main focus of the arbitration.

   b)   Any rights to terminate acquired on the cancelling dates (5 and 10 October respectively) were lost because Grupo R failed to exercise them within a reasonable time.

   c)   Alternatively, the parties conducted themselves on the basis that Grupo R would not be able to exercise the rights to terminate on account of delays caused by the restraint of the Vessels or, at least, would not be able to exercise the rights on that account without reasonable notice, and Grupo R were estopped from doing so.

   d)   If the terminations were not valid, what are the consequences in relation to Grupo R's claims and the Sellers' counterclaims?

We deal with each of these issues below.  As they were all raised by the Sellers, in each section below we set out their position on each issue first, followed by Grupo R's position, regardless of the order in which each point we describe was made in the course of the arbitrations.

## FAILURE TO TERMINATE WITHIN A REASONABLE TIME

### *The issue as pleaded in the Submissions*

89.  In simple terms, the Sellers' case was that Grupo R waited from 5 October 2014 (in the case of MARANGO) and 10 October 2014 (in the case of MAYA) until 28

January 2015 before purporting to terminate the MOAs.  The time which had elapsed was unreasonable.  The way Mr Eaton put it was that "*rights to terminate are to be exercised or lost, not warehoused indefinitely*".

90.  The first basis on which this case was put was that there was an implied term that the right to terminate must be exercised within a reasonable time.  The Sellers pleaded that this term was to be implied because it was necessary for business efficacy, pursuant to the officious bystander rule and/or to give effect to the true construction of the MOAs.  The purported cancellations were not made and/or communicated within a reasonable time and were therefore invalid.

91.  Grupo R's pleaded response was to deny any such implied term: in the case of ongoing delay in delivery, Grupo R were free to decide whether and when to cancel: it was their right to decide how much delay they were prepared to tolerate, and the point at which enough was enough.  In any event, they acted entirely reasonably and therefore complied with the term asserted by the Sellers.  It was entirely reasonable for Grupo R to wait for a period of some months in the hope that the Vessels would be released from the PGR arrests.

### The Sellers' Case on Implied Term

92.  Mr Eaton amplified on the Sellers' pleaded case in his Skeleton Argument, presented just before the hearing.  He argued that the requirement that a term will only be implied where necessary was amply satisfied here: the implication followed readily from the commonplace principle that, where a contract does not specify a time within which a thing is to be done, it is to be done within a reasonable time. This principle is most frequently stated in the context of the performance of contractual obligations, but is equally applicable where one party is given a contractual option to terminate.

93.  Thus, in *KKKK v Belships* (1939) 63 Lloyd's Rep 175, Branson J held that there was an implied term in a time charter that a right to terminate under a war clause must be exercised within a reasonable time after the outbreak of a relevant war. Conspicuously, Mr Eaton argued, the judge's reasoning was not based on any factors peculiar to time charters or war clauses, but on the general principles that (i) a term will be implied where necessary but not otherwise, and (ii) a reasonable

time will be allowed where a contract does not specify a time.   In his oral submissions, Mr Eaton drew our attention to the judge's conclusion:

> *In other words the charterers and the shipowners would be entitled here to a reasonable time within which to ascertain that war had broken out and within which to consider and decide the question whether, seeing that war had broken out, they thought it was in their interest to continue to implement the contract or not.*

94.   In the context of ship sale, in *The 'Great Marine' [1990] 2 Lloyd's Rep 245 @ 249*, it was common ground, and accepted by the Judge, that the Sellers' right to terminate for non-payment was exercisable only within a reasonable time (the contract in that case was on Norwegian Saleform terms).

95.   In the present case, Mr Eaton argued that since the Buyers' right under Cl. 14 to terminate for the Sellers' default is the mirror image of the Sellers' right under Cl. 13 to terminate for the Buyers' default, it would be strange, and would produce a distinctly unbalanced bundle of contractual rights and obligations, if the Buyers' right to terminate was not subject to the same limit; and, since the implied term rests upon general and well-established principles (see above) which are just as applicable to the Buyers' right to terminate as they are to the Sellers' right, there is no principled basis for drawing any distinction between Cl. 13 and Cl. 14 in this respect.

96.   Mr Eaton took us to the Court of Appeal decision in *CMA CGM S.A. v. KG MS 'Northern Pioneer'* [2003] 1 Lloyd's Law Reports 212.   This was a case about cancellation of a time charter under a war clause.   We comment that the appeal was against a refusal of the Commercial Court judge to grant permission to appeal against an arbitration award (the judge having granted permission to appeal against his refusal).   Thus, the primary focus of the Court of Appeal judgments was on the approach to be adopted under s. 69 of the Arbitration Act 1996, rather than on the substantive issues.

97.   For present purposes, it is unnecessary for us to go into the facts of the case. Suffice it to say that the arbitrators had found that the charterers had not validly terminated under the war clause for four separate reasons.   The third (on which the charterers sought leave to appeal) was that under the clause (which did not contain an express deadline for giving notice), the right to cancel had to be exercised within a reasonable time of the event in question; and the fourth was that the charterers had not given notice of cancellation within a reasonable time.

98.   Mr Eaton drew our attention to the following passage in the judgment of Lord Phillips:

> *A time charter-party is a joint adventure.  The shipowner provides the use of his ship in accordance with orders given by the charterer.  The charterer pays hire for the services provided by the shipowner.  The suggestion that such a charter may permit a prolonged period during which one or both of the parties remains at liberty to terminate the charter is in conflict with business efficacy, as so forcefully demonstrated by Sir John Donaldson.  If circumstances arise giving rise to a right to terminate the charter business efficacy requires that the right be exercised promptly.  If the shipowner continues to provide the services of his ship, or the charterer continues to make use of those services beyond such time as would reasonably be needed to react to those circumstances, the inference will normally be that he has decided not to exercise the right to terminate the charter.  In such circumstances the principles of election, waiver and estoppel will normally preclude the party in question from thereafter terminating the charter.  Thus the requirements of business efficacy that justify the implication of a term that the right to withdraw be exercised within a reasonable time will normally produce the same result as a consequence of the application of the principles of election, waiver, and estoppel.*

99.   As mentioned above, Mr Eaton invited us to apply the ordinary principle in a commercial contract that if it does not specify a time within which the relevant thing has to be done, it has to be done within a reasonable time.  He added that the idea that the thing has to be done within a reasonable time applies to non-contractual rights to terminate as well as contractual rights to terminate: a right to terminate a contract for misrepresentation or for duress or for undue influence can be lost by lapse of time if the right is not exercised for a considerable period.

100.  He then concluded that, since the proposition that a right to terminate can be lost if it is not exercised within a reasonable time is based upon an ordinary rule applicable to commercial contracts, and since that ordinary rule is also capable of applying to a non-contractual right to terminate, it was in his submission clearly equally capable of applying in the context of a buyer's termination right under a ship sale contract.

101.  Mr Eaton accepted that there was no authority to support this submission, but he pointed out that both Counsel and the Judge in *The 'Great Marine'*, referred to above, took it for granted that the right to cancel had to be exercised within a reasonable time applied to a seller's right in the context of a ship sale contract. Mr Eaton reiterated his argument in his Skeleton to which we have referred above that since the Buyers' right under Cl. 14 to terminate for the Sellers' default is the mirror image of the Sellers' right under Cl. 13 to terminate for the Buyer's default, it would be odd if the Buyer's right to terminate was not subject to the same limit.

102. Mr Eaton addressed us on the sole legal authority relied upon by Mr Coburn, in Court of Appeal in *Moel Tryvan Ship Company, Limited v Andrew Weir & Co* [1910] 2 K.B. 844.  He pointed out the age of the authority and that the judgments were against the background of a 150-year history of discussion and decisions which had an impact on the judges' views.  He submitted that the approach of the Court of Appeal, at least of Kennedy LJ (who provided the fullest judgment), was perhaps coloured by a concern in that era that the "*reasonable time*" was too vague and open-ended a concept to have any real place in a commercial contract.  He contrasted this with modern times, when it is, he said, perfectly commonplace for the concept of a reasonable time to play a role even in commercial contracts: one need only cite *The Antaios* and *The Northern Pioneer*, which are both about time charterparties, commercial contracts, and indeed the clear assumption taken as read in *The Great Marine*, which is a ship sale contract, a commercial contract.  So, Mr Eaton suggested, things have rather moved on in the modern world since Lord Justice Kennedy's concern about having anything to do with reasonable time.

103. Mr Eaton also drew our attention to the opening words of Farwell L.J.'s judgment

> *I am of the opinion that on the true construction of this charterparty taken as a whole the parties have expressed, not indeed in so many words but with reasonable clearness, the limits of the time within which the power of cancellation is to be exercised, and the limit on the true construction of the clause is that it may be exercised at any moment up until the point at which the ship arrives at the load port.*

104. Mr Eaton also took us to a passage in the judgment of Cozens-Hardy M.R. on which Mr Coburn had relied:

> *Under the charterparty the shipowners were bound to take their ship to Newcastle, however much behind time it might arrive.  If it arrived before December 15 the charterer was bound to load.  If it arrived after that date the charterers were not bound to load, though they had the right to load.  Whether they should load or not would depend upon whether on the arrival of the ship rates had risen or fallen, and also upon whether they had a cargo ready.  The cancelling clause is obviously inserted for the exclusive benefit of the charterers, and I fail to see how, as a matter of business, the charterers can tell whether it would be to their interest to cancel before the arrival of the ship.  I decline to hold that there is any implied condition that the option shall be exercised within a reasonable time after the cancelling date.*

Mr Eaton submitted that this analysis was really based upon the true construction of the express wording of the charterparty and the cancellation clause.

105. In a similar vein, Mr Eaton drew our attention to the following words in the judgment of Kennedy L.J.:

> If I am right in this view there is no room for an implication of a duty on the charterers' part to exercise their right of option within "a reasonable time" (whatever that might be construed to mean) after the date has been reached which ends the absolute right of the shipowners to have their ship loaded when she arrives at Newcastle.

106. The nub of Mr Eaton's case on *Moel Tryvan* was, therefore, that all the Court of Appeal judges based their decision on the true construction of the express terms of the cancelling clause, namely that the right to cancel was exercisable at any moment up until the arrival of the ship at the load port.  From this, it necessarily followed that there would be no room for the implication of a term which set a different time limit, whether reasonable or otherwise: you cannot imply a term which is inconsistent with the express terms.

107. As we have already indicated above, Mr Eaton submitted that *Moel Tryvan* did not reflect modern thinking.  Further, the *dicta* in a voyage charter case such as *Moel Tryvan* should not rightly be broadened out to establish a proposition that the right of a buyer to terminate under the Norwegian Saleform 2012 is not subject to a reasonable time qualification: this is not a voyage charterparty case.  This is not a short-term contract for the provision of services by carrying a cargo on a single voyage.  It is not a case like the situation which the Court of Appeal described in *Moel Tryvan* where the commercial venture is subject to constantly fluctuating charter rates and coal prices, fluctuating day by day and indeed possibly even within a day, which fluctuations may have a significant effect on the commercial viability of the entire venture.  The judges made the point, Mr Eaton observed,  that the charterer is entitled to see what the state of the market is when the ship actually turns up, but that is in the context of volatile coal sale markets, and volatile charterparty markets, which are constantly fluctuating.

108. This, Mr Eaton submitted, is not that kind of short-term contract against volatile markets: we are concerned here with 328 million dollar contracts for the outright sale of highly specialist sophisticated ships which were regarded by Grupo R, as their witnesses told us, as major assets which they were buying as part of the contribution to the strategic growth of their business.  The idea that in that context Grupo R could not be expected to make up their mind whether or not to exercise the right to cancel until the ship was tendered is not commercial.  It may have

34

made commercial sense in the context in the *Moel Tryvan* case to say that you cannot be expected to make your mind up until the ship arrives, but there are not similar considerations here.  Indeed, the idea that the buyers are entitled to keep the right to terminate open until the ship is tendered is very similar to the idea that was rejected in *Belships* that the option to terminate under the war clause can be kept open for as long as the war continues.

### Grupo R's Case on Implied Term

109. It was common ground between the parties that there is no legal authority on the implied obligation of a buyer of a vessel under the Norwegian Saleform to terminate within a reasonable time after the cancelling date if he wishes to exercise his right to cancel.  However, Mr Coburn submitted in his Skeleton Argument that the Sellers' case was essentially the argument rejected by the Court of Appeal in *Moel Tryvan*.  He argued that although that was a voyage charter case, the rationale for the Court of Appeal's decision applies equally to an MOA.

110. In *Moel Tryvan*, the charterers had "*the option of cancelling this charterparty*" if the ship had not arrived ready to load by the cancelling date.  The Court of Appeal rejected the contention that the option had to be exercised within a reasonable time after the cancelling date, concluding instead that the charterers could cancel at any time up to the actual arrival of the ship.

111. The main reasons for that conclusion were as follows:

   a)   The option to cancel is for the exclusive benefit of the charterer;

   b)   The mere passing of the cancelling date does not put the charterer in a position to make an informed decision about whether it is in his interests to cancel. Cozens-Hardy MR said @ p.854:

   > ...I fail to see how, as matter of business, the charterers can tell whether it will be to their interest to cancel before the arrival of the ship.

   Kennedy LJ said @ p.857:

   > … from the mercantile point of view so vague a stipulation as that of "a reasonable time" under which in some way the conflicting interests of shipowner and charterer are to be harmonized, and under which the charterer, as indeed is the present case, would be asked to anticipate, days, or weeks, or possibly months ahead, what his interests

35

> might be when the ship arrives, would certainly be deemed unpractical and unbusinesslike.

c)   The mere passing of the cancelling date does not remove the owners' obligation to tender the ship at the loading port, so the charterers have the right to await the tender of the ship before making their decision.  That rules out any prior "*reasonable time*" deadline.

112.  Mr Coburn submitted that these reasons apply equally in the context of an MOA:

a)   The option to cancel is for the exclusive benefit of the buyer;

b)   The mere passing of a cancelling date does not put the buyer in a position to make an informed decision about whether it is in his interests to cancel. That will depend on what happens next;

c)   The passing of a cancelling date does not remove the seller's obligation to tender the ship, with the consequence that the buyer has the right to await the tender of the ship; and

d)   The suggested "*reasonable time*" obligation is just as vague and unsatisfactory in an MOA context as in a charter context.

113.  Mr Coburn reiterated and amplified on his Skeleton Argument in his opening oral submission as follows:

> … the mere passing of a cancelling date doesn't somehow automatically put the charterer, or we would say the buyer, in a position to make an informed decision about whether it is in its, his or her interests to cancel.  The passing of the date is what gives you the right, but in and of itself it doesn't tell you much if anything about whether it's going to be in your interest to exercise it, and what you really want to know is: when am I actually going to get the ship?  And the Court of Appeal held in the Moel Tryvan case that you were entitled to wait until you knew the answer for sure, i.e. when the ship had actually been tendered.

114.  Mr Coburn also advanced the proposition that what we are concerned with in this case is a "*plain vanilla*" cancelling clause exactly parallel to "*plain vanilla*" cancelling clauses in charterparties; and it is a long-established principle that there is, in an ordinary charter with an ordinary cancelling clause, no implied term requiring the charterer to cancel within a reasonable time after the cancelling date.

115. Mr Coburn also submitted to us that the cases on withdrawal under a time charter such as *The 'Laconia'* and *The 'Antaios'* were of no relevance.  He directed us to the judgment of Staughton J in *The 'Oro Chief'* [1983] 2 Lloyd's Rep 509.  In that case, the time for delivery of and payment for the vessel under a contract on the Norwegian Saleform expired on 6 April 1983.  The buyers failed to tender the purchase price in exchange for the documents which the contract required to be handed over on completion and the owners purported to cancel.  Mr Coburn pointed out to us the following passage in the judgment @ p.519:

> … , reliance is placed on the notice of readiness on March 15.  It is said … that cancellation could only take place promptly, or within a reasonable time, after the expiry of the three-day period from notice of readiness mentioned in cl. 3 of the contract.  No other notice of readiness was subsequently given.  But it is clear that the owners continued striving to achieve delivery and payment.  To say, as Mr Rix did, that the notice of readiness receded in the background of everyone's mind is, at best, plainly wrong.
>
> I was referred to the case of The Laconia … and The Scaptrade … as to what is the proper time for cancellation in the event of non-payment of hire under a time charter.  The time for exercise of the right to cancel under a continuing contract such as a time charter is an altogether different topic from the time for cancellation of a contract for the sale of ship.  In the present case, the question is whether the owners must be taken to have waived or abandoned this right to cancel because they did not exercise it within three working days of March 15.  On the facts, and particularly in the light of the terms in which extensions were granted on March 24 and April 5, they did nothing of the kind.

As Mr Coburn put it, that was a "*curt dismissal*" not only of any analogy with time charter cases (the point which we are now addressing) but also, on the facts of that case, of any question of waiver or abandonment.

116. Mr Coburn drew our attention to a passage in Lord Phillips' judgment which Mr Eaton had not taken us to in which he quoted from Sir John Donaldson's judgment in *The 'Antaios'*:

> I know of no authority for the proposition, and I do not think that I have ever heard it suggested before, that a shipowner can extend the time for reaching a decision whether or not to withdraw beyond what is reasonable in all the circumstances by the simple device of announcing that his failure to decide is without prejudice to his rights. If Mr Pollock is right, and the owner can extend his option to withdraw the vessel in this way, chaos would result. Ships would be hove to at sea or tied up in port, no one knowing whether they were going to perform the chartered service … An interval of nearly a month before the owners could be forced to elect would be wholly unacceptable commercially.

Mr Coburn submitted that the reference to "*forcefully demonstrated*" in Lord Phillips' judgment in *The 'Northern Pioneer'* was a reference to Sir John Donaldson's warning in the above passage that "*chaos would result*".  He urged us to accept that no chaos was going to result if Grupo R were right in this case: they were simply advancing in the MOA context what has already been the law

37

for over 100 years in the charter context: it does not cause chaos, precisely because we are concerned with a completely different sort of context: we are talking about tender of a ship right at the beginning under a contract, not withdrawal under an ongoing time charter where both parties have to play their part and the ship is, with any luck, being engaged in profitable employment.  So when we see Sir John Donaldson's reference to "*chaos*", we should understand even more clearly why Staughton J in *The 'Oro Chief'* rejected any analogy with the time charter cases and rejected reliance on quotations from the well-known cases in that context.

117. With regard to the decision in *KKKK v Belships*, Mr Coburn reminded us that the option to cancel in the time charter in that case was mutual and that one of the points mentioned in *Moel Tryvan* was that different considerations may arise in relation to a mutual option[11].

118. Mr Coburn argued that if you are concerned with a war cancellation clause, there is no natural endpoint for the exercise of the option in the way that there is in relation to the sort of cancelling clause that we are concerned with in the present case, or the sort of cancelling clause that *Moel Tryvan* was concerned with.  In our case there is a natural endpoint which is the actual tender of the ship.  In the case of war, on the other hand, there is no natural endpoint of that sort unless one goes to the extreme of saying that it is the end of the war.

119. Mr Coburn directed our attention to the following passage in the judgment of Branson J in *KKKK v Belships*:

> *It seems to me that the ordinary rule that one applies in the case of a commercial contract where no time is fixed, is applicable to the present case, because what the parties would have had to decide, if and when a war broke out, would be: in view of the outbreak of war, is it our desire to go on with this contract?  As Sir Robert Aske put it, no doubt what is contemplated by people who are envisaging the outbreak of war between Great Powers is that there will immediately be such a dislocation of business as to make it right that both parties to a contract should have a right of reconsidering their position and determining whether, in the changed circumstances, that is to say, whether in view of the outbreak of war, they are prepared to go on implementing a contract which had been made in peace-time and was intended to be operative in peace time.*

---

[11] Although Mr Coburn did not take us to the relevant passage, this would appear to be a reference to the concluding remarks of Kennedy L.J., in which he cautioned against applying dicta in an earlier case in which both the charterer and the owner had the option on the happening of a certain event to cancel the charterparty.

38

Mr Coburn submitted that a major immediate "*dislocation of business*" was enough to allow one to decide what to do, and that this was very different from the case of ongoing delay, where "*the ship is forever just beyond the horizon*".

### *Findings on Implied Term*

120. Having reviewed the parties' respective submissions, we now set out our conclusions on the question whether there was an implied term that the right to terminate must be exercised within a reasonable time.

121. We start by noting that Mr Eaton very properly reminded us of Lord Justice Scrutton's famous dictum in *Reigate v Union Manufacturing*, adopted by Branson J in *KKK v Belships*,:

> *A term can only be implied if it is necessary in the business sense to give efficacy to the contract.*

Branson J enlisted that dictum as support for his observation that –

> *… it always seems to me to be most important that the Courts should abstain from implying terms into contracts unless it is perfectly plain that the parties really intended the contract to have that term."*

122. We have endeavoured to apply this test when considering cl. 14 of the MOAs. To remind ourselves, the relevant part of that clause reads:

> *Should the Sellers fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date the Buyers shall have the option of cancelling this Agreement …*

So, the two inter-related questions we have asked ourselves are: can the clause work without the term which Mr Eaton asks us to imply, and is it perfectly plain that the parties really intended the MOAs to have that term?  Our answers to those questions are, respectively, yes and no.

123. We certainly espouse the principle that if a contract gives a party the right to do something but does not give a deadline for doing it, it would in all probability, depending on all relevant circumstances and factors, be right to imply a term as to that deadline, which might well be "*a reasonable time*".  Against that background, it is a straightforward matter of common sense that such a deadline be implied in a time charter in the case the outbreak of war: to adopt Sir John Donaldson's words, chaos would result if in those circumstances certainty as to

the continuing existence of the charter were not achieved in fairly short order. We respectfully adopt Branson J's words of agreement with Counsel for the Owners in *KKKK v Belships* which we quoted above.

124. On the other hand, in the present case, it appears to us quite clear that, if the option to cancel the MOAs had been triggered under cl. 14 by the Sellers' failure to be ready to validly complete a legal transfer by the Cancelling Dates of 5 and 10 October 2014, then on the true construction of each of the MOAs there was a deadline for exercising the option, namely the moment when, following giving of Notice or Readiness, the Sellers tender the requisite documents and have complied will all necessary steps to validly complete a legal transfer.

125. At that moment, Grupo R would be obliged to pay the Purchase Price under cl.3 of the MOAs.  Accordingly, if by then they had not opted to cancel, they would themselves be in breach of cl.3 and the Sellers would themselves have the right to cancel the MOAs under cl. 13.

126. Thus, in *Moel Tryvan*, just as the arrival at Newcastle of the vessel marked the limit of time when, in the Court of Appeal's judgment, the charterers had to decide whether or not to cancel, so, in our case the moment of tender which we have just identified marked the limit of time when Grupo R had the right to cancel under cl. 14.

127. Thus, adapting the words of Farwell LJ at the start of his judgment, we are of the opinion that on the true construction of the MOAs, taken as a whole, the parties have expressed, not indeed in so many words, but with reasonable clearness, the limits of time within which the power of cancellation is to be exercised by Grupo R.  It follows that, as this is the reasonable construction of the MOAs, no question of reasonable time arises: there is no scope for the implication of a term.

128. As we have mentioned, Mr Eaton sought to persuade us that the Court of Appeal judgment in *Moel Tryvan* should be viewed with caution as it represented an outdated view not in accord with modern thinking.  We see no basis for accepting this submission, not least because Mr Eaton was unable to point to any subsequent, let alone modern, judgment criticising *Moel Tryvan*.

129. As we have noted above, Mr Eaton invited us to distinguish a commercial venture such as a voyage charter in *Moel Tryvan*, subject to fluctuating market rates, from the case under consideration.  Mr Coburn suggested that this was unconvincing, and we agree with him.  He suggested that the value of the ships will go up and down on the S&P market; the market into which the ships are going to be used will fluctuate; rates will fluctuate; in general, prospects for employment may change; in the present sort of case, for example, what Pemex might want to do at one stage of the story could be different from what they would want to do at a different stage in the story.  No expert evidence was offered by either party on the behaviour of the markets, but on the basis of our own trade experience and, indeed, as a matter of common sense, we are bound to agree with Mr Coburn.

130. Mr Eaton deployed in support of his argument the passage (quoted above) in the judgment of Lord Phillips in *The 'Northern Pioneer'* to the effect that a time charter-party is a joint adventure.  We regard the passage as providing support, not for his case, but rather for Mr Coburn's: it offers a cogent basis for distinguishing between the nature of a time charter and that of a contract for the sale of a vessel.  The former, as a joint adventure, requires the parties to work together on a continuing basis throughout the lifetime of the charter, whereas the latter in essence requires one-off acts of performance: tender of the vessel in exchange for the price.

131. As we have mentioned, Mr Eaton submitted that we are concerned here with contracts for 328 million dollars for the outright sale of highly specialist sophisticated ships which were regarded by Grupo R, as their witnesses told us, as "*major assets*" which they were buying as part of the contribution to the strategic growth of their business.  The idea that in that context Grupo R could not be expected to make up their mind whether or not to exercise the right to cancel until the ship was tendered was, Mr Eaton said, not commercial.  Again, Mr Coburn begged to differ: if anything, the size of the contracts under consideration pointed to a longer, not a shorter, deadline.  We would agree, were it relevant to assess what a reasonable time would be.

132. As noted above, given the decision in *The 'Great Marine'* that the Sellers' right to terminate for non-payment was exercisable only within a reasonable time, Mr

Eaton argued that since the Buyers' right under Cl. 14 to terminate for non-delivery is the "*mirror image*" of the Sellers' right under Cl. 13 to terminate for the Buyer's default, it follows that the Buyers' right to terminate for non-payment is exercisable only within a reasonable time.  The relevant passage in *Strong and Herring, Sale of Ships* not only notes that *The 'Great Marine'* dealt with potential cancellation by the Sellers and that there is no case law that the authors are aware of which deals with a cancellation by the Buyers of a contract for the sale of a second-hand ship; it also suggests that the implication of a term that any cancellation must be exercised within a reasonable time is –

> *… more understandable if the potential cancellation is by the Sellers.  The Buyers will usually have made detailed business arrangements in anticipation of prompt delivery – a new crew, a drydocking, a cargo or a ballast voyage to deliver the vessel into a charter. The Sellers will have made no such plans where it is the Buyers who delay their decision.*

133. Finally, we cannot but detect a certain irony in the Sellers' approach to this issue. If they were right that Grupo R had to exercise their right to cancel under cl. 14 within a matter of weeks, failing which they would lose that right and that such right was a mirror image of the Sellers' right to cancel under cl. 13, one may ask why they regarded themselves as entitled to cancel under cl. 13 when they purported to do so in their Defence and Counterclaim Submissions, almost nine months after Grupo R's messages of 28 January 2015.

134. In conclusion on this topic, **WE FIND** that there was no implied term of each of the MOAs that Grupo R had to cancel within a reasonable period of time after the Cancelling Date had passed, failing which they lost their right so to cancel; on the contrary, they retained that right up to the moment that each Vessel was tendered for delivery.

### *Had a Reasonable Time elapsed before 28 January 2015?*

135. The above finding renders academic the question whether a reasonable time had already elapsed before Grupo R purported to cancel on 28 January 2015. However, for completeness, and in case we are hereafter found to be wrong in our above finding, we now address this topic.  Again, we record first Mr Eaton's position, followed by Mr Coburn's.

136. In their Defence Submissions, the Sellers did not specify when the reasonable time had elapsed according to their case, other than that it was evidently before 28 January 2015.  In his Skeleton Argument, Mr Eaton noted Lord Wilberforce's statement in *The 'Laconia' [1977] AC 850 @ 872* that *"a reasonable time"* would often be *"a short time - viz the shortest time reasonably necessary for the shipowner to hear of the default and issue instructions"*.  He then continued:

> *True, Staughton J in The 'Oro Chief' [1983] 2 Lloyd's 509 @ 519 was willing to countenance a less rigorous approach in the context of shipsale, holding that sellers had not lost their right to terminate by failing to exercise it within 3 working days. But the delay in this case was of an entirely different order: 115 days in the case of 'Marango', and 110 in the case of 'Maya'. On any analysis, this was in both cases more than sufficient to satisfy the requirement for Buyer to be afforded a reasonable period in which to decide whether or not to exercise the rights of termination which had accrued on 5 and 10 October 2014 respectively.*

137. Further on, Mr Eaton comes to the nub:

> *Sellers suggest that, even being generous, a period of 1 month was more than sufficient time for Buyer to make up its mind whether or not to terminate. Alternatively, even if the Tribunal considers that this is too short, the concept of a reasonable time cannot legitimately be stretched to cover the period from 5/10 November[12] 2014 to 28 January 2015.*

138. When tackling the topic in his oral submissions at the hearing, Mr Eaton said:

> *… it may well be the case that what is a reasonable time for the exercise of a right to terminate the contract depends upon context, and as Mr Coburn pointed out to you this morning, Staughton J in The 'Oro Chief' said that ship sale was a different context from a time charterparty. That's all right so far as it goes, but I would ask you to note that in the passages which Mr Coburn showed you in The 'Oro Chief', which is a ship sale case, Staughton J doesn't say considerations of reasonable time are just completely irrelevant in a ship sale case.  What he said is, the context is different and in the context of a ship sale on the facts of that case he concluded that a reasonable time had not expired before the right was exercised and therefore the right had not been lost.  But he did not say that questions of reasonable time just don't arise.  He did not say there is no reasonable time qualification at all.  Granted that what is a reasonable time may depend upon context, whatever the context is, whenever a tribunal is concerned with questions of reasonable time, the question is going to be, what is a reasonable time for the doing of some particular thing?  The context which we are concerned with is, what is a reasonable time for the exercising of a right to terminate?  In that context, I would submit the basic yardstick ought to be, what is a reasonable period of time for the buyer to make up its mind what it's going to do?*

139. In an answer to a question put by the Chairman (namely, to what extent did the parties consider that the reasonable time test is influenced by the period between the conclusion of the MOAs and the cancelling dates), there was in Mr Eaton's submission no straight-line correlation between a reasonable time for the exercise of the right and the period of time between the signing of the contract

---

[12] Evidently this was a typographical error for October.

and the contractual cancelling date. Indeed, what is a reasonable time for the exercise of the right to cancel primarily falls to be judged by reference to the situation at the time when the right to cancel arises and afterwards going forwards, whereas the period between the contract signing and the moment when the right to cancel arises looks back in the other direction, so looking in different ways. In his submission, there is no direct relationship.

140. Mr Eaton conceded that it may be that a party with a right to terminate is reasonably entitled to more time to decide  what to do in the context of a $328 million ship sale contract than it would be in the context of a time charter, but in his submission on any reasonable analysis a reasonable time had expired before the Buyers purported to terminate 28 January.

141. The nearest which Mr Eaton got to being specific as to when a reasonable time had expired was when he stated that his primary submission was that it had done so before Grupo R purported to reserve their rights on 12 December – and that they could not extend time beyond what was reasonable simply by reserving their rights in that manner. In support, he referred us to the words, quoted above, of Sir John Donaldson on the topic in *The 'Antaios'*.

142. For their part, Grupo R contended in their Reply Submissions that even if the term was implied, it was entirely reasonable for them to wait for a period of some months in the hope that the Vessels would be released from the PGR arrests. In his Skeleton Argument, Mr Coburn expanded on this contention, stating that "*reasonable*" would mean reasonable in all the circumstances, and here Grupo R acted reasonably in all the circumstances: there was nothing unreasonable about holding off from cancellation until it had become tolerably clear that the delay was going to continue indefinitely.

143. For our part, we conclude that the notices of cancellation of 28 January 2015 were served before a reasonable period could be said to have expired after the contractual Cancellation Dates of 5 and 10 October 2014. This conclusion is reached on the basis of a consideration of all the circumstances. It would in our view be wrong to attempt to approach the test of what was a reasonable time in too analytical manner and therefore the factors which we set out as follows

44

should be viewed as not set in stone but rather as contributors to the general impression which built up to inform our decision:

a)   As Mr Eaton was at pains to establish when cross-examining Mr Garza and Mr Mohamed, it was abundantly obvious that Grupo R were very keen to buy the Vessels.  The Sellers would at all material times have appreciated that Grupo R would abandon the purchases only with reluctance and after hesitation.  It was not a case where they would expect Grupo R to seize an opportunity to get out of the deal promptly if the Sellers failed to tender the Vessels on time – quite the contrary.

b)   As Mr Eaton was also at pains to establish when cross-examining Mr Garza, these contracts, with a total consideration of $328M, were "*major contracts*" which were intended to replace one of Grupo R's two existing offshore vessels and to increase their fleet for the long term.  Again, these were factors which, as the parties would have always anticipated, would make a decision to cancel a weighty one, to be taken, as we have said, with reluctance and after hesitation.

c)   As we noted when introducing our lengthy exposition of the events underlying this dispute, optimism and pessimism as to a successful completion of the MOAs succeeded each other frequently in roller-coaster fashion.  It is hardly surprising, therefore, that against this context both sides would find it difficult to read the signs and it was therefore to be anticipated that decisions might be delayed in the hope, or fear, that a turn of events might sway expectations one way or the other.

d)   As for Grupo R's reservation of rights of 12 December 2014, clearly Sir John Donaldson's dictum (namely, that a shipowner cannot extend the time for reaching a decision whether or not to withdraw beyond what is reasonable in all the circumstances by the simple device of announcing that his failure to decide is without prejudice to his rights) must apply to the buyer of a ship in Grupo R's position.  However, that begs the question when the time for reaching a decision has expired and, as we say, our conclusion is that it had not on that date, nor for that matter by 28 January 2015.

45

e)   Nevertheless, the existence of the reservation, and in particular the non-reaction to it, does to us have an evidential significance: the mere fact that Coastline did not react adversely in any way, let alone protest by asserting that it was too late to cancel, is in our estimation a clear pointer to the fact that, at that time, they were in no doubt that it was <u>not</u> too late. Their reaction ("*Thank you for your mail or Friday 12th December 2014 and the enclosures. Thanks for all your help and attention.*") is to us not the reaction of a party to a very substantial contract who takes exception to its counterpart's message.   We found Mr Highlands' efforts to deal with this difficulty in the Sellers' case unconvincing and we consider that this is a factor which we are entitled to take into consideration when determining whether, in all the circumstances, a reasonable time had by then already elapsed.

f)   This conclusion can only be reinforced by the complete lack of any reaction whatsoever to the actual notices of cancellation of 28 January 2015.

g)   The same observation applies to Coastline's silence following Campbell Johnston Clark's letters of 18 March and, eventually, to the responses of 1 and 15 April to the chasing emails of 25 March.  It is particularly noteworthy that the message of 15 April, albeit fairly detailed in its summary of the history, does not even attempt to suggest that the cancellation notices were too late, let alone uncontractual.   Equally noteworthy is Mr Highlands Senior's enquiry of 21 April asking, without protest, Campbell Johnston Clark to confirm the official termination of the MOAs and enquiring as to the extent of Grupo R's claims.

h)   Indeed, it was only when Defence Submissions, drafted by Counsel, were served on 16 October 2015 that the "*reasonable time*" defence emerged for the first time.

144.  Accordingly, **WE FIND** that, if we are wrong in our finding that there was no implied term of each of the MOAs that Grupo R had to cancel within a reasonable period of time after the Cancelling Date had passed, in any event the notices of cancellation of 28 January 2015 were served before a reasonable time for serving such notices had expired.  It follows that, subject to the next issue which falls for our consideration, such notices were valid and took effect in accordance

46

with their terms so as to cancel the MOAs and trigger Grupo R's entitlement to the immediate release of the Deposits together with interest earned in accordance with cl. 14.

## WAIVER/ESTOPPEL

### *The Sellers' Case*

145. As an alternative to their contention that Grupo R had not served their cancellation notices within a reasonable period, the Sellers pleaded that in failing to cancel the MOAs reasonably soon after the Cancelling Dates of 5 and 10 October, Grupo R had waived their right to do so and/or represented that they were not going to do so, in reliance upon which the Sellers did not take steps to market the Vessels to other potential purchasers, so that it was inequitable for Grupo R to seek to resile from that position by purporting to cancel the MOAs.

146. As a further alternative, the Sellers pleaded that Grupo R represented and/or there was a mutual understanding and/or convention that the MOAs would not be cancelled by reason of delays caused by the PGR arrests, alternatively would not be so cancelled without reasonable notice.   They relied upon that representation, convention and/or mutual understanding, in that they agreed not to stand by their cancellation of the MOAs and/or the MAYA MOA and/or they did not market the Vessels to other potential purchasers and/or arranged for works to be carried out to the Vessels at Grupo R's request.  It would therefore be inequitable, in all the circumstances, for Grupo R to cancel the MOAs and/or the MAYA MOA by reason of delay caused by the fact that the Vessels were still under arrest by or the control of the PGR, either at all, or (in the alternative) until a reasonable period after Grupo R had informed the Sellers that they were no longer willing to wait for the Vessels to be released by the PGR.

147. The upshot of these contentions was that the notices of 28 January 2015 were sent prematurely and/or Grupo R were not entitled to send them.

148. Understandably, the irony that this way of pleading the defence contradicted the Sellers' primary argument that the notices were sent too late was not lost on

anyone.  However, we see nothing inherently objectionable in a party pleading alternative cases which may contradict each other.

149. In his Skeleton Argument, Mr Eaton expanded on his case on waiver, explaining that we are concerned here with waiver by election, which arises where a party is in the position of having alternative but inconsistent rights and must choose between them.  A party which has a right to terminate a contract is in such a position, since it may either exercise the right, in which case the contract ends, or choose to treat the contract as continuing, in which case the party is said to *"affirm"*. The choice is irrevocable.

150. In most cases, the party with the right to terminate has genuine freedom which choice to make. But it must make a choice, since the parties' future rights and obligations will be very different depending upon whether the contract is terminated or affirmed: in case of termination, rights and obligations cease to attach to actual performance of the contract and are transferred instead to damages in lieu of performance; in case of affirmation, actual performance remains due.

151. Certainty about the nature of the parties' rights and obligations is essential: the contract cannot remain suspended in some sort of limbo. So, while the party with the right to terminate is given a period of time in which to make a decision, it will be taken to have affirmed if it delays for an unreasonable period without exercising the right to terminate.

152. These principles are most frequently encountered where one party to a contract has a right to terminate for the other party's renunciatory/repudiatory breach. But they are equally applicable in other circumstances in which one party has a right to terminate, since the same analysis that a choice must be made between inconsistent rights arises whether the right to terminate arises by reason of breach or on some other ground.   Thus, a right to terminate for misrepresentation, duress, or undue influence will be lost by delay in exercising it.

153. As for Mr Eaton's case on estoppel by representation, in his Skeleton Argument he noted that there is considerable overlap between waiver and estoppel, since both, in the context of a right to terminate a contract, rest upon an unequivocal

representation by the relevant party that it is not going to exercise the right.  The points of difference between the two are that, first, knowledge is relevant to waiver, but not to estoppel and, secondly, reliance by the party to whom the representation was made is a necessary ingredient of estoppel, but not of waiver.

154. Mr Eaton contended that Grupo R's delay of about 3½ months before purporting to exercise their Cl. 14 rights was more than sufficient to engage these principles: either the rights were lost by reason of an implied term, and/or Grupo R's excessively prolonged failure to exercise them amounted to a representation that it was not going to do so, sufficient to constitute a waiver and/or to ground an estoppel.

155. For evidence on reliance in the context of estoppel, Mr Eaton referred us to Mr Highlands' witness statement to the effect that other potential buyers were interested in the Vessels, and Coastline would have negotiated with these if Grupo R had given timely notice of termination.  Instead, Coastline remained loyal to Grupo R, believing that it remained as committed to the MOAs as they were.

156. Mr Eaton then went on to assert that Grupo R's assertion that the delay was not unreasonable was not credible.  He suggested that, even being generous, a period of 1 month was more than sufficient time for Grupo R to make up its mind whether or not to terminate.  Alternatively, even if the Tribunal considered that this was too short, the concept of a reasonable time cannot legitimately be stretched to cover the period from 5 or 10 October 2014 to 28 January 2015.

157. Mr Eaton then addressed an assertion, pleaded in Grupo R's Reply Submissions, that their reservation of rights of 12 December prevented any waiver or estoppel from arising.  He denied this for two reasons.

158. First, if, as he had already submitted, a reasonable time was 1 month, or, indeed, any time less than about 8 or 9 weeks (i.e., the period from 5 or 10 October to 12 December 2014), then a reasonable time had already expired, and the rights to terminate had already been lost, by the time Grupo R purported to reserve its rights.  On no analysis could a reservation of rights revive rights which had already been lost.

159. Secondly, where the facts would otherwise ground a waiver or estoppel, a party cannot prevent that waiver or estoppel from taking effect by the simple expedient of reserving rights: *Segal v Thoseby [1963] 1 QB 887 @ 897; Bremer v Mackprang [1979] 1 Lloyd's Rep 221 @ 225, 230*.

160. Mr Eaton submitted that in the specific context of waiver or estoppel arising from delay, a party with an accrued right to terminate cannot extend the time for making a decision whether or not to exercise the right beyond what would otherwise be a reasonable time by stating that its failure to announce a decision is without prejudice to its rights: *The 'Antaios' [1983] 2 Lloyd's Rep 473 @ 480*.

161. Mr Eaton also argued that Grupo R's right to terminate the MOAs was qualified by estoppel by convention.  This form of estoppel arises where the parties to a contract have proceeded on the basis of a common understanding or assumption.  One party will be estopped from resiling from that understanding or assumption if to do so would be unjust or unconscionable, typically because the other party has relied upon the understanding or assumption in a way which would make it unjust for the other party to depart from the understanding or assumption.

162. The common assumption or understanding may be either shared by both parties simultaneously or made first by one party and then acquiesced in by the other, provided that it *"passes across the line"* between the parties.

163. The common assumption or understanding may be one of law, rather than of pure fact.  In particular, estoppel by convention can apply to questions of private right under a contract, such that one party will be estopped from relying on a construction of the contract, even if that construction would otherwise be correct, if the parties have acted on the basis of a common assumption or understanding that their contractual rights are different from what they would be under that construction: e.g., *The 'Vistafjord' [1986] 2 Lloyd's Rep 343*.

164. Mr Eaton submitted that the requirements for an estoppel by convention were satisfied in this case based upon the June 2014 events, the key facts being that:

a)   The Sellers, having terminated the MOAs for non-payment of the Deposits on 18 June 2014, and again on 20 June 2014, were persuaded by Grupo R to withdraw those terminations and to treat the MOAs as valid and binding;

b)   The context was, as both parties knew, that the Vessels had been under arrest since March 2014, and it would not be possible for the Sellers to deliver the Vessels under the MOAs while that state of affairs persisted;

c)   The Sellers had proposed, on no fewer than three occasions before they terminated on 18 June 2014 that, given the ongoing delays caused by the arrests, the contracts should be terminated: see the Sellers' messages of 5 and 16 May 2014 and 6 June 2014;

d)   Grupo R, however, had stated its continuing interest in the Vessels, notwithstanding the delays caused by the arrests, and had not wanted to terminate;

e)   Grupo R repeated its interest after 18 June 2014, notwithstanding that the arrests and delays were still continuing, with no definite or even reasonably certain end in sight, and persuaded the Sellers to withdraw their terminations;

f)   The arrests and delays were still continuing, still with no definite or even reasonably certain end in sight, as at 25 June 2014, when the Sellers confirmed that the MOAs remained valid and binding.

165. Drawing on those facts, Mr Eaton argued that a reasonable person, looking objectively at the parties' conduct, would have understood that, whatever Grupo R's strict legal rights might be on the true construction of the MOAs, they would not be able to terminate the MOAs on account of delays caused by the arrest.

166. A significant part of the period between contracting in March 2014 and the Cancelling Dates in October 2014 had already elapsed, and there was no clarity that the Vessels would be released by the Cancelling Dates. The Sellers were clearly concerned about the situation, and had repeatedly expressed their wish to terminate the MOAs because of the arrests.  It would not have made sense to

a reasonable person to think that the parties were reinstating the MOAs in June 2014 on the basis that they might be terminated again, on account of the same ongoing arrest delays, in a few months' time in October 2014: and a reasonable person would have concluded that the parties were conducting themselves on the basis of a common assumption or understanding that Grupo R would not be able terminate on account of delays caused by the arrests.

167. Commenting now on Grupo R's position, Mr Eaton noted that their Reply Submissions had suggested that this interpretation of the parties' conduct was uncommercial, because it involved the possibility that Grupo R, having paid $10M in Deposits, might have been left waiting *"indefinitely"* for the Vessels to be released.

168. This suggestion that the estoppel could have locked the parties into unperformable MOAs until the end of time is, Mr Eaton contended, a bad point. If the arrests had continued *"indefinitely"*, then there would ultimately have come a time at which the law would have treated the MOAs as discharged by frustration. (Since frustration takes effect by operation of law, not by the exercise of a unilateral right of termination conferred upon one of the parties, the estoppel would not exclude frustration.) Grupo R knew this perfectly well, since it relied upon frustration itself as a final backstop basis for its claim to recover the Deposits (see below).

169. Alternatively, Mr Eaton suggested, if a reasonable person would have thought that the estoppel must be subject to some limitation in time, then the true construction of the estoppel was that Grupo R would not be able to terminate on account of delays caused by the arrests without reasonable notice.

170. On that point, Mr Eaton noted that Grupo R's Reply Submissions suggested that they had given reasonable notice before they purported to terminate the MOAs, relying on Grupo R's reservation of rights messages of 12 December 2014.

171. Mr Eaton commented that this suggestion was rather difficult to understand. Those messages asserted that Buyer already had, as at 12 December 2014, existing and accrued rights to terminate (an assertion which, on either construction of the estoppel, was simply wrong) and purported to reserve those rights. But the messages said nothing whatsoever about when, or under what

circumstances, Grupo R would regard themselves as free to exercise the alleged rights.  The messages were not at all in the form of notices to the Sellers that Grupo R intended, at some point in the future, to exercise rights which were, as at the date of the messages, subject to an estoppel.

172. What was necessary, if Grupo R wanted to bring the effect of the estoppel to an end by giving reasonable notice, was a clear statement that they would terminate if the Vessels had not been released or delivered by a specified date falling a reasonable period after 12 December 2014. That would have given the Sellers proper notice of where they stood.  Grupo R did not provide such notices: the messages of 12 December 2014 did not provide the Sellers with any meaningful information about Grupo R's intentions.  As Mr Highlands said in his statement, the subsequent purported terminations of 28 January 2015 came out of the blue.

173. For similar reasons, any suggestion that, if Grupo R's purported terminations on 28 January 2015 were invalid, they validly terminated by their subsequent messages in March-April 2015 was unsound.  None of those documents gave any notice, let alone reasonable notice, of future termination.  On the contrary, they were all backwards looking: Grupo R claimed in them that they had already validly terminated the MOAs on 28 January 2015.  In none of them did they seek to bring the effect of the estoppel to an end by giving advance notice of a future termination.

174. Mr Eaton asserted that the Sellers relied upon the parties' common assumption or understanding by withdrawing their 18/20 June 2014 terminations of the MOAs and agreeing to treat the MOAs as valid and binding.  He referred us, in particular, to Mr Highlands' evidence.

175. He then went on to  note that Grupo R had in their Reply Submissions asserted that the Sellers' terminations of 18 and 20 June 2014 were invalid.  If this was intended to foreshadow a case that the Sellers' withdrawal of the terminations did not constitute sufficient reliance to support an estoppel by convention, then, Mr Eaton stated, that was wrong:

a) The First Set of MOAs had not been replaced by the Second Set by the time the Sellers terminated on 18 June 2014: the Sellers did not receive the Second Set signed by Grupo R until after they had already sent notice of

termination.   The Sellers' termination of 18 June 2014 was therefore effective.

b)    Since the contracts had already been terminated, the Second Set did not take effect when the Sellers received signed versions from Grupo R later on 18 June 2014.  Although the parties ultimately signed three different sets of documents, they were all on the same terms (aside from the substantively immaterial point about whether the buyer would be Grupo R itself or its nominee), and there was in substance only ever a single set of contracts. Those contracts had been terminated before Sellers received the new documents on 18 June 2014.

c)    Even if the Second Set did take effect on 18 June 2014, that did not affect the time for payment of the Deposits.  Time under cl. 2 ran from signing of contracts, not signing of documents.  Again, there was only ever a single set of contracts, and six Banking Days from signing of these had lapsed before 18 and 20 June 2014.  So, even if the Second Set took effect on 18 June 2014, the Sellers' termination on 20 June 2014 was valid.

d)    It does not ultimately matter whether or not the Sellers' terminations were strictly valid.  It is well settled law that foregoing a right which the relevant party believes is valid constitutes good consideration for a contract, even if the right is invalid in law: *'Chitty' @ 4-053.*  By parity of reasoning, foregoing such a right constitutes sufficient reliance to support an estoppel.

### *Grupo R's Case*

176. On these issues, Grupo R started their pleaded case in their Reply Submissions by asserting that the alleged representation/understanding/convention on which the Sellers relied was inadmissible by virtue of the Entire Agreement Clause (cl. 18) in the MOAs which we have quoted above.  We shall address this discrete topic below.

177. Quite apart from that assertion, Grupo R stated that there was no representation, understanding or convention as alleged by the Sellers, whose case involves an obvious *non-sequitur* and leads to absurdity.  The alternative case, that there

54

was a representation, understanding or convention concerned with the needs for reasonable notice failed to take into account the fact that the Sellers had not asserted that anything was said or understood regarding reasonable notice.  In the event, Grupo R did give fair warning of the prospect of cancellation by its messages of 12 December 2014.  There was nothing unfair about Grupo R's exercise of their contractual right.

178. In his Skeleton Argument, Mr Coburn stated that all that the evidence shows was that at this relatively early stage of the overall story (June 2014) Grupo R remained interested in buying the ships. That was common ground.

    a)    The parties never discussed what would happen if hope of release within an acceptable timeframe were to fade away.

    b)    It was impossible to interpret Grupo R's continued interest in the Vessels in June 2014 as giving rise to any kind of representation, etc., about the position seven months later, when the problem of getting the Vessels released had proved intractable and there was the prospect of indefinite delay.

    c)    Grupo R's position throughout was consistent with their ability, in that event, to exercise their right of cancellation.

179. Mr Coburn submitted that the written correspondence did not go beyond the above.  The phone conversation between Mr Mohamed and Mr Maringer on 20 June 2014 added nothing, whichever version of it is accepted:

    a)    The Sellers offered no direct evidence of that call - Mr Maringer had not given any evidence.  Mr Mohamed, by contrast, was giving evidence.  In any event, the documents were usually the best guide.

    b)    Even if the Sellers' second-hand version of the conversation in Mr Highlands' statement were accepted, it would make no difference.  Nothing in that account evidenced the representation, understanding etc. now alleged.

c)     The conversation was followed by the payment of the Deposits by Grupo R and the confirmation by Coastline that the MOAs were *"firm and active"*. There was no reference to any representation etc. such as now alleged.

d)     If there had been any important representation, understanding or convention, somehow restricting Grupo R's right to rely on its contractual rights under the MOA, there would be some record of it in the documents.

180.   It could also be noted that the Sellers' pleaded case referred only to the PGR, whereas their own evidence stated that there were further arrests, after June 2014, attributable to the civil/insolvency aspect. *A fortiori* from the above, there was no evidence of any representation etc. of the sort alleged but extending to any form of arrest.

181.   If it was necessary to go further, Mr Coburn suggested that the following points could be added.

182.   Commercial Absurdity of Primary Case:

a)     The first half of the Sellers' third case – that, come what may, Grupo R had to await release by the PGR - was commercially implausible.  Indeed it had only to be stated to be rejected.  Nothing said by either party at any stage could possibly be interpreted as showing a common understanding that Grupo R would wait indefinitely for the Vessels to be released by the PGR.

b)     The Sellers' case did not rely on any express statement that Grupo R would wait indefinitely – Grupo R obviously said no such thing.  As already stated, Grupo R simply remained interested in the Vessels while there remained hope of release within an acceptable timeframe.  It was impossible to interpret such interest as any kind of representation or understanding that Grupo R would be obliged to tolerate indefinite delay.

c)     Although Grupo R were prepared within reason to lend their assistance in trying to get the Vessels released (for example by arranging meetings with PGR, as mentioned above), there was and could be no suggestion that they

somehow assumed responsibility, let alone sole responsibility, for getting the Vessels released.

183. The Reasonable Notice Alternative:

   a)   The "reasonable notice" alternative implicitly recognised the difficulty of any suggestion that Grupo R were obliged to wait indefinitely.

   b)   While this alternative case did not suffer from the same obvious lack of commerciality, the same fundamental objection remained: the case was based on nothing other than the fact of Grupo R's continued interest in the Vessels while there remained hope of release within an acceptable timeframe.

184. Further, Mr Coburn contended, again no reliance/inequity can be established. The Sellers had pleaded reliance/inequity in relation to (a) not standing by their cancellation; (b) not marketing; (c) arranging for work to be carried out.  In brief as to these:

   a)   The Respondents had not validly cancelled the MOAs. Even if they had, they lost nothing by reinstating them.

   b)   As to "marketing", Mr Coburn noted that the Sellers had not pleaded that any such marketing (even if it had occurred) would have resulted in a consummated sale on good terms; further, if the Sellers could not conclude a contract for the sale of the Vessels with a third party after Grupo R's January 2015 cancellation, there was no reason to think that they would have been able to do so before that, let alone on terms that would have committed a buyer to wait years on end.

   c)   There was no evidence of work being done on the Vessels on the basis of any representation etc.; and in any event the Sellers lost nothing by improving their own Vessels.

185. Reasonable notice was given:

a)   Further, it again remained the case that Grupo R had acted reasonably.  In particular, Grupo R did give reasonable notice prior to cancellation, and thus acted consistently with the representation, understanding or convention alleged.

b)   In fact, the pleader of the Defence on this topic appeared to have been unaware of the notices sent by Grupo R on 12 December 2014.  Those notices gave fair warning of the prospect of cancellation.  Grupo R then allowed an interval of some 1½ months to elapse before actual cancellation. During that period the Respondents offered no update, still less any reason to hold on further.

c)   Thus the idea that Grupo R's cancellation at the end of January 2015 somehow came unfairly out of the blue is unsustainable.  It is also inconsistent with Coastline's reaction, as summarised above. At the time they appeared, unsurprisingly, to be resigned to the cancellation.

d)   For completeness, Grupo R relied if necessary on the further messages communicating their decision to cancel sent on 18 March, 16 and 28 April 2015 and on the Claim Submissions.

e)   In other words if, strictly contrary to Grupo R's primary case, the MOAs were not validly cancelled on 28 January 2015, they were validly cancelled by the subsequent repeated communication of Grupo R's decision to cancel, in particular on 18 March, alternatively 16 April, alternatively 28 April, alternatively 4 September 2015 (the Claim Submissions).

f)   This arose because, even on their own case, the Sellers did not purport to treat Grupo R's 28 January 2015 messages as a repudiation. The Sellers' case as expressed in Mr Highlands' statement was that the alleged "repudiation" was accepted in the Defence Submissions (served October 2015).

g)   Thus the Sellers needed to contend that all the messages communicating Grupo R's decision to cancel were premature and not preceded by sufficient notice that Grupo R was *no longer willing to wait for the Vessels*

*to be released by the PGR*". That, Mr Coburn suggested, was an impossible contention.

### Findings on Waiver/Estoppel

186. Having reviewed the parties' respective submissions, we now set out our conclusions on waiver/estoppel.

187. The first point made by Mr Eaton, as set out in our summary above, is that the doctrine of waiver by election effectively compelled Grupo R to exercise their right to terminate under cl. 14 within a reasonable period after it arose (on 5 and 10 October 2014), failing which they were taken to have affirmed the MOAs. We have to reject this contention.

188. First, it contradicts our finding that, on the true construction of the MOAs, the parties had agreed that Grupo R had until the tender of delivery of the Vessels to decide whether or not to cancel; further, that there was no implied term that they had to cancel within a reasonable period of time after the Cancelling Dates had passed. We do not see how the doctrine of waiver by election can be deployed to defeat the parties' agreement.

189. Secondly, were we wrong in rejecting the implied term argument, we have found that in any event the notices of cancellation of 28 January 2015 were served before a reasonable time for serving such notices had expired and we see no basis for applying a different test in determining what a reasonable time was for the purposes of waiver by election.

190. Next, Mr Eaton argued that Grupo R's right to cancel was lost by reason of their delay of about 3½ months before purporting to exercise their Cl. 14 rights, which was more than sufficient to trigger estoppel by representation. We do not accept that this was a delay which can form the basis of estoppel when, as we have found, it was perfectly justified under the terms of the MOAs. No balanced assessment of Grupo's conduct and communications could justify any inference that were, in effect, saying that they would not exercise their Cl. 14 rights.

191. As there was no relevant representation, it becomes irrelevant to assess whether there is any basis for finding that there was reliance on the Sellers' part. Nonetheless, we are satisfied that Mr Highlands' evidence, to which Mr Eaton referred us, provided no cogent basis for any such finding.  That evidence, as to the strength of the market and the potential for selling the Vessels to *"many interested buyers"*, failed to convince us, not least because there was a complete absence of any communications between the parties, let alone the Sellers and interested buyers, relevant to the topic in the critical period of the immediately following the Cancellation Dates.

192. Furthermore, the Sellers offered no evidence as to their attempts to market the Vessels after the MOAs were cancelled on 28 January 2015 or of any radical change in market conditions between, say, the first two weeks of November 2014 (i.e. when, according to the Sellers' case, the reasonable period to cancel expired) and 28 January 2015 which might explain the lack of such attempts. The Chairman questioned Mr Highlands about this at the close of his evidence but Mr Highlands' answer failed to enlighten us.

193. The only specific mention in Mr Highlands' witness statement as to marketing possibilities at the relevant time was:

> *I believe we would only have been able to release the vessels quicker if we had agreed to sell them to a Mexican company like the Aleman Group.*

194. Mr Coburn put this to Mr Highlands in cross-examination:

> *Overall it is unrealistic, isn't it, to suggest that at either of those stages, June or October, you would have been able not only to agree but also perform a sale to a third party?*

Mr Highlands answered:

> *I disagree.  In June we had offers from parties who were prepared to take the risk of the vessels' further detention as part of any purchase price.  They would buy the vessels as is, where is, which would effectively mean this whilst the vessels would have remained under arrest the owners would be able to sell them.  And that was specifically said to us.*

Mr Highlands did not answer as to the position in October, but he had the following further exchange with Mr Coburn:

> *Q.  You didn't want to do a deal with the Aleman family, did you?*
>
> *A.  For honourable reasons.  Were we being presented, under the scenario under 109, where the Aleman family would buy us out, for want of a better choice of words, and would assume the risk of lifting the arrest because of their political connections.  The downside was no doubt they would wish to get a discounted price in exchange for their actions. In answer to your question did we want to do a deal with them, no we didn't.  We didn't like the honour code and the behaviour of being forced to do that.  Was it a bad idea to reject*

60

> *their offer, which would have taken cash out of the situation? In retrospect possibly. But at the time we didn't want to deal with basically a blackmailing party.*
>
> *Q. They never made any firm offer, did they?*
>
> *A. They never made a firm offer at that stage because after an exploratory talk we were quite categoric we didn't want to deal with them on principle. Subsequent to that they have came back and made us an offer recently.*

195. The upshot appeared clear to us: the only potential buyers specifically mentioned by Mr Highlands were not, in fact, a viable option for the Sellers. In conclusion on this aspect, therefore, if, despite our contrary finding, Grupo R's failure to exercise their cl. 14 cancellation rights promptly amounted to estoppel by representation, the Sellers did not rely upon it.

196. We can deal briefly with Mr Eaton's denial of Grupo R's contention that their reservation of rights of 12 December prevented any waiver or estoppel from arising. First, contrary to Mr Eaton's case, we have found that the reservation of rights of 12 December was not sent after a reasonable period had already expired, so the impossibility of reviving lost rights does not arise. Secondly, as we have found that the facts do not ground a waiver or estoppel, the principle that a party cannot prevent that waiver or estoppel from taking effect by the simple expedient of reserving rights becomes moot. Finally, the reservation of rights of 12 December did not extend the accrued right to terminate beyond what would otherwise be a reasonable time because, as we say, that right in any event remained extant as at the notices of cancellation of 28 January 2015.

197. As for Mr Eaton's argument that Grupo R's right to terminate the MOAs was qualified by estoppel by convention, to our mind the clearest evidence of the lack of the common assumption or understanding alleged by the Sellers was their lack of protest at either the reservation of rights of 12 December 2014 or the notices of cancellation of 28 January 2015 themselves or the subsequent communications from Grupo R's solicitors. If the Sellers had genuinely understood that, whatever Grupo R's strict legal rights might be on the true construction of the MOAs, they would not be able to terminate the MOAs on account of delays caused by the arrest (or, as their secondary case, would not be able to terminate without reasonable notice), that lack of protest is wholly inexplicable. Indeed, Mr Highlands' attempt to explain it was unsatisfactory.

198. We do not accept Mr Eaton's enumeration of the key facts on which he relied to satisfy the requirements for an estoppel by convention.

a)   The termination for non-payment of the Deposits on 18 June 2014 was the termination of the First Set of MOAs, not with Grupo R but with their Portuguese nominees.   From the surrounding circumstances, it is abundantly clear to us that the termination was part and parcel of the novations of the MOAs taking place at the time: evidently, and rightly, the Sellers did not wish to have the First Set extant when the intention was to replace them with the Second Set.

b)   The termination of 20 June 2014 was in reality not for non-payment of the Deposits but rather a negative reaction to Mr Mohamed's proposal the previous day for amendments to the MOAs.   Regardless of the motive for the termination, there is no evidence that the Sellers were persuaded to withdraw the termination of the Second Set on the strength of a representation or promise by Grupo R or a common assumption or understanding that Grupo R would not exercise its express rights to cancel if delivery did not take place by the Cancelling Dates in contracts which had only just been signed a week earlier.   The evidence is that the sole *quid pro quo* for the reinstatement of the MOAs was the immediate payment of the Deposits.

c)   Although the context certainly was, as both parties knew, that the Vessels had been under arrest since March 2014, and it would not be possible for the Sellers to deliver the Vessels under the MOAs while that state of affairs persisted, we have seen nothing to persuade us that this context was tantamount to a common assumption or understanding that, come what may, and despite the express terms of the Second Set of the MOAs, just signed, Grupo R were committed to not cancelling, and therefore to not recovering the Deposits, however long the arrests of the Vessels might continue.   To reach a contrary conclusion would require compelling evidence, which is simply not there.

d)   Similar comments apply to the fact that the Sellers had proposed on three occasions before they terminated on 18 June 2014 that the MOAs be

terminated.  Given the non-payment of the Deposits, they were on those occasions fully entitled to terminate whether Grupo R agreed or not. Accordingly, they were fully entitled to, but did not, seek to impose a condition upon their agreement to maintain the MOAs in force, namely that Grupo R could not cancel, and therefore recover the Deposits, however long the arrests of the Vessels might continue.

e)      Grupo R's expressions of continuing interest in the Vessels, notwithstanding the delays caused by the arrests, and of their desire not to terminate, were a million miles from establishing a common assumption or understanding that, come what may, and despite the express terms of the Second Set of the MOAs, just signed, they were committed to not cancelling, and therefore to not recovering the Deposits, however long the arrests of the Vessels might continue.

f)      Similar comments apply as at 25 June 2014, when the Sellers confirmed that the MOAs remained valid and binding.

199.   Mr Eaton submitted to us that the common assumption or understanding for which he contended would not have implied an indefinite commitment to the continued existence of the MOAs because there would ultimately have come a time at which the law would have treated the MOAs as discharged by frustration. We were not convinced: he suggested that Grupo R knew this perfectly well, since it relied upon frustration itself as a final backstop basis for its claim to recover the Deposits.  That does not mean that the concept of frustration was part of the common assumption or understanding of the parties in June 2014.  To put it at its mildest, we strongly suspect that it was not.

200.   It follows that we do not accept Mr Eaton's submission that it would not have made sense to a reasonable person to think that the parties were reinstating the MOAs in June 2014 on the basis that they might be terminated again, on account of the same ongoing arrest delays, in a few months' time in October 2014.  What, we suggest, would have made sense, would be for a person in the Sellers' position who thought as Mr Eaton contends would not have given Grupo R an unqualified option to cancel in the terms of cl. 14 when concluding and signing the Second Set of MOAs.

201. Our above observations concern Mr Eaton's primary position on estoppel by convention.  His alternative position was that, if a reasonable person would have thought that the estoppel must be subject to some limitation in time, then the true construction of the estoppel was that Grupo R would not be able to terminate on account of delays caused by the arrests without reasonable notice.  Although this has the merit of a less absolutist, and therefore less uncommercial, approach, we see nothing in the evidence which might justify it any more than the primary position.  However, even if we had been satisfied on that point, we agree with Mr Coburn, and disagree with Mr Eaton, as to the effect of the Grupo R's reservation of rights messages of 12 December 2014.

202. Mr Eaton said that what was necessary, if Grupo R wanted to bring the effect of the estoppel to an end by giving reasonable notice, was a clear statement that they would terminate if the Vessels had not been released or delivered by a specified date falling a reasonable period after 12 December 2014. That would have given the Sellers proper notice of where they stood.  Grupo R did not provide such notices: the messages of 12 December 2014 did not provide the Sellers with any meaningful information about Grupo R's intentions.

203. We regard this as unrealistic and uncommercial.  The messages of 12 December 2014 were clear (and therefore reasonable) notices that Grupo R regarded themselves as entitled, as of then, to cancel the MOAs and recover the Deposits, that they expressly reserved their right to exercise that entitlement and that delay in so exercising did not constitute waiver of that right.  Given that we have already found that Grupo R indeed had that right, we regard the messages as clear warning that the right might be exercised in the future.  We see no reason why, to be valid reasonable notice for the purposes of Mr Eaton's common assumption or understanding, it was necessary to say more: the tenor of the messages was that such common assumption or understanding (were it to have existed, despite our finding to the contrary) no longer held good and cancellation might occur at any time.

204. The only question on Mr Eaton's alternative case then would be: was the time elapsed between the giving of the reservation of rights notices on 12 December 2014 and the giving of the cancellation notices on 28 January 2015, i.e. 47 days,

reasonable notice?  To put it another way, had the cancellation notices been given the next day, on 13 December 2014, would that have been reasonable notice?  In the context, probably not; but we have no hesitation in finding that 47 days was reasonable notice.  Equally, we do not accept Mr Highlands' assertion that the notices of 28 January 2015 *"came out of the blue"*; had that been his reaction at the time, we can only repeat our previous observations: why did he not protest?

205. In view of our above findings, it is unnecessary for us to comment on the legal effect of Grupo R's subsequent messages.

206. In conclusion on this part of the case, **WE FIND** that Grupo R did not waive their right to terminate the MOAs under cl. 14 or at all and/or represent that they were not going to do so; further, that Grupo R did not represent and/or there was no mutual understanding and/or convention that the MOAs would not be cancelled by reason of delays caused by the PGR arrests, alternatively would not be so cancelled without reasonable notice.

### *Entire Agreement Clause*

207. In view of our above finding, the final argument on waiver/estoppel raised by Grupo R does not arise.  Nevertheless, for the sake of completeness we address it.

208. As we mentioned above, Grupo R started their pleaded case in their Reply Submissions by asserting that the alleged representation/understanding/ convention on which the Sellers relied was inadmissible by virtue of the Entire Agreement Clause (cl. 18).

209. In his Skeleton Argument, Mr Eaton argued that Grupo R's reliance on this provision was misconceived.

210. First, he submitted, while the meaning and effect of any clause ultimately depends upon the true construction of its particular wording, the generally understood function of an entire agreement clause is to preclude a party from trawling through the pre-contractual negotiations to try to build a case based on collateral contract or terms otherwise agreed outside the contractual text.

211. As such, an entire agreement clause looks backwards, to the pre-contract stage. The wording of cl. 18, with its reference to superseding agreements *"previous"* to the MOAs and to no reliance at time of contracting, confirms that it is backwards looking.  But, Mr Eaton submitted, the Sellers' estoppel case was not based on any pre-contractual events: it was focussed on events in June 2014, well after the time of contracting.

212. Mr Eaton continued that it was no answer that the parties signed the Third Set in July 2014.  What was relevant for cl. 18 was the date of contracting, not the date of signing a particular document: again, there was in substance only ever a single set of contracts, concluded well before the Third Set was signed in July 2014. And in any event, the parties, as they were free to do, dated the Third Set 21 March 2014.  Since that was the date which the parties selected as the effective date, that was the date by reference to which cl. 18 took effect.  Again, the Sellers' estoppel case was not based on events before that date.

213. Secondly, Mr Eaton contended that the wording of cl. 18 was ineffective to exclude estoppel by convention in any event.  Estoppel by convention is based upon a common assumption or understanding, not on a unilateral representation or promise by the party which is estopped: *'Chitty' @ 4-108*.  Accordingly, the Sellers' case was not based upon any *"statement, representation, assurance or warranty"*.   Nor was it based on any *"agreement"*: if there had been an agreement, there would have been a collateral contract or a contract term otherwise agreed outside the text.

214. Mr Eaton stated that it was established in this respect that an entire agreement clause, unless it contained suitable specific wording, will not exclude claims based upon rectification or misrepresentation: *'Chitty' @ 3-061 & 7-145/6*. The same principle applied in relation to estoppel by convention: e.g., *Shoreline v Mears [2013] EWCA Civ 639@ Para 17.*

215. We understand the crux of Mr Eaton's first point to be that as the date of contracting was 21 March 2014 and the events relied upon for the Sellers' estoppel case occurred after that date, the entire agreement clause simply does not "bite" because, as he says, it looks backwards, to the pre-contract stage. Thus, it appears to us, the point stands or falls on the question whether there

66

was a single date of contracting, namely 21 March 2014 or whether there was a new date of contracting when the Second Set was concluded, alternatively when the Third Set was concluded.

216. Dealing with the latter alternative first, although the issue did not appear to be fully argued before us, we can certainly see a viable argument in favour of the contention that the Third Set did not amount to fresh contracts, newly entered into.  Neither party had purported to terminate or cancel the Second Set and on the evidence before us the Third Set came into existence for two reasons only, first, so that Grupo R would have signed originals of the MOAs and, secondly, to make a minor technical correction with regard to the MARANGO.  Accordingly, for present purposes, and without making a firm finding on the point, we are inclined to disregard 16 July 2014 (the date on which the Third Set came into existence).

217. The position with the Second Set, on the other hand, appears to us quite different.

218. In the first place, the buyers named in the Second Set were different legal entities from those named in the First Set, so the suggestion that there was contractual continuity from 21 March 2014 would appear incorrect.

219. In the second place, although the Second Set first came into existence on 16/18 June, the Sellers' own pleaded case, right or wrong, was that it only survived for a few days before they cancelled it, only to reinstate it later.  Specifically:

a)   they sent notices of cancellation for failure to pay the deposits on 20 June,

b)   Grupo R sought to have the MOAs "*reinstated*",

c)   Mr Mohamed asked Mr Maringer to persuade the Sellers to permit the MOAs to be "*reinstated, notwithstanding the fact that the Sellers had cancelled them*", and

d)   On 23 June 2014, the Sellers notified Grupo R that if the Deposits were remitted within the stated deadline, "*the Sellers would consider the*

*Agreements to be valid and in force; and if not, the Agreements would be terminated*".

Furthermore, in his submissions on estoppel by convention, Mr Eaton expressly made it part of his argument that the Sellers terminated on 20 June.

220. Our understanding of that pleaded case is that at that time the Sellers regarded the MOAs as contractually terminated but capable of reinstatement, and that reinstatement happened after the sequence of matters constituting representation and/or mutual understanding and/or convention on which the Sellers relied for their estoppel case had ended.  Whether that pleaded case represented a correct legal analysis does not appear to us to matter: if it was the Sellers' understanding that they were reinstating the MOAs on 25 June 2014 (when they had received the Deposits and the MOAs became "*firm and active*"), it is that understanding which in our estimation is relevant for present purposes. In any event, such understanding was certainly arguably correct: the Sellers had indisputably cancelled the MOAs and Grupo R's conduct in requesting their reinstatement signified acceptance of the reality of such cancellation.

221. Mr Eaton also contended that the consensual dating of the MOAs 21 March 2014, the application of cl. 18 must be viewed by reference to that date.  The mere fact that the parties retained that date in all three Sets of the MOAs does not detract from the fact that the Second Set, and *a fortiori* the Third Set, were in reality concluded, and in the case of the Second Set reinstated, at the later dates which we have indicated.

222. Thus far, we have addressed the first point made by Mr Eaton.  The second point was that the wording of cl. 18 was ineffective to exclude estoppel by convention in any event.  That is a matter of construction.  Mr Eaton referred us to a wealth of authority.  We certainly accept that Mr Eaton has an arguable case on the point.  However, a discussion of the authorities which would do justice to the point would appear to us to be disproportionate, given that it would have no bearing on the outcome in view of our finding that there was no estoppel by convention.

## FRUSTRATION

223. References have been made above to frustration.  The doctrine of frustration first arose in Grupo R's Reply Submissions, when they argued that even if their cancellations were invalid, the MOAs were frustrated by delay prior to any acceptance by the Sellers of any repudiation by Grupo R, and Grupo R accordingly remained entitled to the return of the Deposits on the basis of a total failure of consideration and/or pursuant to section 1(2) of the Law Reform (Frustrated Contracts) Act 1943.  Given our finding that the cancellations were valid, and the fact that Mr Coburn did not expand on this topic in his Skeleton argument, we do not propose to explore it.

## THE COUNTERCLAIM

224. Although, as stated above, on 1 February 2016 we ordered that quantification of the counterclaim be deferred, the parties asked us to address one matter of principle.  Given that our findings on liability defeat the  counterclaim, we shall address the points raised only fairly briefly.

225. The matter of principle concerns cl. 13 of the MOAs.  To repeat, this says:

    *13. Buyers' default*
    *Notwithstanding anything herein to the contrary, should Buyers fail to* [sic] *any of its obligations under this Agreement, Sellers shall have the right to cancel this Agreement and to retain the Deposit … , which shall be Sellers sole and exclusive remedy.*

226. Had we found in the Sellers' favour on their substantive defences, Mr Eaton accepted that their sole and exclusive remedy for the exercise of their <u>contractual</u> right to cancel was indeed the retention of the Deposits.  However, he submitted that this did not impact upon the Sellers' <u>common law</u> right to treat Grupo R's breach (had we found that there was such a breach) as a repudiation and to terminate under common law – and to claim damages accordingly, as well as being entitled to a declaration that the Sellers were entitled to retain the Deposits.

227. In reply, Mr Coburn pointed out that the wording of cl. 13, quoted above, does not appear in the standard form.  We would comment here that the standard printed wording of cl. 13 of the Norwegian Saleform includes the following words, which were deleted from the MOAs by the parties:

69

> *If the Deposit does not cover their loss, the Sellers shall be entitled to claim further compensation for their losses and for all expenses incurred together with interest.*

Without drawing our attention to that fact, Mr Coburn commented on the words used in cl. 13 as follows:

> *They obviously make this a different regime from the standard-form regime, and the clear intention is that the sellers cannot advance a claim based on a proposition that we failed to perform, one that we repudiated and that was accepted, and get damages over and above the retention of the deposit, said to be their sole and exclusive remedy.*

228. On this point, Mr Eaton relied on *Chitty* at §22-049 and on the Court of Appeal decision in *Griffon Shipping LLC v Firodi Shipping Ltd (The 'Griffon')* [2014] 1 Lloyd's Law Reports 471.   In our view, neither authority supports Mr Eaton's position: neither addresses the position where, as here, (a) the parties have expressly and unambiguously excluded any remedy other than the retention of the Deposits, and (b) such exclusion is expressed to extend to Grupo R's failure "*to [perform]*[13] *any of its obligations under this Agreement*".   *The 'Griffon'* was a case where the buyers of a vessel under an MOA failed to pay the deposit by the agreed deadline and the sellers held them in repudiation, cancelled the MOA and claimed the deposit; the buyers asserted that the sellers were only entitled to damages, being the difference between the contract and market price.   For present purposes, we do not need to discuss the Court of Appeal judgment at length: suffice it to say that it was held that the sellers were entitled to the deposit. The key passage in the judgment of Tomlinson LJ is at the start of paragraph 10 @ p.475 of the report, which reads:

> *The basic fallacy in this argument is that limb 1 of clause 13 does not prescribe what is to happen if the deposit is unpaid.   It does no more than afford to sellers an express contractual right or rights exercisable in the event that the deposit is not paid.   These contractual rights are to be distinguished from those which arise under the general principles governing discharge by breach…*

In our case, on the other hand, cl. 13 <u>does</u> prescribe what is to happen if Grupo R fail to perform any of their obligations, namely, the Sellers can keep the Deposits – no more and no less.   *The 'Griffon'* can be clearly distinguished for this reason.

229. Mr Eaton accepted that the Sellers only expressly accepted Grupo R's repudiation when serving their Defence and Counterclaim Submissions.

---

[13] We have inserted the word "*perform*", which clearly was omitted from the clause as a result of a typographical or clerical error.

However, he argued that acceptance of repudiation did not have to be in any particular form and sometimes inactivity in the face of a repudiation may suffice. He relied on the decision of the House of Lords in *The 'Santa Clara'* [1998] AC 800. Again, we take the view that this decision can be distinguished from our case. It is authority for the proposition that an act of acceptance of a repudiation requires no particular form: it is sufficient if the relevant communication or conduct clearly and unequivocally conveys to the repudiating party that the aggrieved party is treating the contract as at an end. Further, a failure to perform may sometimes signify to a repudiating party an election by the aggrieved party to treat the contract as at an end.

230.  In our case, until service of the Defence and Counterclaim Submissions there was no communication from the Sellers which clearly and unequivocally conveyed to Grupo R that the Sellers were treating the MOAs as at an end; nor was there a failure to perform which so signified: the continuing failure to perform after 28 January 2015 signified nothing, given that it was no different from the failure to perform before that date. This may be contrasted with, for example, the situation where, following the buyer of a ship renouncing the MOA by declaring an inability to pay, the seller does not present delivery documents the form of which had been agreed with the buyer and which were to have been presented the day after the renunciation.

231. Furthermore, when in the Defence and Counterclaim Submissions the Sellers conveyed to Grupo R that they were treating the MOAs as at an end, they did not do so in terms of accepting Grupo R's repudiation; instead, they expressly invoked their right to cancel under cl. 13 and, accordingly, their entitlement under their Counterclaim, had we found in their favour, would be restricted to the retention of the Deposits, as expressly provided for in cl. 13.

232. On a different point, Mr Coburn argued that on *The 'Golden Victory'* principles, damages would be assessed at nil or nominal anyway, given that the MOAs would have been frustrated at some point prior to any obligation to pay, given the very protracted delay. Mr Eaton submitted that this issue should not be considered at this stage and we agree with him.

233. In conclusion, were we to have found in favour of the Sellers on liability, **WE FIND** that their entitlement under their Counterclaim would have been to a declaration that they were entitled to retain the Deposits.

## INTEREST

234. Having found that Grupo R is entitled to the release of the Deposits, we address the question of its entitlement to interest.

235. Cl. 14 of the MOAs entitled Grupo R to "*interest earned, if any*".  By the time of the hearing, the Sellers had not furnished an account of any such interest and at the conclusion of the hearing we directed that such account be provided.  On 23 May 2019, Grupo R's solicitors reported to us that the Sellers' solicitors had advised that "*… the two accounts in which it is said that the deposit sums have been held are non-interest bearing and, therefore, no interest has been earned on the deposits*".  The next day, we ordered the Sellers to provide evidence of this.  They then produced bank statements showing that the bank accounts credited with the Deposits were indeed non-interest bearing.  However, the statements also showed that some of the funds were transferred out of the accounts and no information was given as to what happened to them and, specifically, whether interest was earned in some other account or accounts. Grupo R's solicitors observed:

> *We note that the Respondents have provided excerpts of bank statements from OCBC Bank and DBS Bank which appear to show receipt of the two deposits of US$ 5 million. However, the bank statements also show that much of the money was withdrawn within a very short time after being deposited. By way of example, the OCBC Bank statement (Caballo Maya deposit) shows that in less than 7 days between when the deposit was received on 24 June 2014 to 30 June 2014, almost US$1.5 million was withdrawn. Furthermore, by 31 December 2014, only US$15,169.58 remained of the US$5 million deposit. No information/evidence has been provided as to where these sums were transferred and whether any interest was earned on these transferred sums in their new location(s).*

> *We also note that MFB state that the bank statements for the two bank accounts show that both were non-interest bearing. The OCBC and DBS Bank statements simply shows that no credit interest was paid – not necessarily that the bank accounts were non-interest bearing.*

We directed the Sellers to provide full evidence which would enable us to determine whether any interest had been earned on the Deposits.  They responded:

> *(1) the deposits were spent by them over time on day-to-day business expenses, and (2) the deposits were not in whole or in part transferred into interest-bearing accounts.  It*

72

*follows that the deposits earned no interest in the period from 24 June 2014 to 28 January 2015 or the period thereafter.*

For their part, Grupo R maintained their position that we determine that Grupo R were entitled to discretionary interest pursuant to s.49 of the Arbitration Act 1996 throughout the period from the Deposits being placed on 23 June 2014 to date.  We are of the view that different considerations apply, on the one hand, to the period before the cancellation of the MOAs and, on the other, to the period after that cancellation.  We address the second period below.  As to the first, the parties expressly agreed that Grupo R were in these circumstances to receive "*interest earned, if any*" – no more and no less.  We are bound by that agreement.  In the face of the Sellers' statement that no interest was earned, supported by the bank statements referred to above and the further response, quoted above, to our direction, we have no choice but to decline to award interest on the Deposits from the date on which they were paid to the date of cancellation of the MOAs.

236. When on 28 January 2015 Grupo R cancelled the MOAs and demanded the immediate refund of the Deposits together with interest earned, if any, the contractual provision with regard to interest thereupon ceased to apply: from that point, or rather, in our estimation two days later to allow time for the Sellers to comply with the demand, the Sellers were in breach and accordingly are liable to pay interest.  In accordance with s.49 of the Arbitration Act 1996, **WE FIND** that the justice of the case renders it appropriate to award interest at the rate of 4.5% p.a., such interest to be compounded with quarterly rests, from 30 January 2015 until the date of payment.

## COSTS

237. As the Claimants Grupo R has been completely successful, it is appropriate that we award and direct that the Sellers bear their own costs and pay Grupo R its legal costs in both references on the basis for which section 63(5) of the Arbitration Act 1996 provides, such costs to be assessed by us if not agreed, and we expressly reserve our jurisdiction for that purpose.

238. It also follows that the Sellers bear the fees of the Tribunal, split equally between the two references.

73

We hereby certify that the foregoing 73 pages are a true and complete copy of the Reasons for our Award dated 30 May 2019.

DATED and made in London 26TH June 2019

..............................
SARRA KAY

..............................
SIMON GAULT

..............................
DAVID LUCAS

74